# EXHIBIT 4

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Charge No. 161A300109

| | | |
|---|---|---|
| ISAAC WILLIAMS, JR.<br>Complainant | ) | |
| | ) | |
| v. | ) | RESPONDENTS' STATEMENT OF POSITION |
| | ) | |
| DAVID L. BABSON & COMPANY and MASSMUTUAL FINANCIAL GROUP,<br>Respondents | ) | |

This Statement of Position is filed on behalf of respondents David L. Babson & Company Inc. ("Babson") and Massachusetts Mutual Life Insurance Company ("MassMutual") (misnamed in the Charge of Discrimination as MassMutual Financial Group) (collectively, "the Respondents") in response to the Charge of Discrimination ("Charge") filed by Isaac Williams, Jr. ("Mr. Williams"). Babson and MassMutual deny that Mr. Williams was discriminated against because of his race. Mr. Williams went out on medical leave during an investigation of a complaint of inappropriate conduct made against him and never returned to work. Mr. Williams made no complaint of discrimination during his more than four-year tenure as a MassMutual and Babson employee, nor was there any basis for him to do so. For the reasons set forth below, the EEOC should find no reasonable cause to infer discrimination and should dismiss Mr. Williams' Charge.

## I. Mr. Williams Left Work During the Investigation of a Complaint Against Him of Inappropriate Conduct

The principal allegation in Mr. Williams' Charge is that he left his position as Director of Corporate Communications at Babson because of stress caused by discrimination based on race. In fact, Mr. Williams left the workplace and did not return

immediately following an April 26, 2002 meeting with Susan A. Moore, Babson's Director of Human Resources, and Larry N. Port, Senior Vice President & Deputy General Counsel of MassMutual, concerning a complaint of inappropriate conduct made against Mr. Williams by T.J. ("Ms. J."), an African American student attending the University of Virginia ("University"), whom Mr. Williams met when he was at the University as a representative of Babson and its parent company, MassMutual.

The events that led up to Mr. Williams' meeting with Ms. Moore and Mr. Port were as follows. Beginning in or around 2000, MassMutual had put substantial time and resources into developing a relationship with the University. Senior officers of MassMutual, including MassMutual's Chief Executive Officer, had participated in recruiting efforts. Minority recruitment was one of MassMutual's specific goals at the University. On February 26, 2002, Mr. Williams was at the University, as a representative of Babson and its parent, MassMutual, to interview potential applicants for employment and to be a guest speaker in a class that MassMutual sponsored. Most of the participants in this class were foreign students or members of minority groups considering majors in the University's School of Commerce. Ms. J. attended the class at which Mr. Williams spoke.

On or around March 27, 2002, Caroline Mandeville, College Relations Manager for MassMutual, who was overseeing MassMutual's recruiting at the University, received a telephone call from James McBride, a member of the University's career services organization. Mr. McBride told Ms. Mandeville that the University had received a complaint from Ms. J. that she had been the target of inappropriate communications from Mr. Williams. Mr. McBride told Ms. Mandeville that the University was taking the

allegations as very serious. He said that Mr. Williams should never return to the University on behalf of MassMutual or be on campus for any reason, and that a letter of apology from MassMutual would be necessary. Mr. McBride provided Ms. Mandeville with copies of e-mails from Mr. Williams to the student as well as a memorandum summarizing telephone calls Mr. Williams made to her.

Those documents showed that:

- **On March 21, 2002**, Mr. Williams sent Ms. J. an e-mail asking for a telephone number where he could reach her. Ms. J. provided a telephone number by e-mail. According to Ms. J., Mr. Williams telephoned her three times on March 21st. The first time, he asked her to meet him in New York City for lunch. He asked where she lived and whether her boyfriend would be angry if they met. He told Ms. J. that he had wanted to speak with her after his February 26, 2002 presentation at the University, but he did not want Caroline to know. (Mr. Williams presumably was referring to Caroline Mandeville, who also was present during the class.) He told Ms. J. that he knew there was something different about her. He mentioned during the conversation that he was going to close his office door. According to Ms. J., Mr. Williams called her twice more on March 21st and left messages, but she did not return his calls. Also on this date, Mr. Williams sent Ms. J. an e-mail indicating that it had been great talking to her. She responded: "same here. Talk to you soon."
- **On March 22, 2002**, Mr. Williams sent Ms. J. an e-mail message saying: "Hope to see you soon."

- **On March 25, 2002,** Ms. J. indicated that Mr. Williams called her again. Mr. Williams asked about the man who answered the phone and said he thought perhaps he should have hung up. He said he told the person who answered the phone that he was from MassMutual so the person would not think anything. Mr. Williams told Ms. J. that he went to New York a lot and asked when he was going to see her. Ms. J. became uncomfortable during this conversation.
- **On March 26, 2002**, Mr. Williams sent Ms. J. an e-mail asking her to send him a picture of herself via e-mail.

At this point, Ms. J. called one of her teachers because she was concerned about the e-mails and other communications from Mr. Williams. On March 27, 2002, Ms. J. met with her teacher, D. M. ("Ms. M."), and they reviewed Mr. Williams' communications with Ms. J. Ms. M. drafted an e-mail that Ms. J. sent to Mr. Williams directing him to stop all communications with Ms. J. and referring him to Ms. M. with any questions. (Copies of the documents the University sent to MassMutual are attached hereto as Exhibit 1.)

On March 27, 2002, following Mr. Williams' receipt of the e-mail from Ms. J. directing him to stop communicating with her, Mr. Williams arranged to meet with Deborah Wojcik, an Assistant Vice President at MassMutual with responsibilities for overseeing MassMutual's executive and college recruiting efforts. Mr. Williams told Ms. Wojcik that he had "screwed up." Mr. Williams was visibly shaken. He was crying. He told Ms. Wojcik that he thought he was supposed to stay in touch with students he had met at the University to encourage their interest in Babson and MassMutual. He said that he thought that one of these students had misinterpreted his efforts to stay in touch with

her. Mr. Williams asked Ms. Wojcik what he should do. Ms. Wojcik said that she could not keep confidential what Mr. Williams had told her and that she would get back to him. Ms. Wojcik counseled Mr. Williams to have no further contact with the complaining student.

On March 27 or 28, 2002, after Mr. Williams met with Ms. Wojcik, Ms. Mandeville told Ms. Wojcik about the telephone call from Mr. McBride and gave Ms. Wojcik the documents that Ms. Mandeville had received from the University. Ms. Wojcik called Mr. McBride, who again emphasized that Mr. Williams must not return to the University. Ms. Wojcik apologized to Mr. McBride, told him how important the relationship with the University was to MassMutual and assured Mr. McBride that Mr. Williams would never be at the University again as a representative of Babson or MassMutual. Mr. McBride said that Ms. J. had been assured that she would not see Mr. Williams again. On or around April 3, 2002, Ms. Wojcik telephoned Mr. Williams and reiterated that he was to have no further communications with anyone at the University in his capacity as a Babson employee and he was not to be at the University as a representative of Babson or MassMutual. Mr. Williams asked what would happen to him. Ms. Wojcik told Mr. Williams that the matter had been turned over to Ms. Moore, that she did not know what would happen but that she thought, at a minimum, a letter of reprimand would be appropriate.

On April 8, 2002, at Mr. Williams' initiative, he met with Stuart H. Reese, Chairman and Chief Executive Officer of Babson, and Executive Vice President and Chief Investment Officer of MassMutual, concerning Ms. J.'s complaint. Mr. Reese referred Mr. Williams to Ms. Moore, who met with Mr. Williams the same day.

Mr. Williams was very upset and was crying. He told Ms. Moore that he could not sleep and that this was "eating him up." Mr. Williams said he would take the blame for crossing the line and getting too personal. Mr. Williams admitted to three or four telephone calls and three or four e-mails to Ms. J. He said he had not told his wife about the complaint. He asked whether his past three years and his good performance would count. Ms. Moore told Mr. Williams that she would need more information about the complaint and would need to meet with Mr. Williams and ask some questions before a decision could be made about Mr. Williams' employment situation.

Between April 8 and April 26, 2002, Ms. Moore took steps to investigate the complaint against Mr. Williams. She spoke with Ms. Mandeville about Mr. Williams' trip to the University and Ms. Mandeville's communications with Mr. McBride. She spoke with Ms. Wojcik about Ms. Wojcik's communications with the University and Mr. Williams and obtained copies from Ms. Wojcik of the documents that the University provided. At Ms. Moore's request, computer security employees searched the hard drive on Mr. Williams' Babson computer for e-mails to Ms. J.[1] Ms. Moore also tried (unsuccessfully) to get records of telephone calls to the University from Mr. Williams' Babson telephone extension.

On April 26, 2002, Ms. Moore and Mr. Port met with Mr. Williams to give him an opportunity to present information concerning Ms. J.'s complaint. Mr. Williams' account of events did not appear consistent with the information that the University had sent to MassMutual. Mr. Williams said he could not remember any comments he had made that might have upset Ms. J. He said that he had gotten in touch with Ms. J. to see

[1] A compliance guide distributed to all Babson employees notifies employees that all electronic messages on the company's information systems are considered company records and that the company reserves the right to access those records.

if she had found a job. He denied asking Ms. J. to meet him in New York and said that he had asked Ms. J. for her picture so that he could get a caricature of her. Mr. Williams was asked to think about anything else he might remember over the weekend and to call with any additional information. Mr. Williams never returned to the workplace after April 26, 2002. Following the April 26, 2002 meeting with Mr. Williams, the decision was made to proceed with, and accelerate the timing of, a previously planned elimination of Mr. Williams' position.[2] That decision was never communicated to Mr. Williams because, on April 29, 2002, Babson was informed by Mr. Williams' physician that Mr. Williams would be absent from work for an indefinite period because of stress. He never returned to the workplace.

Contrary to Mr. Williams' claims in the Charge, the apparent precipitating factor for the stress and disability claimed by Mr. Williams was an investigation into a complaint by an African American student that Mr. Williams' communications with her had been inappropriate. These facts do not support Mr. Williams' claim that any stress or disability that he suffered was attributable to allegations in his Charge. For this reason, the EEOC should dismiss Mr. Williams' Charge.

## II. Mr. Williams' Complaints About Alleged Discriminatory Treatment Lack any Basis in Fact

### 1. Background

Mr. Williams was hired by MassMutual, effective February 16, 1998, as a special assistant to the company's Chief Investment Officer, Gary Wendlandt. Mr. Wendlandt

[2] Mr. Williams had previously been informed, on March 13, 2002, that his position was being eliminated but that he would have four to six months to find another position within the MassMutual family of companies. After the April 26th meeting, the decision was made to proceed immediately with the elimination of Mr. Williams' position because any disciplinary measure imposed based on Mr. Williams' involvement with Ms. J. would limit his ability to find another position with MassMutual and would be a negative on his employment record.

left MassMutual on April 30, 1999 and was succeeded as Chief Investment Officer by Mr. Reese. On or around December 1, 1999, MassMutual's Investment Management organization merged with Babson, an existing subsidiary of MassMutual, and Mr. Williams became a Babson employee. Babson is an investment management company registered with the Securities and Exchange Commission with offices in Springfield and Cambridge, Massachusetts and is one of MassMutual's investment subsidiaries.

On or around October 2, 2000, Mr. Williams was assigned to the newly created position of Director of Corporate Communications, reporting to Edward Bickford, Director of Client Services. In this position Mr. Williams was responsible for all advertising, website design and media relations, and was the point person for all press and media contact. In addition, Mr. Williams had responsibilities for in-house communications, such as improving communications between the Springfield and Cambridge offices and organizing in-house events, such as meetings for Babson's managing directors. Mr. Bickford's office is in Cambridge. Mr. Williams' office was in Springfield.

**2. Mr. Bickford Set Reasonable Objectives and was Fair in his Assessment of Mr. Williams' Performance**

In December 2000 and January 2001, Mr. Bickford and Mr. Williams discussed and set the key business objectives and priorities for Babson's Communications Department, for which Mr. Williams was responsible. There is no record that Mr. Williams complained at the time that the priorities set for the Communications Department were "unrealistic" or "unobtainable," nor were they unrealistic or unobtainable. Mr. Bickford had worked in the past for another organization with a public

relations officer who had duties and responsibilities similar to those that Mr. Bickford established for Mr. Williams and who had met the expectations of her job.

Mr. Bickford was balanced in his assessments of Mr. Williams' performance and his criticisms were based largely on objective factors. On or around February 1, 2001, Mr. Bickford reviewed Mr. Williams' performance during his first four months as Director of Corporate Communications for Babson. Mr. Bickford noted Mr. Williams' strengths, including good people skills, an orientation towards success, enthusiasm and hard work. Mr. Bickford noted, however, that Mr. Williams needed to improve his focus and set priorities appropriately, improve his familiarity with Babson products and markets, and improve in the area of timely completion of projects. (A copy of Mr. Williams' February 1, 2001 performance feedback form is attached hereto as Exhibit 2.)

Throughout 2001, Mr. Williams and Mr. Bickford had regular status meetings. On several occasions, Mr. Bickford discussed with Mr. Williams concerns that Mr. Bickford had with specific aspects of Mr. Williams' performance. In Mr. Williams' performance evaluation for 2001, Mr. Bickford noted that Mr. Williams continued to work hard and show enthusiasm for Babson and his position. The evaluation, however, reflected that Mr. Williams had not completed certain key projects by the established deadlines. For example, Mr. Bickford had to take over the responsibility for completing a Babson brochure. The deadline for completion of the project was not met because Mr. Williams did not work effectively with an outside vendor. Progress on the Babson website, one of the major projects for which Mr. Williams was responsible in 2001, was not satisfactory. The content on the website was not updated regularly, and the goal of

putting client information on the website was not met. In addition, feedback from Babson employees on internal communication events organized by Mr. Williams was not positive. (Copies of January 18, 2002 performance feedback forms completed by Mr. Williams and Mr. Bickford are attached hereto as Exhibit 3.) Throughout the reporting relationship, Mr. Bickford's evaluations of Mr. Williams were based on objective factors and fairly reflected Mr. Williams' performance.

**3. Babson Did Not Discriminate Against Mr. Williams in Terms of Compensation**

Mr. Williams' claim in his Charge that Mr. Bickford tried to have Mr. Williams "denied any bonus at all" is untrue. In February 2001, four months after Mr. Williams began reporting to Mr. Bickford, Mr. Williams received a bonus of $45,000 (for work in 2000) and, effective April 1, 2001, a 4.3 % salary increase of $4,200 (for a new base salary of $103,000). As Mr. Williams' immediate manager at the time, Mr. Bickford had input into the compensation decisions concerning Mr. Williams' raise in 2001 and the bonus paid to him in 2001. According to MassMutual's compensation records, these were the largest salary increase and bonus that Mr. Williams received during his tenure with MassMutual and Babson. In 2002, because of Mr. Williams' disappointing performance, Mr. Bickford's manager initially recommended that Mr. Williams receive no bonus for work in 2001. Mr. Bickford felt that Mr. Williams merited a bonus and, based on input from Mr. Bickford and others, Mr. Williams received a $15,000 bonus for work done in 2001 (paid in 2002).

**4. There was no Decision to Terminate or Demote Mr. Williams Until the Complaint was Made by Ms. J.**

Mr. Bickford did not "la[y] a foundation for [Mr. Williams'] demotion and/or termination" as alleged in the Charge. In or around January or February 2002, Kevin McClintock, Mr. Bickford's manager, and Mr. Bickford recommended to Mr. Reese that the position of Director of Corporate Communications for Babson be eliminated because, as the position had evolved, it was not meeting the needs of the business. The goal for internal communications was shifting towards more technical communications about new products, and Babson had not clearly defined its external communication goals. Mr. Reese agreed that the position of Director of Corporate Communications for Babson was not meeting the needs of the organization and should be eliminated.

On or around March 13, 2002, Mr. Reese met with Mr. Williams and explained that his position was going to be eliminated.[3] Before this March 13th meeting, Mr. Reese had already spoken with two executive officers at MassMutual about an alternative position for Mr. Williams. Both of these individuals agreed to help Mr. Williams find a position within the MassMutual family of companies. During the meeting, Mr. Reese indicated that Mr. Williams' lack of technical knowledge in the investment world would make it difficult to place Mr. Williams in another position at Babson. Mr. Reese told Mr. Williams that he (Mr. Reese) had spoken with two executive officers at MassMutual who had agreed to help Mr. Williams find other opportunities with MassMutual or one of its subsidiaries. Mr. Reese told Mr. Williams that this conversation was intended to give Mr. Williams a "heads up" on what Mr. Reese was contemplating and that, for the next

[3] The position at Babson of Director of Corporate Communications has been eliminated and a number of the functions that Mr. Williams performed are no longer being done. Glenda Berry, Mr. Williams' former assistant in the Communications Department, has been reassigned.

four to six months, Mr. Williams would report directly to Mr. Reese working on special projects. Until MassMutual and Babson were informed of Ms. J.'s complaint against Mr. Williams, senior executives at Babson and MassMutual were committed to finding Mr. Williams a new position.

Mr. Williams received special consideration in connection with the planned elimination of his position. The usual policy for Babson and MassMutual with respect to position elimination is to give the affected employee sixty days pay in lieu of notice or provide a sixty-day notice period during which the employee may use MassMutual's job post system to seek another position. If the employee does not find another position within sixty days, then the employee is terminated, paid severance benefits consistent with the terms of an employee benefit plan, and may be offered outplacement services. Because MassMutual desired to retain Mr. Williams as an employee, Mr. Reese offered Mr. Williams an extended four to six month period to find an alternative position. Additionally, other executive officers of MassMutual promised to assist Mr. Williams with finding a new position. At the time, Mr. Williams indicated he was pleased with the arrangements that had been made to find another position for him within the MassMutual family of companies. After Mr. Williams spoke with Mr. Reese, Mr. Williams met with Ms. Moore. Mr. Williams told Ms. Moore that he felt good about his discussion with Mr. Reese and that he believed there were better opportunities for him within the MassMutual enterprise. No decision was made to terminate (or demote) Mr. Williams until MassMutual and Babson were apprised of, and had investigated, the circumstances of Ms. J.'s complaint against Mr. Williams.

### 5. Mr. Williams' Newly Contrived Claims concerning Inappropriate Comments are Vague and Indefinite and Cannot Support Claims Against the Respondents

Mr. Williams alleges that Mr. Bickford referred to him as "boy" and was condescending and that other employees "have referred to Mr. Bickford as a racist." It is difficult to respond to these allegations because Mr. Williams has failed to provide any specific information, such as dates, the frequency of any such alleged communications or the context in which allegedly objectionable comments were made. Mr. Williams has not identified any witness to this alleged conduct, nor has he identified the "other employees" who supposedly referred to Mr. Bickford as a racist. Mr. Bickford does not recall any instance in which he referred to Mr. Williams as "boy" and is certain he did not do so repeatedly. No other Babson employee has made a complaint about inappropriate conduct by Mr. Bickford, nor has any other Babson employee substantiated Mr. Williams' allegations. Mr. Williams never made a complaint of discrimination during his employment with MassMutual and Babson. As Babson's Director of Human Resources, Ms. Moore has responsibility, with other members of MassMutual's Corporate Human Resources Department, for ensuring compliance with Babson's equal employment opportunity and anti-harassment policies. Babson employees were informed by numerous communications of those policies and of the avenues available to them for redress if they believed that any violation of those policies had occurred. In or around February 2002, Mr. Williams spoke with Ms. Moore about his dissatisfaction with his January 18, 2002 performance evaluation and what he anticipated receiving in terms of bonus and compensation increase. Mr. Williams did not, during this conversation or in a subsequent March 13, 2002 conversation with Ms. Moore, allege that Mr. Bickford had made discriminatory statements to him or made employment decisions based on race.

Mr. Williams' allegations that "other African-American executive-level employees have been terminated and/or resigned over the last two years" are so vague that neither Babson nor MassMutual reasonably can be expected to respond to them. With respect to the percentage of executive employees who are members of minority groups, EEO-1 forms filed by MassMutual and its subsidiaries with the Equal Employment Opportunity Commission for the years 1995 to 2002 show that from six to eight percent (6-8%) of officials and managers are members of minority groups identified on the EEO-1 form.

**III. Conclusion**

Because there is no basis for concluding that Mr. Williams was subjected to discrimination on the basis of race that caused him to leave the workplace, Respondents request that the Commission find no reasonable cause to infer discrimination and dismiss Mr. Williams' Charge.

The Respondents
DAVID L. BABSON & COMPANY INC.
and MASSMUTUAL FINANCIAL GROUP
By Their Attorneys:

Dated: January 24, 2003

[signature]

Francis D. Dibble, Jr.
BBO No. 123220
Katherine A. Robertson
BBO No. 557609
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA 01115-5507
Tel: (413) 781-2820
Fax: (413) 272-6804

# EXHIBIT 1

Communication with Isaac Williams:

Not sure how he got your email address and not sure how he knew her last name.

Phone Call on 3/21:
Request that she meet him in NY for lunch.
Asked where she lives.
"If I meet up with you, your boyfriend isn't going to be mad."
"Wanted to talk to you after the presentation, but I left quickly and didn't want Caroline to know."
Asked where she was from and mentioned "I knew there was something different about you."
"Let me close my office door."

Tried to call back twice on 3/21.
Left a message.
She didn't call back.

Phone Call on 3/25 at 10:00am:
"There was a guy that answered the phone and I thought maybe I should hang up."
"I just said I was from MassMutual so that he wouldn't think anything."
(At this point, she started to get uncomfortable and began responding with just yes or no)
Asked about going to church.
"When am I going to see you. I go to NY a lot."

Communication with Student and Denise:
Received call from Student on Tuesday, 3/26 at 5:15 pm
Expressed her concern with correspondences/communications with Mr. Williams.

Met with Student on Wednesday, 3/27 at 9:30am
Drafted an email to send to Mr. Williams (please see attached.)

Denise responded to two phone calls from Mr. Williams concerning this situation on 3/27.
Denise followed up with Dean of McIntire Students Services, Rebecca Leonard and Allison Tewcles in McIntire's External Affairs Division (primary point of contact for MassMutual).



Reply | Reply to all | Delete | Show full headers | <- Read previous
Forward | Read next ->

**From:** "Williams, Isaac" <IWilliams@DLBabson.com>
**To:** [redacted]' <[redacted]@cms.mail.virginia.edu>
**Time:** Thu, 21 Mar 2002 12:58:54 -0500
**Subject:** RE:

It was great talking with you. IW

-----Original Message-----
From: [redacted] [mailto:[redacted]@cms.mail.virginia.edu]
Sent: Thursday, March 21, 2002 11:59 AM
To: Williams, Isaac; '[redacted]@virginia.edu'
Subject: Re:

REDACTED

You can call me at 434-963-4791 . If you don't reach me there you can leave a message for me at 434-243-3871 and I will get back in touch with you ASAP.

-[redacted]



Reply | Reply to all | Delete | Show full headers | <- Read previous
Forward | Read next ->

Reply | Reply to all | Delete | Show full headers | <- Read previous
Forward | Read next ->

**From:** "Williams, Isaac" <IWilliams@dlbabson.com>
**To:** @virginia.edu' <@virginia.edu>
**Time:** Thu, 21 Mar 2002 09:16:00 -0500
**Subject:** ?

REDACTED

Please give me a number where I can call you. If you forgot, I am the individual that gave the presentation on personal finances. Please respond.

Isaac Williams Jr.
Director of Corporate Communications





Reply | Reply to all | Delete | Show full headers | <- Read previous
Forward | Read next ->

**From:** "Williams, Isaac" <IWilliams@DLBabson.com>
**To:** '[redacted]' <[redacted]@cms.mail.virginia.edu>
**Time:** Fri, 22 Mar 2002 12:28:18 -0500
**Subject:** RE:

Hope to see you soon

-----Original Message-----
From: [redacted] [mailto:[redacted]@cms.mail.virginia.edu]
Sent: Thursday, March 21, 2002 5:02 PM
To: Williams, Isaac
Subject: RE:

same here. Talk to you soon
-[redacted]

--

REDACTED

Reply | Reply to all | Delete | Show full headers | <- Read previous
Forward | Read next ->



Reply | Reply to all | Forward | Delete | Show full headers | << Read previous | Read next >>

**From:** "Williams, Isaac" <IWilliams@DLBabson.com>
**To:** '[redacted]' <[redacted]@cms.mail.virginia.edu>
**Time:** Tue, 26 Mar 2002 13:49:43 -0500
**Subject:** RE:

HOW ARE YOU TODAY? CAN YOU SEND ME A PICTURE VIA E-MAIL?

-----Original Message-----
From: [redacted] [mailto:[redacted]@cms.mail.virginia.edu]
Sent: Thursday, March 21, 2002 5:02 PM
To: Williams, Isaac
Subject: RE:

same here. Talk to you soon
-[redacted]

--

REDACTED

Reply | Reply to all | Forward | Delete | Show full headers | << Read previous | Read next >>

From: <█@cms.mail.virginia.edu>

To: IWilliams@DLBabson.com

Address book... LDAP search

Cc:

Address book... LDAP search

Bcc:

Address book... LDAP search

Subject: Request

Attachments: (No attachments) Add attachment... Remove marked attachments

Mr. Williams,
I am requesting that ALL communications f rom you to me cease from this point forward. It is my opinion and that of my COMM 200 Instructor, Ms. D█ M█, that your communication with me has been of an inappropriate nature and there fore, I have become increasingly uncomfortable with these correspondences. If you fail to honor this request and continue to contact me, I will pursue the necessary channels to ensure my right to privacy. If you have any questions concerning this request, contac t Ms.M█ to discuss your concerns at 434.924.7937.

█

REDACTED

Save a copy

Send Save draft Cancel Spell check american

**Jim McBride**

From: "M[redacted], D[redacted]" <[redacted]@forbes2.comm.virginia.edu>
To: <mcbride@virginia.edu>
Sent: Thursday, March 28, 2002 1:03 PM
Subject: FW: Request

Jim,
Thanks for your phone call. This document wasn't included with the others and I thought you might like to have it as well. It's the apology email Mr. Williams sent to the student.
Thanks,
D[redacted]

-----Original Message-----
From: Williams, Isaac [mailto:IWilliams@dlbabson.com]
Sent: Wednesday, March 27, 2002 11:09 AM
To: '[redacted]@virginia.edu'
Subject: FW: Request

FYI

-----Original Message-----
From: Williams, Isaac
Sent: Wednesday, March 27, 2002 11:09 AM
To: '[redacted]@cms.mail.virginia.edu'
Subject: RE: Request

REDACTED

[redacted], let me first apologize for what has transpired. I have spoken with D[redacted] and also apologized to her. It was not my intention to make you feel uncomfortable. As I explained to D[redacted] some students have stayed in contact with me after my visit. I will honor your wish. I wish you great success as you continue your education and career. Good luck finding a summer job. Again, am sorry for any inconvenience this may have caused you.

-----Original Message-----
From: [redacted]@cms.mail.virginia.edu [mailto[redacted]@cms.mail.virginia.edu]
Sent: Wednesday, March 27, 2002 9:44 AM
To: Williams, Isaac
Subject: Request

Mr. Williams,
I am requesting that ALL communications from you to me cease from this point forward. It is my opinion and that of my COMM 200 Instructor, Ms. D[redacted] M[redacted], that your communication with me has been of an inappropriate nature and therefore, I have become increasingly uncomfortable with these correspondences. If you fail

to honor this request and continue to contact me, I will pursue the necessary channels to ensure my right to privacy. If you have any questions concerning this request, contact Ms.M[redacted] to discuss your concerns at 434.924.7937.

[redacted]

REDACTED

03/28/2002


UNIVERSITY of VIRGINIA
University Career Services
POWERED BY monsterTRAK.com
View Contacts
New Contact
Export List
Caroline Mandeville, College Recruiting
cmandeville@massmutual.com
*On-Grounds Recruiting Coordinator
MASS MUTUAL FINANCIAL GROUP
1295 State Street, F031
Springfield, MA 01111
Phone: (413) 744-6816
FAX: (413) 744-6297
Edit
Primary Contact
[To delete this contact, first set a new Primary Contact.]
Contact Notes:
2/7 Updated contact info.
New Contact
Export List
monsterTRAK
© 2002

# EXHIBIT 2

FINAL

1 of 1

## CORPORATE COMMUNICATIONS OFFICER FEEDBACK FORM

~~PMO~~ CC O: IW Date Reviewed: 2/1/01

Reviewer: EB

Scale: 1-2 Substantial improvement needed; 3-4 Below average; 5-6 Meets expectations; 7-8 Exceeds expectations; 9-10 Clearly outstanding

1.) **Product and Market Knowledge:** shows a thorough understanding of DLB products and the various markets in which they are being sold. 4

2.) **Communication Skills:** displays strong verbal and written communication skills; has a sense of what the various audiences need to hear and the frequency of contact; creative. 6

3.) **Media Familiarity:** understands what media forums are effective and has developed close contacts with these groups; proactive approach. 4

4.) **Project Management:** well organized and exhibits a keen sense of how projects are completed in a timely fashion; able to set priorities for day-to-day tasks. 4-5

5.) **Teamwork:** promotes a team-oriented environment by helping others; works well with all areas of company especially sales, client service and investment professionals. 9

Clear strengths:

- enthusiastic
- works hard
- good people skills
- success oriented

Areas to Improve:

- more focus (fewer distractions)
- need to complete projects in a timely fashion
- prioritize work load (too many miscellaneous projects)
- familiarity of DLB products and markets

# EXHIBIT 3

3

## CORPORATE COMMUNICATIONS OFFICER FEEDBACK FORM

CCO: IW Date Reviewed: 1/18/02
Reviewer: EB

| Scale: | | | | |
|---|---|---|---|---|
| 1-2 | Substantial improvement needed | | 7-8 | Exceeds expectations |
| 3-4 | Below average | | 9-10 | Clearly outstanding |
| 5-6 | Meets expectations | | | |

1.) **Product and Market Knowledge:** shows a thorough understanding of DLB products and the various markets in which they are being sold. 2

2.) **Communication Skills:** displays strong verbal and written communication skills; has a sense of what the various audiences need to hear and the frequency of contact; creative. 3

3.) **Media Familiarity:** understands what media forums are effective and has developed close contacts with these groups; proactive approach. 6

4.) **Project Management:** well organized and exhibits a keen sense of how projects are completed in a timely fashion; able to set priorities for day-to-day tasks. 4

5.) **Teamwork:** promotes a team-oriented environment by helping others; works well with all areas of company especially sales, client service and investment professionals. 6

Clear strengths:
- enthusiastic
- enjoys people
- works hard

Areas to Improve:
- does not have sufficient understanding of Babson's business, both target markets and specific products
- needs to significantly improve frequency and type of communication between Springfield and Cambridge offices
- needs to be more proactive in making certain assignments are completed on a timely basis

MM000139

IW & Communications 1/18/02

## CORPORATE COMMUNICATIONS OFFICER FEEDBACK FORM

PMO: ____________ Date Reviewed: ________

Reviewer: ____________

Scale: 1-2 Substantial improvement needed
3-4 Below average
5-6 Meets expectations
7-8 Exceeds expectations
9-10 Clearly outstanding

1.) **Product and Market Knowledge:** shows a thorough understanding of DLB products and the various markets in which they are being sold. 5

2.) **Communication Skills:** displays strong verbal and written communication skills; has a sense of what the various audiences need to hear and the frequency of contact; creative. 9

3.) **Media Familiarity:** understands what media forums are effective and has developed close contacts with these groups; proactive approach. 7

4.) **Project Management:** well organized and exhibits a keen sense of how projects are completed in a timely fashion; able to set priorities for day-to-day tasks. 6

5.) **Teamwork:** promotes a team-oriented environment by helping others; works well with all areas of company especially sales, client service and investment professionals. 10

Clear strengths:

(c) Solicits more information to fully understand other's views
(c) Presents recommendations for improving communication
(m) Aligns efforts w/ organizational goals + objectives
(m) Demonstrates urgency and enthusiasm around critical issues
Provides logical, compelling rationale for ideas.
Able to link objectives + plans to business initiatives

Areas to Improve:

Become more comfortable with uncertainty
Engage more in conflicting viewpoints
Leveraging my communication skills to better acknowledge the perspectives of others.
Need to drive issues forward and push for closure

MM000140