UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 03-CV-11470 MAP

| | | |
|---|---|---|
| ISAAC WILLIAMS, JR., | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| MASSACHUSETTS MUTUAL LIFE | ) | BABSON'S STATEMENT |
| INSURANCE COMPANY (a/k/a | ) | OF MATERIAL FACTS |
| MASSMUTUAL FINANCIAL GROUP) | ) | NOT IN DISPUTE |
| and DAVID L. BABSON & COMPANY, INC. | ) | |
| (a/k/a DAVID L. BABSON AND COMPANY), | ) | |
| Defendants | ) | |

## I.    Introduction

Pursuant to Local Rule 56.1 of the Local Rules of the Federal District Court for the

District of Massachusetts, the defendant, Babson Capital Management, LLC (previously known

as David L. Babson & Company) ("Babson"), submits the following statement of material facts

of record as to which there is no genuine issue to be tried.  As is set forth in the accompanying

memorandum of law in support of Babson's Motion for Summary Judgment, the undisputed

facts related to plaintiff's claim mandate summary judgment for Babson.

## II.    Statement of Material Facts

**1.    Plaintiff's Employment with Babson**

1.    Plaintiff Isaac Williams, Jr. is African-American.  (Verified Complaint

("Complaint"), ¶ 8.)

2.    Plaintiff was hired by Massachusetts Mutual Life Insurance Company

("MassMutual") as a Second Vice President in MassMutual's Investment Management Division

beginning on or around February 16, 1998.  (Complaint, ¶ 9.)

3.      According to plaintiff, from the time he first worked at MassMutual through the fall of 2000, his performance evaluations were positive, and he received raises and bonuses comparable to those received by his colleagues.  (Complaint, ¶12.)

4.      On or around January 1, 2000, MassMutual's investment management organization was merged into Babson.  Plaintiff became an employee of Babson on or around this date.  (Deposition of Isaac Williams, Jr. ("Williams Depo."), p. 76; Deposition of Stuart Reese ("Reese Depo."), p. 30.)  (Relevant portions of the Deposition of Isaac Williams, Jr. are attached hereto as Exhibit 1.  Relevant portions of the Deposition of Stuart Reese are attached hereto as Exhibit 2.)

5.      On or around October 2, 2000, plaintiff assumed the newly created position of Director of Corporate Communications for Babson, reporting to Edward Bickford, Director of Client Services.  (Williams Depo., p. 85 & Exh. 5.)

6.      Babson's announcement of the position stated that plaintiff would have responsibilities for advertising, website design and media relations, and would be the point person for all press and media contact.  (Williams Depo., p. 85 & Exh. 5.)

7.      In addition, plaintiff had responsibilities for improving internal communications among Babson's employees.  (Deposition of Edward Bickford ("Bickford Depo."), p. 38.) (Relevant portions of the Deposition of Edward Bickford are attached hereto as Exhibit 3.)

8.      From October 2000 through mid-March 2002, the time during which plaintiff reported to Mr. Bickford, plaintiff's office was in Springfield, Massachusetts.  Mr. Bickford's office was in Cambridge, Massachusetts.  Plaintiff saw Mr. Bickford in person once or twice a month.  He communicated with Mr. Bickford primarily by telephone.  (Williams Depo., p. 182.)

**2.       Plaintiff's Allegations Related to Discrimination Based on Race**

9.       Plaintiff's testimony about the use of allegedly offensive language in the

workplace was as follows:

Q:  Tell me each and every occasion on which you say Mr. Bickford called you "boy"?
Could you do that?

A:  There were several occasions, counselor.

Q:  Could you please describe each occasion on which you say that Mr. Bickford called
you "boy"?

A:  Each occasion?

Q:  Yes.

A:  I don't know how to answer that because there was several occasions.

Q:  How many is several?

A:  A lot.

Q:  How many?

A:  Twenty-five, fifty times.

Q:  When is the first time you say this occurred?

A:  Right after I started working for him and he said, "that's a good boy."  It really
shocked me.  I finished a project or something and he said "that's a good boy."
It just . . . .

Q:  When do you say this occurred?

A:  After I completed one of my first projects with Mr. Bickford.

Q:  I'm asking for the date, Mr. Williams.

A:  Counselor, I can't give you the exact date.

Mr. Reilly:  Just answer to the best of your recollection.

The witness:  Sometime in 2000.

Q: (BY MS. ROBERTSON):  Where were you when you say this remark was made to you?

A:  In Cambridge.

Q:  What project do you say you had completed?

A:  I can't remember the exact project, I'm sorry.  It was a project

Q:  What general project was it?  In general, what project?

A:  I can't remember.

. . .

Q:  When is the next occasion on which you say Mr. Bickford referred to you as "boy"?

A:  It was a part of his conversation so everything was "that's a good boy."  It could be in the course of a conversation, "that's a good boy."

Q:  Is it your testimony that every time he used the word "boy," he used it in the context of "that's a good boy"?

A:   That was a lot of it, "that's a good boy"; yes.

Q:  Was there ever any other context in which he used the term "boy"?

A:  Not to my recollection.

Q:  Do you ever recall him saying – do you say he ever said this in front of anyone else, Mr. Williams?

A:  Not that I can recall.

Q:  When is the most recent occasion on which you say Mr. Bickford said "that's a good boy" to you?

A:  Most recent?

Q:  Most recent?

A:  It would have been before I left MassMutual.

Q:   Before you left Babson?

A:  Babson, MassMutual.

Q: How long before you left Babson?

A: I don't recall.

Q: You don't have any idea?

A: I don't.

Q: Did it happen in 2002?

A: It could have.

Q: But you don't recall?

A: No.

. . . .

Q: Can you recall any specific occasion out of what you say were twenty-five to fifty occasions on which Mr. Bickford used this phrase "that's a good boy" to you?

A: Counselor, as I answered before, that was a part of his conversation with me. That's just the way Ed spoke to me. I cannot think of an instance. I can just think of numerous times in conversations of this condescending attitude of "that's a boy." Can I think of a time or an incident, I told you after a project, but he could say "that's a good boy" –

Q: (Interposing): You can't think of any specific occasion, any specific event?

A: I said no, counselor.

Q: You said that.

A: I said that.

(Williams Depo., pp. 91-99.)

10.    Plaintiff has not alleged that Mr. Bickford ever used any other word or term other than "that's a good boy" that plaintiff believed was inappropriate based on race. (Williams Depo., p. 172.)

11.    Plaintiff never told Mr. Bickford that Mr. Bickford's use of the phrase "good boy" was offensive to plaintiff. (Williams Depo., p. 267.)

12.      Plaintiff alleged that Mr. Bickford treated him differently than other employees by looking over his shoulder and critiquing everything plaintiff did.  (Williams Depo., p. 173.)

13.      When asked to identify a specific individual whom he alleged had been treated differently than him, plaintiff responded that he could "not give names.  There were several managing directors."  Asked again if he could give the name of anyone whom he alleged had been treated differently than him, plaintiff said "no."  (Williams Depo., pp. 173-174.)

14.      Plaintiff does not allege that anyone employed by Babson or MassMutual other than Mr. Bickford ever said anything to him that he considered offensive based on race. (Complaint, ¶¶ 14-15.)

15.      Mr. Bickford gave plaintiff a performance evaluation in January 2002 that, according to plaintiff, was the worst performance evaluation that plaintiff ever received. (Complaint, ¶¶ 19-20.)

16.      Plaintiff alleged in his complaint that Babson and MassMutual had a practice of treating African-American employees differently and seeking to get rid of them by a "pretextural [sic] use of their employment reviews and procedures."  (Complaint, ¶ 43.)

17.      When plaintiff was asked whether he could identify anyone other than himself at Babson whom he claimed was subjected to this "policy of content-based treatment of African-American employees through the pretextural use of employment reviews and procedures," he answered:  "It could be, but I'm not aware of it."  Plaintiff admitted that as to Babson, the allegation applied only to himself.  (Williams Depo., p. 358.)

18.      Plaintiff identified eight to ten former employees of MassMutual whom he alleged had knowledge of discriminatory treatment on the basis of race in the workplace.  As to each of these former MassMutual employees, plaintiff admitted that the individual's only

knowledge of alleged discrimination against any Babson employee would be knowledge of

alleged discrimination against himself.  He further admitted, as to each of these former

MassMutual employees, that any knowledge any such individual had about alleged

discrimination against plaintiff was based on what plaintiff himself had told the individual.

(Williams Depo., pp. 242, 246, 254, 256, 258, 263, 266, 276, 358.)

### 3.    Decision to Eliminate Plaintiff's Position

19.    In or around February 2002, Babson decided that plaintiff's position would be

eliminated.  (Rule 30(b)(6) Deposition of Babson ("Babson Depo."), p. 8.)  (Relevant portions of

the Rule 30(b)(6) Deposition of Babson are attached hereto as Exhibit 4.)

20.    The decision to eliminate plaintiff's position was made collaboratively by Kevin

McClintock, a managing director of Babson with responsibility for sales, marketing, client

services and equities management, and Stuart Reese, Chief Executive Officer of Babson, based

on the needs of Babson at the time and the role and skill set that plaintiff had relative to Babson's

needs at the time.  (Babson Depo., pp. 10-12; Reese Depo., pp. 57-59.)

21.    Mr. McClintock believed, in early 2002, that some of the functions that had been

assigned to plaintiff were not required at that time, those being public relations, advertising, and

some community relations work.  Mr. McClintock further believed that some of the functions,

such as event planning, could be reassigned to other employees, and that plaintiff did not have

the skill set necessary to manage the further development of Babson's website.  (Babson Depo.,

p. 18).

22.    In Mr. Reese's view, it was unlikely, in early 2002, that Babson would have a

continuing need for the kind of job that plaintiff was doing for at least a period of time because

Babson needed to evolve before it had a strong need for communications with the outside world.

Mr. Reese also felt that the structure for internal communications had been created and had become an administrative function. (Reese Depo., p. 58.)

23.    On or around March 13, 2002, Mr. Reese told plaintiff that plaintiff's position would be eliminated, that plaintiff would remain a Babson employee for four to six months to give him time to find another position within the MassMutual family of companies, and that he would, during this period, report directly to Mr. Reese. (Williams Depo., p. 179; Reese Depo., pp. 83-84; Complaint, ¶44.)

24.    Babson's usual practice with respect to a position elimination is to provide a 60-day notice period to the employee, during which the employee can network and seek an alternative position within the company. (Deposition of Susan Moore ("Moore Depo."), pp. 27-28.) (Relevant portions of the Deposition of Susan Moore are attached hereto as Exhibit 5.)

25.    Babson planned to provide plaintiff with a four to six month period before his position was eliminated because Mr. Reese was interested in giving plaintiff as much opportunity and support as possible to find another position within the MassMutual family of companies. (Moore Depo., pp. 28-29; Deposition of Nancy Roberts, pp. 29-30.) (Relevant portions of the Deposition of Nancy Roberts are attached as Exhibit 6.)

26.    During his deposition, plaintiff contended that Babson did not eliminate his position in 2002, and that Babson actually had an employee (other than himself) with the title Director of Communications in 2002 and 2003. (Williams Depo., p. 339.)

27.    Plaintiff based this allegation on an e-mail he said he saw in 2002. (Williams Depo., p. 339.)

28.    In discovery, plaintiff identified Albert Rocheteau as the individual whom he alleged had been hired to replace him in 2002. Mr. Rocheteau joined Babson as Director of

8

Institutional Marketing Promotion (not Director of Corporate Communications) on or around

May 8, 2002.  (Bickford Depo., p. 210 & Exh. 20.)

29.    Mr. Rocheteau's responsibilities at the time of hire included the development of

technical marketing materials for presentation to Babson's institutional clients, including

advertising copy, and maintaining and enhancing Babson's website in terms of format and

content.  (Bickford Depo., pp. 213-220 & Exh. 20; Babson Depo., pp. 25-27.)

30.    Mr. Rocheteau is African-American.  (Bickford Depo., pp. 20, 23-27.)

31.    In or around January 2004, Babson hired Marty McDonough as a new Director of

Corporate Communications.  (Babson Depo., p. 32.)

32.    Babson hired Mr. McDonough after an intensive internal review concerning the

development and corporate direction of Babson, under the direction of Williams Glavin, who

joined Babson as Chief Operating Officer in Spring 2003.  Mr. Glavin was responsible for

building and developing Babson's distribution, operations, systems and finance areas.  (Affidavit

of Jacqueline Maurer, ¶¶ 2-4.)  (The Affidavit of Jacqueline Maurer is attached hereto as

Exhibit 7.)

### 4.    Plaintiff's Departure from the Workplace

33.    On or around February 26, 2002, plaintiff visited the University of Virginia as a

representative of Babson and MassMutual to interview potential applicants for employment and

to be a guest speaker in a class that MassMutual sponsored.  (Williams Depo., p. 278.)

34.    Plaintiff was asked to take on this assignment by a Babson colleague who was

unable, for personal reasons, to travel to Virginia.  (Williams Depo., p. 278.)

35.    While plaintiff was at the University of Virginia, he met a female, African-

American student, T.J., and obtained her e-mail address.  (Williams Depo., pp. 282-283.)

36.     On March March 27, 2002, Caroline Mandeville, a College Relations Manager for

MassMutual who was overseeing MassMutual's recruiting at the University of Virginia, received

a telephone call from James McBride, a member of the University of Virginia's career services

organization.  Mr. McBride told Ms. Mandeville that the University had received a complaint

from T.J. that she had been the target of inappropriate communications from plaintiff.   Mr.

McBride told Ms. Mandeville that the University of Virginia was taking the allegations as very

serious, that plaintiff should never return to the University of Virginia on behalf of MassMutual

or be on campus for any reason, and that a letter of apology from MassMutual would be

necessary.  (Affidavit of Caroline Mandeville ("Mandeville Aff."), ¶ 6.)  (The Affidavit of

Caroline Mandeville is attached hereto as Exhibit 8.)

37.     Mr. McBride provided Ms. Mandeville with copies of e-mails from plaintiff to

T.J. as well as a memorandum summarizing telephone calls T.J. said plaintiff had made to her.

(Mandeville Aff., ¶ 7.)

38.     The documents showed that:

- **On March 21, 2002**, plaintiff sent T.J. an e-mail asking for a telephone number
  where he could reach her.  T.J. provided a telephone number by e-mail.  According
  to T.J., plaintiff telephoned her three times on March 21st.  The first time, he asked
  her to meet him in New York City for lunch.  He asked where she lived and
  whether her boyfriend would be angry if they met.  He told T.J. that he had wanted
  to speak with her after his February 26, 2002 presentation at the University, but he
  did not want Caroline to know.  (Plaintiff presumably was referring to Caroline
  Mandeville, who also was present during the class.)  He told T.J. that he knew there
  was something different about her.  He mentioned during the conversation that he
  was going to close his office door.  According to T.J., plaintiff called her twice
  more on March 21st and left messages, but she did not return his calls.  Also on this
  date, plaintiff sent T.J. an e-mail indicating that it had been great talking to her.  She
  responded:  "same here.  Talk to you soon."

- **On March 22, 2002**, plaintiff sent T.J. an e-mail message saying:  "Hope to see you
  soon."

- **On March 25, 2002**, according to T.J., plaintiff called her again. Plaintiff asked **about** the man who answered the phone and said he thought perhaps he should have hung up. He said he told the person who answered the phone that he was from MassMutual so the person would not think anything. Plaintiff told T.J. that he went to New York a lot and asked when he was going to see her. T.J. became uncomfortable during this conversation.

- **On March 26, 2002**, Plaintiff sent T.J. an e-mail asking her to send him a picture of herself via e-mail.

(Mandeville Aff., ¶ 8 & Exh. A.)

39.    The information from the University of Virginia showed that, around this point,

T.J. called one of her teachers because she was concerned about the e-mails and other

communications from plaintiff. On March 27, 2002, T.J. met with her teacher, D. M., and they

reviewed plaintiff's communications with T.J. (Mandeville Aff., ¶ 9.)

40.    On March 27, 2002, T.J. sent an e-mail to plaintiff that provided:

> I am requesting that ALL communications from you to me cease from this point forward. It is my opinion and that of my COMM 200 Instructor, Ms. [D.M.] that your communication with me has been of an inappropriate nature and therefore, I have become increasingly uncomfortable with these correspondences. If you fail to honor this request and continue to contact me, I will pursue the necessary channels to ensure my right to privacy. If you have any questions concerning this request, please contact [D.M.] to discuss your concerns at [telephone number omitted].

(Williams Depo., p. 303 & Exh. 18.)

41.    Plaintiff telephoned and spoke with D.M. and sent an apology by e-mail to T.J. on

March 27, 2002. (Williams Depo., pp. 303-304.)

42.    On or around March 28, 2002, plaintiff told Debra Wojcik, an employee in

MassMutual's Corporate Human Resources Division, about the March 27, 2002 e-mail from T.J.

Ms. Wojcik was plaintiff's wife's best friend. (Williams Depo., p. 311.)

43.    Ms. Mandeville reported to Ms. Wojcik. After plaintiff spoke with Ms. Wojcik,

Ms. Mandeville told Ms. Wojcik about the telephone call from Mr. McBride and gave Ms.

Wojcik the documents Ms. Mandeville had received from Mr. McBride. Ms. Wojcik telephoned

Mr. McBride, who again emphasized that plaintiff must not return to the University of Virginia.

Ms. Wojcik apologized to Mr. McBride, told him how important MassMutual's relationship with

the University of Virginia was to the company, and assured Mr. McBride that plaintiff would

never be at the University again as a representative of the MassMutual family of companies.

(Affidavit of Debra Wojcik, ¶  .)  (The Affidavit of Debra Wojcik is attached hereto as

Exhibit 9.)

44.     On April 3, 2002, Ms. Wojcik telephoned plaintiff and reiterated that plaintiff

should not communicate with any student at the University of Virginia. (Williams Depo., p. 317

& Exh. 20.)

45.     Following the complaint to MassMutual about inappropriate communications

from plaintiff to T.J., Susan Moore, Managing Director and Director of Human Resources for

Babson, conducted an investigation into the complaint. (Moore Depo., p. 47.)

46.     On Friday, April 26, 2002, as part of Ms. Moore's investigation into T.J.'s

complaint, Ms. Moore and Larry Port, an attorney with MassMutual, met with plaintiff.

(Williams Depo., pp. 323, 324 & Exh. 22.)  On the following Monday, April 29, 2002, plaintiff

left work on a disability leave. (Williams Depo., pp. 334-336.)

47.     Plaintiff filed his Charge of Discrimination with the Equal Employment

Opportunity Commission on December 10, 2002. (A copy of plaintiff's Charge of

Discrimination, showing the date of filing, is attached hereto as Exhibit 10.)

**5.     Short-Term and Long-Term Disability Plans**

48.     Under Babson's short-term disability program, an employee who is unable to

perform his or her job because of a physical or mental impairment is entitled to a continuation of

salary, at a percentage determined by length of service, for up to six months.  (First Affidavit of

Susan A. Moore ("Moore Aff."), ¶ 3.)  (The First Affidavit of Susan A. Moore is attached hereto

as Exhibit 11.)

49.     Liberty Life Assurance Company of Boston ("Liberty") is the administrator for

Babson's short-term disability program.  (Moore Aff., ¶ 4.)

50.     If an employee of Babson remains unable to perform his or job after six months,

the employee may be eligible for long-term disability benefits under the long-term disability

plan, an ERISA plan ("LTD Plan") that protects employees of MassMutual and its family of

companies, including Babson.  (Moore Aff., ¶ 5.)

51.     The LTD Plan is not a self-insured plan.  Liberty was and is the insurer of the

LTD Plan.

52.     Under the terms of the Liberty policy, an employee is entitled to benefits if the

employee is unable to perform all of the material duties of his or her position.  (Moore Aff., ¶ 7.)

53.     When a Babson employee is approved for long-term disability benefits, that

individual's status as a Babson employee ends.  (Moore Aff., ¶ 8.)

54.     Plaintiff was unhappy with Liberty's investigation into whether he was entitled to

long-term disability benefits under the Liberty long-term disability policy.  On December 27,

2003, plaintiff wrote to Liberty asking that Liberty extend his long-term disability benefits.  In

the letter, plaintiff told Liberty that Liberty "twice had [him] under investigation with private

investigators that told [him] why they were out.  On one occasion, an investigat[or] violated [his]

religious rights by enter[ing] his church with a recorder.  A place of Holy ground.  He later stated

that he didn't want to do it."  (Williams Depo., pp. 9-12 & Exh. 1.)

55.    On or around March 29, 2004, plaintiff again wrote to Liberty seeking payment of long-term disability benefits he claimed Liberty owed to him.  In this letter, plaintiff complained to Liberty that:  "Liberty Mutual sent a skinhead with a backpack into an all Afro-American church and taped the service.  Many of the members are still upset about this issue and have voiced a possible action.  I was followed twice by unmarked cars and saw three doctors assigned by Liberty Mutual."  (Williams Depo., pp. 16-19 & Exh. 2.)

56.    Plaintiff admitted during his deposition that he "did not have any factual basis" for his "suspicion" that Babson or MassMutual might have been responsible for sending "a skinhead with a back pack" into the church at which plaintiff was a pastor.  (Williams Depo., p. 16 & Exh. 2.)

The Defendant,
DAVID L. BABSON & COMPANY, INC.
By Its Attorneys:


Dated:  November 4, 2005          /s/ Katherine A. Robertson
Francis D. Dibble, Jr.
 BBO No. 123220
Katherine A. Robertson
 BBO No. 557609
Bulkley, Richardson and Gelinas, LLP
1500 Main Street, Suite 2700
Springfield, MA  01115-5507
Tel:  (413) 781-2820
Fax: (413) 272-6804

Certificate of Service

I hereby certify that a true copy of the above document was served electronically upon the attorney of record for each party on November 4, 2005.

/s/ Katherine A. Robertson
Katherine A. Robertson


303429

14