# EXHIBIT 1

09:51:30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 03-CV-11470MAP
Pages 1-363

ISAAC WILLIAMS, JR.

vs.



MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY (a/k/a
MASSMUTUAL FINANCIAL GROUP)and
DAVID L. BABSON & COMPANY, INC.
(a/k/a DAVID L. BABSON AND COMPANY)

------------------------------------------------
**DEPOSITION OF:  ISAAC WILLIAMS, JR.**
------------------------------------------------

Taken before Joanne Coyle, Certified
Shorthand Reporter, Notary Public, pursuant
to the Federal Rules of Civil Procedure, at
the offices of Bulkley, Richardson and
Gelinas, LLP, 1500 Main Street, Springfield,
Massachusetts on October 28, 2004,
commencing at 9:52 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931    Fax (413) 731-7451

| | |
|---|---|
| 09:56:27 | 1 |

identify them for the record and as to what --

whether they are employees of the various

corporations or not.

          MS. ROBERTSON:  Ms. Federici is a

paralegal employed in my office.  Mr. Seely is a

lawyer in MassMutual's law office.

          If you are going to tell Mr. Williams

that he doesn't have to answer that question, we

are going to take that up in the Court.

          MR. REILLY:  I'm indicating that

pursuant to appropriate protection, he has

indicated to me he is willing to answer the

question.  The presence or the -- he has his

concern.

     Q.   (BY MS. ROBERTSON) What past privacy

issues do you say cause you to take the position

that you don't want to provide that information,

Mr. Williams?

     A.   Surveillance in my church, my family

being intimidated by a skinhead who is inside of

my church, people being parked outside not only my

house, but my mother's house.  I'm concerned about

that.

     Q.   Do you have any basis or any reason to

| | | |
|---|---|---|
| 09:57:29 | 1 | believe that MassMutual played any role in the |
| 09:57:32 | 2 | surveillance that took place at your church? |
| 09:57:34 | 3 | A.   At the present time, I believe there has |
| 09:57:36 | 4 | been some based on my conversation with the |
| 09:57:39 | 5 | gentleman who took the surveillance. |
| 09:57:41 | 6 | Q.   Do you have any reason to believe that |
| 09:57:43 | 7 | Babson played any role in surveillance while you |
| 09:57:47 | 8 | were out a disability -- |
| 09:57:49 | 9 | A.   (Interposing) I certainly have. |
| 09:57:50 | 10 | Q.   You have to let me finish my question |
| 09:57:52 | 11 | before you answer, otherwise Joanne can't make a |
| 09:57:54 | 12 | record. |
| 09:57:56 | 13 | A.   I understand. |
| 09:57:59 | 14 | Q.   Do you have any reason to believe that |
| 09:58:02 | 15 | Babson played any role in the surveillance that |
| 09:58:05 | 16 | took place while you were out of work on |
| 09:58:07 | 17 | disability? |
| 09:58:07 | 18 | A.   I do. |
| 09:58:07 | 19 | Q.   What is your basis for that? |
| 09:58:09 | 20 | A.   My basis again is I believe they are all |
| 09:58:12 | 21 | connected and surveillance based on my |
| 09:58:15 | 22 | conversation with the gentleman who took the |
| 09:58:17 | 23 | surveillance. |
| 09:58:17 | 24 | Q.   What conversation did you have with the |

| | | |
|---|---|---|
| 09:58:20 | 1 | gentleman who took the surveillance? |
| 09:58:21 | 2 | A.    I actually met him.   I saw him with the |
| 09:58:24 | 3 | camera and he told me that he had been hired by |
| 09:58:26 | 4 | several insurance companies to follow me. |
| 09:58:28 | 5 | Q.    What exactly did he say? |
| 09:58:31 | 6 | A.    He said he apologized for being in my |
| 09:58:35 | 7 | church. |
| 09:58:36 | 8 | He said it was not his doing and he had |
| 09:58:42 | 9 | an argument with his boss about even doing this |
| 09:58:45 | 10 | and that he should never have been in there; he |
| 09:58:49 | 11 | would never do it again. |
| 09:58:50 | 12 | Q.    Did he say anything else during this |
| 09:58:52 | 13 | conversation that you say you had with him? |
| 09:58:53 | 14 | A.    He said he enjoyed the service. |
| 09:58:55 | 15 | Q.    Did he say anything else? |
| 09:58:56 | 16 | A.    No. |
| 09:58:56 | 17 | Q.    What did he say to you about who had |
| 09:58:59 | 18 | hired him? |
| 09:59:00 | 19 | A.    He said it was insurance companies. |
| 09:59:01 | 20 | Q.    Did he identify the insurance company |
| 09:59:03 | 21 | that hired him? |
| 09:59:03 | 22 | A.    No; he didn't. |
| 09:59:24 | 23 | Q.    Can you identify that letter for me, |
| 09:59:26 | 24 | Mr. Williams? (Indicating.) |

| | | |
|---|---|---|
| 09:59:35 | 1 | A.    It looks like a letter I wrote to a |
| 09:59:42 | 2 | disability manager. |
| 09:59:43 | 3 | MS. ROBERTSON:  I'm going to mark |
| 09:59:44 | 4 | that as an exhibit. |
| | 5 | (Defendant's Deposition Exhibit |
| | | No. 1 offered and marked.) |
| 10:00:27 | 6 | |
| 10:00:29 | 7 | Q.    (BY MS. ROBERTSON)  Could you identify |
| 10:00:29 | 8 | the letter that we've marked as Exhibit 1? |
| 10:00:32 | 9 | A.    It's a letter addressed to Liberty |
| 10:00:36 | 10 | Mutual Insurance Company, Disability Manager, and |
| 10:00:39 | 11 | signed with my -- actually, it's typed with my |
| 10:00:43 | 12 | name. |
| 10:00:43 | 13 | Q.    Is that a letter that you sent to |
| 10:00:46 | 14 | Liberty Mutual Insurance Company? |
| 10:00:46 | 15 | A.    To the best of my knowledge, I would say |
| 10:00:48 | 16 | it is. |
| 10:00:48 | 17 | Q.    And you did that on or around the |
| 10:00:51 | 18 | twenty-seventh of December of 2003, is that |
| 10:00:53 | 19 | correct? |
| 10:00:54 | 20 | A.    That's what it's dated. |
| 10:00:56 | 21 | Q.    Is it fair for me to say on the basis of |
| 10:00:59 | 22 | the document that we've marked as Exhibit 1 that |
| 10:01:02 | 23 | you believed in December of 2003 that the |
| 10:01:04 | 24 | investigator who visited your church was hired by |

**PERLIK and COYLE REPORTING**

10:04:25  1        A.    There were several e-mails back and

10:04:27  2    forth -- and again, it was a suspicion on my part.

10:04:32  3        Q.    You don't have any factual basis?

10:04:34  4        A.    That's correct, counselor.

10:04:35  5        Q.    Let me ask you if you can identify that

10:04:49  6    document that I just put in front of you?

10:04:52  7    (Indicating.)

10:04:53  8        A.    (Witness examining document.)    Yes.

10:05:19  9        Q.    Is that a letter that you sent to

10:05:22 10    Liberty Mutual?

10:05:23 11        A.    It has my signature.    I would assume it

10:05:27 12    is.

10:05:27 13              MS. ROBERTSON:    Could you mark that

10:05:31 14    Exhibit 2, please?

         15                       (Defendant's Deposition Exhibit
                                   No. 2 offered and marked.)
10:05:51 16

10:05:53 17        Q.    (BY MS. ROBERTSON)    Is Exhibit 2 a

10:05:54 18    letter that you sent Liberty Mutual in or around

10:05:57 19    March of 2004?

10:06:02 20        A.    It has my typed name.    I would assume

10:06:05 21    that it came from me.

10:06:06 22        Q.    Well, you know.    Is it a letter that you

10:06:08 23    sent to Liberty Mutual in or around March of 2004?

10:06:13 24        A.    It could be.

10:06:14  1      Q.    Do you believe that you didn't send that

10:06:18  2  letter?

10:06:18  3      A.    It doesn't have my signature on it.

10:06:21  4      Q.    Do you deny that you sent --

10:06:23  5      A.    (Interposing) I'm not denying.

10:06:24  6      Q.    You have to let me finish my question.

10:06:27  7  Do you deny sending the letter that we've marked

10:06:29  8  as Exhibit 2 to Liberty Mutual in or around March

10:06:32  9  of 2004?

10:06:32  10      A.    I do not deny it; no.

10:06:34  11      Q.    In this letter that we've marked as

10:06:37  12  Exhibit 2, did you again indicate that Liberty

10:06:41  13  Mutual sent an investigator into your church?

10:06:44  14      A.    That's what it reads.

10:06:45  15      Q.    Is this a letter that you wrote,

10:06:48  16  Exhibit 2, Mr. Williams?

10:06:49  17      A.    It doesn't have my signature on it.   It

10:06:52  18  could come from me.

10:06:52  19      Q.    Do you have any reason to believe

10:06:55  20  anybody else wrote to Liberty Mutual about this

10:06:58  21  topic in or around March of 2004?

10:07:00  22      A.    I would think not, but my signature is

10:07:03  23  not on there.

10:07:04  24      Q.    I understand your signature is not on

**PERLIK and COYLE REPORTING**

10:07:06 1    there.

10:07:06 2            What I'm asking you, did you send

10:07:08 3    Exhibit 2 to Liberty Mutual in or around March of

10:07:11 4    2004?  Can you answer yes or no?

10:07:12 5            MR. REILLY:  Objection; asked and

10:07:14 6    answered.  You may answer again.

10:07:16 7            THE WITNESS:  I believe I did.

10:07:18 8        Q.    (BY MS. ROBERTSON)  Thank you.  Did you

10:07:20 9    know or did you believe, as of March of 2004, that

10:07:23 10   it was Liberty Mutual that had sent an

10:07:26 11   investigator to your church?

10:07:27 12       A.    Repeat the question, please?

10:07:30 13       Q.    Did you believe in or around March of

10:07:32 14   2004 when you sent Exhibit 2 to Liberty Mutual

10:07:35 15   that it was Liberty Mutual who had sent an

10:07:38 16   investigator to your church?

10:07:38 17       A.    I believed it was; yes.

10:07:40 18       Q.    Again, did anybody from Liberty Mutual

10:07:43 19   ever indicate to you that they had not sent this

10:07:47 20   investigator to your church?

10:07:48 21       A.    I believe I answered that, but they

10:07:50 22   never said one way or the other.

10:07:52 23       Q.    Did anybody connected to Liberty Mutual

10:07:55 24   ever tell you that somebody else had told them to

| | | |
|---|---|---|
| 10:07:58 | 1 | conduct an investigation of your disability |
| 10:08:00 | 2 | benefits claim? |
| 10:08:01 | 3 | A.    I don't believe they did. |
| 10:08:08 | 4 | Q.    I'm going to ask you again, |
| 10:08:10 | 5 | Mr. Williams, are you currently employed? |
| 10:08:12 | 6 | A.    Yes; I am. |
| 10:08:13 | 7 | Q.    Where do you work? |
| 10:08:14 | 8 | A.    I will repeat my same answer. |
| 10:08:16 | 9 | Q.    Are you not going to answer my question? |
| 10:08:17 | 10 | A.    No; I'm not. |
| 10:08:18 | 11 | Q.    You're not going to tell me where you're |
| 10:08:21 | 12 | currently employed? |
| 10:08:22 | 13 | MR. REILLY:  For the record, I'm not |
| 10:08:24 | 14 | instructing him not to answer the question. |
| 10:08:25 | 15 | MS. ROBERTSON:  I understand that |
| 10:08:26 | 16 | but there's going to be a motion to compel. |
| 10:08:29 | 17 | MR. REILLY:  I am offering with an |
| 10:08:31 | 18 | appropriate protective order. |
| 10:08:33 | 19 | MS. ROBERTSON:  We have a protective |
| 10:08:35 | 20 | order.  We're willing to treat this as protected. |
| 10:08:38 | 21 | MR. REILLY:  For counsel only.  Not |
| 10:08:40 | 22 | counsel employed by or at the respective |
| 10:08:42 | 23 | companies. |
| 10:08:43 | 24 | MS. ROBERTSON:  I would like to put |

**PERLIK and COYLE REPORTING**

| 11:23:49 | 1 | Q. What was Mr. McClintock's position at |
| 11:23:53 | 2 | the time with Babson? |
| 11:23:56 | 3 | A. Kevin, I believe, was brought in as head |
| 11:24:00 | 4 | of -- it wasn't Fixed Income; head of Investments, |
| 11:24:19 | 5 | I believe, for Babson. |
| 11:24:20 | 6 | Q. When you say there was a merger of |
| 11:24:22 | 7 | Babson with Investment Management, is that the |
| 11:24:24 | 8 | time that Babson became a subsidiary of |
| 11:24:26 | 9 | MassMutual? |
| 11:24:27 | 10 | A. No; that's the time when Investment |
| 11:24:30 | 11 | Management became a part of Babson. |
| 11:24:31 | 12 | Q. At some point Babson became a subsidiary |
| 11:24:34 | 13 | of MassMutual, is that correct? |
| 11:24:36 | 14 | A. Babson was always a subsidiary of |
| 11:24:39 | 15 | MassMutual. |
| 11:24:40 | 16 | Q. So Babson merged into Investment |
| 11:24:46 | 17 | Management? |
| 11:24:46 | 18 | A. That's correct. |
| 11:24:46 | 19 | Q. Is it at that point that you became a |
| 11:24:50 | 20 | Babson employee? |
| 11:24:50 | 21 | A. That's correct. |
| 11:24:51 | 22 | Q. When Mr. McClintock was brought in, he |
| 11:24:56 | 23 | was brought in then as an employee of Babson, is |
| 11:24:59 | 24 | that correct? |

| | | |
|---|---|---|
| 11:34:48 | 1 | when you were appointed to the position of |
| 11:34:50 | 2 | director of Corporate Communications? |
| 11:34:51 | 3 | A.    Yes. |
| 11:34:52 | 4 | Q.    When did that occur? |
| 11:34:55 | 5 | A.    This was sent out on October 2nd, 2000. |
| 11:35:02 | 6 | Q.    Is that approximately when you began -- |
| 11:35:05 | 7 | when you were appointed to the position of |
| 11:35:06 | 8 | director of Corporate Communications? |
| 11:35:08 | 9 | A.    That's correct. |
| 11:35:08 | 10 | Q.    Is that also approximately when you |
| 11:35:23 | 11 | began reporting to Mr. Bickford? |
| 11:35:24 | 12 | A.    Yes. |
| 11:35:25 | 13 | Q.    How did you learn that you were going to |
| 11:35:28 | 14 | be reporting to Ed Bickford? |
| 11:35:34 | 15 | A.    Kevin called me in at another meeting -- |
| 11:35:42 | 16 | and it had to be prior to this memo -- and he told |
| 11:35:47 | 17 | me that he thought working for Ed would be a good |
| 11:35:52 | 18 | fit.  He says he's a nice guy and the two of you |
| 11:35:56 | 19 | would get along. |
| 11:35:57 | 20 | He basically sold Ed to me because he |
| 11:35:59 | 21 | knew my history of being just from boss to boss to |
| 11:36:02 | 22 | boss to boss.  He assured me that this was a good |
| 11:36:05 | 23 | home. |
| 11:36:06 | 24 | Q.    Let me ask you again to the best of your |

| | | |
|---|---|---|
| 11:51:20 | 1 | Q.    Who prepared the particulars, page two |
| 11:51:30 | 2 | of Exhibit 6? |
| 11:51:31 | 3 | A.    I did, with assistance from my counsel. |
| 11:51:47 | 4 | Q.    Tell me each and every occasion on which |
| 11:52:14 | 5 | you say Mr. Bickford called you "boy"?  Could you |
| 11:52:19 | 6 | do that? |
| 11:52:20 | 7 | A.    There were several occasions, counselor. |
| 11:52:25 | 8 | Q.    Could you please describe each occasion |
| 11:52:28 | 9 | on which you say that Mr. Bickford called you |
| 11:52:32 | 10 | "boy"? |
| 11:52:32 | 11 | A.    Each occasion? |
| 11:52:33 | 12 | Q.    Yes. |
| 11:52:33 | 13 | A.    I don't know how to answer that because |
| 11:52:51 | 14 | there was several occasions. |
| 11:52:55 | 15 | Q.    How many is several? |
| 11:52:59 | 16 | A.    A lot. |
| 11:53:00 | 17 | Q.    How many? |
| 11:53:02 | 18 | A.    Twenty-five, fifty times. |
| 11:53:08 | 19 | Q.    When is the first time you say that this |
| 11:53:12 | 20 | occurred? |
| 11:53:12 | 21 | A.    Right after I started working for him |
| 11:53:17 | 22 | and he said, "that's a good boy."  It really |
| 11:53:22 | 23 | shocked me. |
| 11:53:22 | 24 | I finished a project or something and he |

**PERLIK and COYLE REPORTING**

11:53:24  1  said "that's a good boy."  It just...

11:53:32  2       Q.   When do you say this occurred?

11:53:33  3       A.   After I completed one of my first

11:53:36  4  projects with Mr. Bickford.

11:53:37  5       Q.   I'm asking for the date, Mr. Williams.

11:53:39  6       A.   Counselor, I can't give you the exact

11:53:42  7  date.

11:53:43  8            MR. REILLY:   Just answer to the best

11:53:44  9  of your recollection.

11:53:45  10           THE WITNESS:   Sometime in 2000.

11:53:46  11      Q.   (BY MS. ROBERTSON)   Where were you when

11:53:52  12  you say this remark was made to you?

11:53:55  13      A.   In Cambridge.

11:53:57  14      Q.   What project do you say you had

11:54:01  15  completed?

11:54:02  16      A.   I can't remember the exact project.

11:54:10  17      Q.   You don't have any idea what project it

11:54:14  18  is that you completed?

11:54:14  19      A.   I can't remember the exact project, I'm

11:54:17  20  sorry.  It was a project.

11:54:18  21      Q.   What general project was it?   In

11:54:22  22  general, what project?

11:54:23  23      A.   I can't remember.

11:54:24  24      Q.   You have no recollection of the project

**PERLIK and COYLE REPORTING**

11:54:26   1    that you say you completed that you say you were

11:54:30   2    complimented or there was a remark made to you as

11:54:33   3    a result?

11:54:34   4        A.    I don't remember the project.

11:54:35   5        Q.    You have no idea?

11:54:36   6        A.    No.

11:54:36   7              MR. REILLY:  Object as to the form.

11:54:38   8    Asked and answered twice now.

11:54:41   9        Q.    (BY MS. ROBERTSON)  Did you say anything

11:54:42  10    to Mr. Bickford about what you apparently said was

11:54:47  11    an offensive remark?

11:54:51  12        A.    I was too shocked to say anything.

11:54:51  13        Q.    Is the answer no?

11:54:51  14        A.    The answer is no.

11:54:51  15        Q.    You were in Cambridge, is that correct?

11:54:53  16        A.    That's correct.

11:54:54  17        Q.    Where were you in Cambridge?

11:54:56  18        A.    In his office.

11:54:57  19        Q.    Was anybody else present?

11:55:00  20        A.    No.

11:55:00  21        Q.    What was the occasion of your being in

11:55:04  22    Mr. Bickford's office?

11:55:06  23        A.    I was required to go to Cambridge during

11:55:10  24    the course of the month to check in with Ed.

**PERLIK and COYLE REPORTING**

11:55:16  1         Q.   How often were you required to go to
11:55:21  2    Cambridge to check in with Mr. Bickford?
11:55:24  3         A.   At least once a month.
11:55:25  4         Q.   Was this the first occasion on which you
11:55:28  5    went into Cambridge to check in with Mr. Bickford?
11:55:32  6         A.   No.
11:55:32  7         Q.   Was it the second occasion on which you
11:55:35  8    went into Cambridge to check in with Mr. Bickford?
11:55:38  9         A.   I don't believe so.
11:55:39 10         Q.   Was it the third occasion on which you
11:55:41 11    went into Cambridge --
11:55:43 12         A.   (Interposing) I can't recall.
11:55:44 13         Q.   When is the next occasion on which you
11:55:46 14    say Mr. Bickford referred to you as "boy"?
11:55:48 15         A.   It was a part of his conversation so
11:55:55 16    everything was "that's a good boy."
11:55:58 17              If it was on a telephone call and
11:56:00 18    something was done, "that's a good boy."  It could
11:56:05 19    be in the course of a conversation, "that's a good
11:56:08 20    boy."
11:56:13 21         Q.   Is it your testimony that every time he
11:56:15 22    used the word "boy," he used it in the context of
11:56:20 23    "that's a good boy"?
11:56:21 24         A.   That was a lot of it, "that's a good

| | | |
|---|---|---|
| 11:56:23 | 1 | boy"; yes. |
| 11:56:24 | 2 | Q. Was there ever any other context in |
| 11:56:27 | 3 | which he used the term "boy"? |
| 11:56:32 | 4 | A. Not to my recollection. |
| 11:56:34 | 5 | Q. Do you ever recall him saying -- do you |
| 11:56:47 | 6 | say he ever said this in front of anyone else, |
| 11:56:50 | 7 | Mr. Williams? |
| 11:56:50 | 8 | Is there any occasion that you recall |
| 11:56:52 | 9 | Mr. Bickford saying "that's a good boy" to you in |
| 11:56:55 | 10 | front of anybody else? |
| 11:56:56 | 11 | A. Not that I can recall. |
| 11:56:59 | 12 | Q. When is the most recent occasion on |
| 11:57:04 | 13 | which you say Mr. Bickford said "that's a good |
| 11:57:08 | 14 | boy" to you? |
| 11:57:09 | 15 | A. Most recent? |
| 11:57:10 | 16 | Q. Most recent? |
| 11:57:11 | 17 | A. It would have been before I left |
| 11:57:12 | 18 | MassMutual. |
| 11:57:12 | 19 | Q. Before you left Babson? |
| 11:57:14 | 20 | A. Babson, MassMutual. |
| 11:57:15 | 21 | Q. How long before you left Babson? |
| 11:57:17 | 22 | A. I don't recall. |
| 11:57:18 | 23 | Q. You don't have any idea? |
| 11:57:19 | 24 | A. I don't. |

**PERLIK and COYLE REPORTING**

11:57:19  1    Q.    Did it happen to 2002?

11:57:21  2    A.    It could have.

11:57:22  3    Q.    But you don't recall?

11:57:23  4    A.    No.

11:57:23  5    Q.    Did you ever make any note with respect

11:57:37  6  to the phrase that you say that Mr. Bickford used,

11:57:40  7  calling you, saying "that's a good boy" to you?

11:57:46  8  Did you ever make any notes on the occasion that

11:57:49  9  you said it occurred?

11:57:50 10            MR. REILLY:  Objection.

11:57:50 11            MS. ROBERTSON:  Can you tell me the

11:57:52 12  basis of the objection?

11:57:53 13            MR. REILLY:  To form.  There are

11:57:55 14  many things that can be a written note.  Did he

11:57:58 15  take notice of it?

11:57:59 16            MS. ROBERTSON:  I'll clarify.

11:58:00 17    Q.    (BY MS. ROBERTSON)  Did you ever make

11:58:02 18  any written record, whether it be in electronic

11:58:05 19  format or in handwriting on any occasion that

11:58:10 20  Mr. Bickford said something to you along the lines

11:58:12 21  of "that's a good boy"?

11:58:14 22    A.    Yes.

11:58:14 23    Q.    What record did you make of that?

11:58:16 24    A.    A record to Human Resources.

11:58:18  1      Q.    When do you say you put this in writing

11:58:22  2  to Human Resources?

11:58:23  3      A.    I can't recall the exact date.

11:58:25  4      Q.    In what form do you say you made some

11:58:28  5  kind of a report or record to Human Resources?

11:58:32  6      A.    It would either have been written or

11:58:34  7  e-mail fashion to Sue Moore.

11:58:36  8      Q.    You say you either wrote or sent an

11:58:39  9  e-mail to Ms. Moore?

11:58:40 10      A.    That's correct.

11:58:41 11      Q.    Is that a document that you have in your

11:58:43 12  possession or control?

11:58:44 13      A.    Possibly.

11:58:47 14      Q.    Did you keep a copy of the document?

11:58:49 15      A.    Possibly -- it could be in there.

11:58:51 16      Q.    Is this a record that you say you made

11:58:54 17  in your own handwriting?

11:58:55 18      A.    I said either e-mail or I wrote it.

11:58:58 19      Q.    So your testimony is you either wrote to

11:59:00 20  Ms. Moore or sent an e-mail to Ms. Moore in which

11:59:04 21  you said Mr. Bickford had said "that's a good boy"

11:59:07 22  to you, is that correct?

11:59:08 23      A.    That's correct.

11:59:08 24      Q.    Did you specify on which occasion that

| | | |
|---|---|---|
| 11:59:13 | 1 | occurred? |
| 11:59:13 | 2 | A.    No.    No; I didn't. |
| 11:59:15 | 3 | Q.    Did you ever make a contemporaneous |
| 11:59:18 | 4 | electronic or handwritten note on any occasion on |
| 11:59:23 | 5 | which you say Mr. Bickford said "that's a good |
| 11:59:25 | 6 | boy" to you? |
| 11:59:26 | 7 | A.    No. |
| 11:59:26 | 8 | MS. ROBERTSON:    I'm going to take a |
| 11:59:28 | 9 | break here and say I don't believe I have any |
| 11:59:30 | 10 | document that's either an e-mail or a note from |
| 11:59:33 | 11 | Mr. Williams to Ms. Moore on making that kind of a |
| 11:59:36 | 12 | complaint or assertion, Mr. Reilly. |
| 11:59:41 | 13 | MR. REILLY:    I think it was there. |
| 11:59:46 | 14 | We did receive your proffer. |
| 11:59:48 | 15 | MS. ROBERTSON:    Well, let me check. |
| 11:59:51 | 16 | I don't believe there's a document to that effect. |
| 12:00:03 | 17 | Q.    (BY MS. ROBERTSON)    Can you recall any |
| 12:00:05 | 18 | specific occasion out of what you say were |
| 12:00:09 | 19 | twenty-five to fifty occasions on which |
| 12:00:10 | 20 | Mr. Bickford used this phrase "that's a good boy" |
| 12:00:14 | 21 | to you? |
| 12:00:15 | 22 | A.    Counselor, as I answered before, that |
| 12:00:24 | 23 | was a part of his conversation with me.    That's |
| 12:00:27 | 24 | just the way Ed spoke to me.    I cannot think of an |

12:00:31  1    instance.  I can just think of numerous times in

12:00:34  2    conversations of this condescending attitude of

12:00:38  3    "that's a boy."

12:00:39  4              Can I think of a time or an incident, I

12:00:43  5    told you after a project, but he could say "that's

12:00:47  6    a good boy" --

12:00:48  7         Q.    (Interposing) You can't think of any

12:00:49  8    specific occasion, any specific event?

12:00:52  9         A.    I said no, counselor.

12:00:54  10        Q.    You said that.

12:00:55  11        A.    I said that.

12:00:56  12        Q.    And you can't think of any occasion on

12:00:59  13   which someone overheard the comment?

12:01:01  14        A.    Somebody could have heard that on the

12:01:05  15   other side.  I don't know that.

12:01:06  16        Q.    Are you aware of anybody that you say

12:01:08  17   overheard --

12:01:10  18        A.    (Interposing) No.

12:01:10  19        Q.    The end of my question:  Are you aware

12:01:13  20   of anyone that overheard the language of

12:01:16  21   Mr. Bickford that was "that's a good boy" to you?

12:01:19  22        A.    Overheard?  No; I'm not aware.

12:01:21  23        Q.    Did you ever hear that Mr. -- did you

12:01:26  24   ever hear Mr. Bickford use that term, "that's a

| | | |
|---|---|---|
| 02:25:22 | 1 | Q.   Other than what you've already testified |
| 02:25:25 | 2 | to, which is Mr. Bickford calling -- saying to you |
| 02:25:28 | 3 | "that's a good boy," do you say that Mr. Bickford |
| 02:25:32 | 4 | made any other comment to you based on your race |
| 02:25:36 | 5 | that you believe was inappropriate?  Did he use |
| 02:25:39 | 6 | any other term? |
| 02:25:40 | 7 | A.   No other term; no. |
| 02:25:42 | 8 | Q.   Did he say anything else to you based on |
| 02:25:45 | 9 | your race that you say or believe was |
| 02:25:48 | 10 | inappropriate? |
| 02:25:48 | 11 | A.   His actions were more than his words, |
| 02:25:51 | 12 | counselor. |
| 02:25:51 | 13 | Q.   What do you mean by that? |
| 02:25:56 | 14 | A.   I was not treated like the other |
| 02:26:00 | 15 | employees. |
| 02:26:06 | 16 | Q.   In what way do you say you were not |
| 02:26:08 | 17 | treated like other employees? |
| 02:26:10 | 18 | A.   When we first engaged with the hiring of |
| 02:26:20 | 19 | W. T. Blaise Company for public relations, I was |
| 02:26:29 | 20 | to go to New York once a month to meet with Bill |
| 02:26:32 | 21 | Blaise, the marketing principal, to get our reps |
| 02:26:36 | 22 | into CNBC, NBC, other large media outlets. |
| 02:26:42 | 23 | Into our -- my third month of going |
| 02:26:45 | 24 | there, Mr. Bickford started accompanying me, and |

PERLIK and COYLE REPORTING

| | | |
|---|---|---|
| 02:26:57 | 1 | Mr. Blaise's comment was, "What is Mr. Bickford |
| 02:27:00 | 2 | doing here with you?" I said I don't know. So I |
| 02:27:03 | 3 | went to Ed and I said, "Ed, you know, that's part |
| 02:27:06 | 4 | of my responsibility." "Well, I just want to make |
| 02:27:09 | 5 | sure things are going okay." |
| 02:27:12 | 6 | It wasn't rocket scientist stuff but he |
| 02:27:16 | 7 | was over my shoulder on everything that I did. He |
| 02:27:19 | 8 | critiqued everything that I did. He challenged |
| 02:27:26 | 9 | everything I said. I wasn't treated -- given the |
| 02:27:33 | 10 | respect of the other employees. |
| 02:27:37 | 11 | Q. What other employees do you say were |
| 02:27:40 | 12 | treated differently than you were? |
| 02:27:41 | 13 | A. People of my level -- other managing |
| 02:27:44 | 14 | directors. Out of the entire Babson work force, I |
| 02:27:51 | 15 | believe there was one other African-American and |
| 02:27:56 | 16 | that was Mr. Bagley and it was very obvious that I |
| 02:28:00 | 17 | was the odd duck out. |
| 02:28:02 | 18 | At meetings and conferences, it was like |
| 02:28:05 | 19 | I didn't even exist. It was very uncomfortable -- |
| 02:28:13 | 20 | very uncomfortable -- and this was a person who I |
| 02:28:16 | 21 | reported to directly, but I would see him engage |
| 02:28:20 | 22 | with other direct reports. I would come from |
| 02:28:23 | 23 | Springfield to Cambridge and it was like I didn't |
| 02:28:26 | 24 | even exist. |

02:28:28  1        Q.    Can you name anybody specific who you

02:28:33  2   say you were treated differently than,

02:28:35  3   Mr. Williams?

02:28:36  4        A.    I cannot give names.  There were several

02:28:39  5   managing directors.

02:28:40  6        Q.    You can't given any names?

02:28:41  7        A.    No.

02:28:42  8        Q.    Is there any other way in which you say

02:28:44  9   you were treated differently than other employees

02:28:48  10  other than what you've already testified to?

02:28:50  11       A.    No.

02:28:58  12       Q.    You also allege in paragraph three of

02:29:11  13  Exhibit 6 that "the respondent companies" -- and

02:29:20  14  that's MassMutual and Babson -- "employ less than

02:29:23  15  one percent minority executive employees."  Do you

02:29:25  16  see that?

02:29:26  17       A.    Yes.

02:29:26  18       Q.    Did I read that correctly?

02:29:28  19       A.    Did you read it correctly?

02:29:32  20       Q.    Did I read it correctly?

02:29:33  21       A.    Yes.

02:29:33  22       Q.    What is your basis for that statement?

02:29:40  23       A.    Well, I think I sat down and I listed

02:29:52  24  all the senior level staff employees and then I

02:35:40   1    Exhibit 9, paragraph one refers to a meeting on
02:35:44   2    March 13th of 2002, correct?
02:35:46   3         A.    Yes.
02:35:47   4         Q.    Is that the meeting in which Mr. Reese
02:35:50   5    told you that your position was being eliminated?
02:35:52   6         A.    Yes.
02:35:53   7         Q.    And you've already testified about what
02:35:54   8    you recall being said during this meeting?
02:35:57   9         A.    Yes
02:36:04  10         Q.    In paragraph five of Exhibit 9, you say
02:36:08  11    that in June you requested copies of your
02:36:11  12    personnel file and records and that you learned
02:36:14  13    for the first time of repeated interaction between
02:36:17  14    Mr. Bickford, Mr. Reese, and Babson's Human
02:36:20  15    Resources Department designed to assist
02:36:23  16    Mr. Bickford's agenda in having you demoted and/or
02:36:26  17    fired, correct?
02:36:27  18         A.    Mmm-hmm.
02:36:27  19              MR. REILLY:    You really need to say
02:36:29  20    yes or no.
02:36:30  21              THE WITNESS:    I'm sorry, yes.
02:36:31  22         Q.    (BY MS. ROBERTSON) What interaction do
02:36:33  23    you say you learned that Mr. Bickford had with
02:36:36  24    Mr. Reese to assist Mr. Bickford's agenda in

| | |
|---|---|
| 02:39:54 1 | Q.    When you reported to Mr. Bickford, where |
| 02:39:56 2 | was your office? |
| 02:39:57 3 | A.    In Springfield. |
| 02:39:57 4 | Q.    And where was Mr. Bickford's office? |
| 02:40:00 5 | A.    Cambridge. |
| 02:40:01 6 | Q.    How often were you in Cambridge during |
| 02:40:03 7 | an average month? |
| 02:40:04 8 | A.    Once or twice a month. |
| 02:40:08 9 | Q.    How often was Mr. Bickford in |
| 02:40:10 10 | Springfield during an average month? |
| 02:40:11 11 | A.    It wasn't even once a month. |
| 02:40:16 12 | Q.    My question really is designed to know |
| 02:40:18 13 | how often did you see Mr. Bickford face-to-face in |
| 02:40:22 14 | an average month? |
| 02:40:23 15 | A.    Once or twice a month. |
| 02:40:24 16 | Q.    How often during an average month would |
| 02:40:27 17 | you speak with him by telephone? |
| 02:40:28 18 | A.    Almost daily. |
| 02:40:35 19 | Q.    Do you recall ever seeing the document |
| 02:40:56 20 | that I've just handed you before?  Have you seen |
| 02:40:59 21 | this before? (Indicating.) |
| 02:41:01 22 | A.    (Witness examining document.)  Yes. |
| 02:41:13 23 | MS. ROBERTSON:  Let me mark that. |
| 24 | |

**PERLIK and COYLE REPORTING**

| | | |
|---|---|---|
| 04:09:46 | 1 | Q. David Richardson would have knowledge of |
| 04:09:52 | 2 | what you told him about your treatment at Babson, |
| 04:09:54 | 3 | is that right? |
| 04:09:55 | 4 | A. Yes. |
| 04:09:55 | 5 | Q. What knowledge do you say David |
| 04:09:57 | 6 | Richardson would have about the treatment of |
| 04:10:00 | 7 | African-Americans about unequal treatment at |
| 04:10:05 | 8 | MassMutual? |
| 04:10:07 | 9 | A. Myself at MassMutual. |
| 04:10:08 | 10 | Q. Do you know if there's any other basis |
| 04:10:10 | 11 | that David Richardson would have knowledge of |
| 04:10:13 | 12 | unequal treatment at Babson other than what you |
| 04:10:18 | 13 | told him about your situation? |
| 04:10:18 | 14 | A. His own situation in addition to what I |
| 04:10:25 | 15 | told him about my situation. |
| 04:10:28 | 16 | Q. I'm focussed on Babson. Is the only |
| 04:10:30 | 17 | knowledge that you say he would know, that he |
| 04:10:33 | 18 | would have about unequal treatment at Babson, |
| 04:10:36 | 19 | would that be based on what you told him about |
| 04:10:38 | 20 | your situation? |
| 04:10:39 | 21 | A. That's correct. |
| 04:10:40 | 22 | Q. With respect to Mr. Richardson's own |
| 04:10:43 | 23 | situation, have you spoken to Mr. Richardson? |
| 04:10:45 | 24 | A. Yes. |

**PERLIK and COYLE REPORTING**

04:14:47  1    Robert Jones would have about unequal treatment at

04:14:51  2    Babson for African-American employees?

04:14:54  3         A.    Just myself.

04:14:54  4         Q.    What knowledge do know or believe

04:15:05  5    Mr. Jones would have about unequal treatment of

04:15:09  6    African-American employees at MassMutual?

04:15:10  7         A.    Himself and other people.

04:15:11  8         Q.    Do you know what position Mr. Jones held

04:15:20  9    at MassMutual?

04:15:20 10         A.    He was a second vice president, I

04:15:27 11    believe, in some customer service center, I

04:15:31 12    believe, nineteen years.

04:15:32 13         Q.    What knowledge do you say that Mr. Jones

04:15:37 14    would have about unequal treatment of

04:15:40 15    African-American employees at MassMutual?

04:15:42 16         A.    He was fired.

04:15:43 17         Q.    What is your understanding of the reason

04:15:45 18    he was fired?

04:15:46 19         A.    I believe they said it was for

04:15:51 20    performance.

04:15:51 21         Q.    Do you know whether Mr. Jones ever

04:15:53 22    brought a claim against MassMutual?

04:15:55 23         A.    I don't know.

04:15:56 24         Q.    Have you spoken with Mr. Jones?

04:24:07  1          A.    I don't know.  I believe she did but I

04:24:10  2    don't know.

04:24:10  3          Q.    Do you know who Ms. Ambrose reported to?

04:24:12  4          A.    No; I do not.

04:24:13  5          Q.    What knowledge do you believe Ms. Jones

04:24:26  6    had with respect to unequal treatment at Babson?

04:24:30  7          A.    Myself.

04:24:31  8          Q.    When did you have a conversation with

04:24:38  9    Ms. Jones about your situation?

04:24:46  10         A.    It would be while I was going through it

04:24:49  11   as well as after I left.

04:24:50  12         Q.    Was Ms. Jones a Babson employee?

04:24:55  13         A.    No; she wasn't.

04:24:56  14         Q.    Was Ms. Jones a MassMutual employee?

04:24:58  15         A.    Yes; she was.

04:24:59  16         Q.    What was her role at MassMutual?

04:25:02  17         A.    She had become -- she worked in the

04:25:16  18   training department -- training and learning, I

04:25:19  19   believe it was called.

04:25:19  20         Q.    To your knowledge or belief, does

04:25:22  21   Ms. Jones still work at MassMutual?

04:25:23  22         A.    No; she doesn't.

04:25:24  23         Q.    Do you know when she left?

04:25:26  24         A.    Either 2001 or 2002.

**PERLIK and COYLE REPORTING**

04:26:55  1    Connors.

04:27:04  2        Q.    What knowledge do you say Judy Greene

04:27:08  3    has of unequal treatment of African-American

04:27:11  4    employees at Babson?

04:27:13  5        A.    Myself.

04:27:17  6        Q.    To your knowledge or belief, would

04:27:20  7    Ms. Greene have any other knowledge of unequal

04:27:23  8    treatment of employees at Babson --

04:27:25  9    African-American employees at Babson?

04:27:27  10       A.    No.

04:27:27  11       Q.    Was Ms. Greene a Babson employee?

04:27:31  12       A.    No; she wasn't.

04:27:32  13       Q.    Was Mr. Green a MassMutual employee?

04:27:34  14       A.    Yes; she was.

04:27:35  15       Q.    Do you know what her position at

04:27:37  16    MassMutual was?

04:27:37  17       A.    I did.  I've forgotten what it was.

04:27:42  18       Q.    Is Ms. Greene still employed at

04:27:46  19    MassMutual?

04:27:47  20       A.    No; she isn't.

04:27:48  21       Q.    Do you know when she left MassMutual?

04:27:50  22       A.    I believe it was 2001.

04:27:59  23       Q.    Did Ms. Greene ever tell you why she

04:28:01  24    left MassMutual?

**PERLIK and COYLE REPORTING**

| | | |
|---|---|---|
| 04:29:04 | 1 | Q.  With respect to Tammy Johnson, what |
| 04:29:15 | 2 | knowledge do you know or believe Tammy Johnson |
| 04:29:17 | 3 | would have with respect to unequal treatment of |
| 04:29:20 | 4 | African-American employees at Babson? |
| 04:29:22 | 5 | A.  Myself. |
| 04:29:23 | 6 | Q.  Other than yourself, do you know or |
| 04:29:26 | 7 | believe Ms. Johnson would have knowledge of |
| 04:29:28 | 8 | unequal treatment of any other African-American |
| 04:29:31 | 9 | employees at Babson? |
| 04:29:32 | 10 | A.  No. |
| 04:29:32 | 11 | Q.  Was Tammy Johnson a Babson employee? |
| 04:29:38 | 12 | A.  No; she wasn't. |
| 04:29:39 | 13 | Q.  Was Tammy Johnson a MassMutual employee? |
| 04:29:41 | 14 | A.  She was. |
| 04:29:47 | 15 | Q.  To your knowledge, is Ms. Johnson |
| 04:29:49 | 16 | currently a MassMutual employee? |
| 04:29:51 | 17 | A.  She isn't. |
| 04:29:51 | 18 | Q.  What position did Ms. Johnson hold at |
| 04:29:54 | 19 | MassMutual? |
| 04:29:55 | 20 | A.  I'm not sure of what her position was. |
| 04:29:57 | 21 | Q.  Do you know the corporate unit or line |
| 04:30:00 | 22 | of business she worked in? |
| 04:30:01 | 23 | A.  I believe it was in a customer service |
| 04:30:04 | 24 | role. |