| | | |
|---|---|---|
| 04:35:18 | 1 | leaving MassMutual? |
| 04:35:19 | 2 | A.    No; he resigned. |
| 04:35:23 | 3 | Q.    Did you know whether he ever brought a |
| 04:35:27 | 4 | claim against MassMutual? |
| 04:35:27 | 5 | A.    I don't know. |
| 04:35:27 | 6 | Q.    With respect to Karen Hightower, what |
| 04:35:31 | 7 | knowledge do you know or believe Ms. Hightower |
| 04:35:32 | 8 | would have about unequal treatment of |
| 04:35:34 | 9 | African-American employees at Babson? |
| 04:35:37 | 10 | A.    Just myself. |
| 04:35:37 | 11 | Q.    What would Ms. Hightower's source of |
| 04:35:44 | 12 | knowledge be about your treatment at Babson? |
| 04:35:47 | 13 | A.    Myself. |
| 04:35:47 | 14 | Q.    Was Ms. Hightower a Babson employee? |
| 04:35:50 | 15 | A.    No. |
| 04:35:50 | 16 | Q.    Was Ms. Hightower a MassMutual employee? |
| 04:35:53 | 17 | A.    I believe MMLISI, it's subsidiary.  Yes; |
| 04:36:02 | 18 | she was.  I'm sure you're familiar with that. |
| 04:36:04 | 19 | Q.    To your knowledge, Ms. Hightower was |
| 04:36:09 | 20 | employed by MML Investor Services Incorporated? |
| 04:36:13 | 21 | A.    Yes. |
| 04:36:13 | 22 | Q.    Is that also where your wife was |
| 04:36:15 | 23 | employed? |
| 04:36:15 | 24 | A.    Yes. |

**PERLIK and COYLE REPORTING**

04:54:45  1        A.    My own, myself.

04:54:46  2        Q.    What would be Mr. Woolridge's source of

04:54:51  3    knowledge about the treatment of you?

04:54:53  4        A.    Myself and maybe some other Babson

04:55:07  5    employees.

04:55:08  6        Q.    Did you talk to Mr. Woolridge about your

04:55:10  7    situation at Babson?

04:55:10  8        A.    Mmm-hmm -- yes.

04:55:13  9        Q.    What conversation do you say you had

04:55:15 10    with Mr. Woolridge about your employment at

04:55:17 11    Babson?

04:55:18 12        A.    He was fully aware of the relationship

04:55:25 13    with Mr. Bickford and I.  He was fully aware of

04:55:30 14    the phrase that Mr. Bickford used on numerous

04:55:34 15    occasions with myself.

04:55:42 16              I believe he also told me that he had

04:55:46 17    heard that there were several racists in the

04:55:52 18    Cambridge office besides Mr. Bickford.

04:55:55 19        Q.    What was Mr. Woolridge's source of

04:56:03 20    knowledge about the phrase that you say

04:56:05 21    Mr. Bickford used in speaking to you?

04:56:08 22        A.    I'm sorry?

04:56:10 23        Q.    What was Mr. Woolridge's source of

04:56:12 24    knowledge about the phrase you say Mr. Bickford

04:56:14  1    used in speaking to you?

04:56:15  2         A.    I was the source.

04:56:18  3         Q.    Did Mr. Woolridge have any other

04:56:21  4    knowledge of the relationship between you and

04:56:23  5    Mr. Bickford?

04:56:23  6         A.    He could have.  Not to my knowledge, but

04:56:28  7    he could have.

04:56:29  8         Q.    Did you talk to Mr. Woolridge about the

04:56:32  9    relationship between yourself and Mr. Bickford?

04:56:34 10         A.    Yes.

04:56:34 11         Q.    Did you ever ask Mr. Bickford to stop

04:56:37 12    using the phrase that you found objectionable?

04:56:40 13         A.    I started to.  I confronted him on

04:56:51 14    several issues that were somewhat minor than this

04:57:00 15    and he was just very defensive and very

04:57:05 16    condescending and became very angry.

04:57:12 17              I was fearful that he would find a way

04:57:14 18    to get rid of me if I confronted this issue.

04:57:17 19         Q.    So my question to you, Mr. Williams,

04:57:19 20    was:  Did you ever say anything to Mr. Bickford

04:57:21 21    about being offended by his use of the phrase

04:57:23 22    "that's a good boy"?

04:57:24 23         A.    No.

04:57:25 24         Q.    When you say you confronted Mr. Bickford

05:09:56  1       Q.   Have you spoken to Ms. Jones since the
05:10:03  2   conversation about -- which you had with her about
05:10:06  3   two months ago in which she told you she was going
05:10:10  4   to look for her notes?
05:10:12  5       A.   No; I haven't.
05:10:12  6       Q.   Other than the individuals listed in
05:10:43  7   your answer to interrogatory two (e) about which
05:10:46  8   you've already answered questions, are you aware
05:10:48  9   of any other person or individual whom you say
05:10:52 10   has -- whom you know or believe has knowledge
05:10:56 11   about unequal treatment of African-American
05:10:59 12   employees at Babson?
05:11:00 13       A.   At Babson?  No.
05:11:05 14       Q.   Other than the employees listed in
05:11:08 15   answer two (e) to your Answers to Interrogatories,
05:11:12 16   as you sit here, are you aware of any other
05:11:15 17   employee who you know or believe has knowledge of
05:11:17 18   unequal treatment of African-American employees at
05:11:20 19   MassMutual?
05:11:21 20       A.   No.
05:11:21 21       Q.   Have you testified fully and completely
05:11:25 22   today about the knowledge you know or believe
05:11:27 23   those individuals have with respect to unequal
05:11:29 24   treatment of African-American employees at Babson?

**PERLIK and COYLE REPORTING**

05:12:29  1        Q.    Did you make a recruiting trip to the

05:12:47  2   University of Virginia in 2002?

05:12:49  3        A.    It would have been late 2001 or 2002.  I

05:12:58  4   believe it could have been 2002.

05:12:59  5        Q.    Do you recall when in 2002 you made that

05:13:04  6   recruiting trip?

05:13:05  7        A.    January, February, maybe.  It was early

05:13:11  8   2002 or late 2001.

05:13:13  9        Q.    How did it come about that you were

05:13:17 10   asked to make a recruiting trip to the University

05:13:20 11   of Virginia in 2002?

05:13:21 12        A.    I was sitting in my office one day and a

05:13:25 13   woman by the name of Janet LePre from Babson came

05:13:31 14   over.  She came over and asked me would I like to

05:13:36 15   go on a talk to some students at UVA about

05:13:45 16   investments.  I told her just give me some more

05:13:50 17   information but it sounds like an exciting trip,

05:13:54 18   sure.

05:13:58 19        At the time, Janet was, I think,

05:14:00 20   experiencing throat cancer or some sort of -- so I

05:14:04 21   believe she was asked to go and she could not make

05:14:07 22   it medically, so I volunteered and said I would

05:14:09 23   go.

05:14:09 24        Q.    What happened next with respect to this

05:17:56  1        Q.    Were you told the subject you were

05:17:58  2    supposed to speak about?

05:17:59  3        A.    Just investments, talk about anything

05:18:01  4    about investments.

05:18:02  5        Q.    During your day at the University of

05:18:04  6    Virginia, did you meet a student named Tiffany

05:18:10  7    James?

05:18:10  8        A.    Yes.

05:18:10  9        Q.    When did you meet Ms. James?

05:18:12  10       A.    I met Ms. James -- at the time, of

05:18:15  11   course, I didn't know her name but after the class

05:18:18  12   had already started, a woman walked in, heavy-set

05:18:22  13   woman eating a sandwich.  Of course everyone

05:18:34  14   turned to look who she was.  I said did you bring

05:18:36  15   a sandwich for the whole class.  Everybody

05:18:41  16   laughed.  She sat down.

05:18:42  17             I had already gone around and asked

05:18:44  18   people what their names were.  I said, "Excuse me,

05:18:47  19   can you introduce who you are?"  She said my name

05:18:51  20   is Tiffany James or Jones -- Tiffany -- and that's

05:18:55  21   how I met her.

05:18:57  22       Q.    She had not been one of the students

05:19:02  23   that you interviewed for a possible position at

05:19:05  24   MassMutual, is that correct?

**PERLIK and COYLE REPORTING**

| | |
|---|---|
| 05:19:06 | 1 |

A.    That's correct.

Q.    Did you have any other conversation with Ms. James during this day you spent at the University of Virginia?

A.    She was one of several students that I spoke with after the class.  Several students -- the students were engaged in our lesson, it was very good.

After the class, many of the young black men asked me for my business card, my e-mail address.  I got out of business cards so they started giving me their e-mail address.

Q.    Did you keep any of the cards that these students gave you -- that you say these students gave you at the University of Virginia?  Did you keep the business cards?

A.    No; I said I gave my business cards.

Q.    You said some students --

A.    (Interposing) Their e-mail address.

Q.    Did you keep their e-mail addresses?

A.    I think I kept two or three of them.

Q.    Do you have them?

A.    I have Ms. James.

Q.    What did you do with the e-mail

05:42:55  1    walking into class.  I thought that would be

05:42:58  2    funny, humorous.

05:42:58  3         Q.   Did you ever get a picture from her via

05:43:01  4    e-mail?

05:43:01  5         A.   No; I didn't.

05:43:23  6              MS. ROBERTSON:   Why don't I just

05:43:24  7    mark that as an exhibit.

          8                   (Defendant's Deposition Exhibit
                            No. 18 offered and marked.)

05:43:47  9

05:43:50 10         Q.   (BY MS. ROBERTSON)   Can you identify the

05:43:50 11    document that we just marked as Exhibit 18?

05:43:53 12    (Indicating.)

05:43:54 13         A.   This is an e-mail dated March 27th '02

05:44:06 14    from Tiffany to me and on the same date, an e-mail

05:44:11 15    from me to her.

05:44:12 16         Q.   How old was Ms. James, approximately?

05:44:15 17         A.   I don't have a clue.

05:44:19 18         Q.   Did you call her a teenager a few

05:44:22 19    minutes ago?

05:44:23 20         A.   I would say a teenager.  A sophomore, I

05:44:27 21    believe.

05:44:27 22         Q.   After you received this e-mail message

05:44:31 23    from Ms. James, did you speak with Ms. Meadows?

05:44:39 24         A.   Yes; I did.

05:44:40 1    Q.   What was said during the conversation

05:44:44 2    you had with Ms. Meadows -- and again, to the best

05:44:47 3    of your ability, I'm asking you to tell me

05:44:50 4    everything that was said by both parties to the

05:44:52 5    conversation?

05:44:52 6        A.   I first apologized to Ms. Meadows for

05:44:56 7    anything that they felt were inappropriate.  I

05:45:00 8    told her -- she was there so she saw the class.  I

05:45:04 9    asked her to -- what did she mean when she said

05:45:13 10   inappropriate nature.

05:45:17 11            She said there was three things that

05:45:19 12   were thought were inappropriate.  One was me

05:45:21 13   talking about religion to the student; a second

05:45:26 14   thing was asking for her picture; and I believe

05:45:33 15   the third item that she said was inappropriate

05:45:43 16   was -- there was three things -- the picture, the

05:45:46 17   church -- there was another item, counselor, but I

05:45:57 18   can't think of what it was.  She told me all three

05:46:00 19   of those that she told me were inappropriate.

05:46:03 20            I reminded her that it was not me that

05:46:05 21   brought up church but it was the students.  When I

05:46:07 22   spoke about the picture and the caricature,

05:46:10 23   Ms. Meadows comment was if you were going to do

05:46:13 24   that, you should have told her what you were going

| 05:53:10 | 1 | that some students stayed in contact with you |
| 05:53:13 | 2 | after the visit? |
| 05:53:14 | 3 | A.    I probably shouldn't have stated that. |
| 05:53:17 | 4 | I should have said made contact. |
| 05:53:19 | 5 | Q.    So it's not accurate that some students |
| 05:53:22 | 6 | stayed in contact with you after your visit? |
| 05:53:24 | 7 | A.    That's correct. |
| 05:53:28 | 8 | Q.    Did you speak with anyone employed by |
| 05:53:34 | 9 | Babson or MassMutual about the contents of |
| 05:53:38 | 10 | Exhibit 18? |
| 05:53:38 | 11 | A.    I believe I did. |
| 05:53:49 | 12 | Q.    With whom do you recall speaking? |
| 05:53:52 | 13 | A.    It would been, I'm sure, someone in HR. |
| 05:54:03 | 14 | I believe Carolyn Mandeville was out so it wasn't |
| 05:54:07 | 15 | Carolyn at that particular moment.   She |
| 05:54:11 | 16 | reported -- I believe it was Deb Wojtek.   I'm not |
| 05:54:21 | 17 | sure. |
| 05:54:22 | 18 | Q.    Did you know Ms. Wojcik? |
| 05:54:23 | 19 | A.    Very well. |
| 05:54:25 | 20 | Q.    How long did you know Ms. Wojcik? |
| 05:54:27 | 21 | A.    Years; she was Valerie's best friend -- |
| 05:54:32 | 22 | my wife's best friend. |
| 05:54:33 | 23 | MS. ROBERTSON:   Let's mark this as |
| 05:55:09 | 24 | the next exhibit. |

06:03:24   1        Q.    But the e-mail, itself, is not dated, is

06:03:26   2   that fair?

06:03:27   3        A.    That's fair to say.

06:03:28   4        Q.    Have you read Exhibit 20?

06:03:29   5        A.    "I spoke with Deb Wojcik on 3/8

06:03:33   6   regarding the e-mail I received.  Was told not

06:03:35   7   good to get personally, keep it business.  She'll

06:03:37   8   take care of it.  Received a call from Deb on 4/3

06:03:41   9   indicating again not to contact no student and

06:03:43  10   this could result in a letter of reprimand.  To

06:03:47  11   date, no one has ask me what happened."

06:03:51  12        Q.    Did you in fact have a telephone

06:03:54  13   conversation or telephone call with Ms. Wojcik on

06:03:57  14   April 3rd about your communications with Tiffany

06:04:00  15   James?

06:04:00  16        A.    If I wrote that, I did.  Deb called me.

06:04:03  17        Q.    Do you recall the conversation that you

06:04:05  18   had with Ms. Wojcik on April 3rd?

06:04:11  19        A.    I can only respond to what I say here.

06:04:14  20   I can't recall my conversation but if that's what

06:04:16  21   I wrote, that's what took place.

06:04:18  22        Q.    You don't have any other recollection of

06:04:20  23   the conversation that you had with Ms. Wojcik on

06:04:22  24   April 3rd, is that correct?

06:10:39  1          She asked me the question did I tell my

06:10:41  2     wife about this, which was very disturbing because

06:10:46  3     the inference was as if I was cheating on my

06:10:50  4     wife -- have you told Valerie about this.  The way

06:10:58  5     she said it to me was as if I was having an affair

06:11:02  6     with this woman.

06:11:03  7          I said, "Why would you even say that?

06:11:06  8     Why would I have to tell Valerie about this?"  She

06:11:09  9     said, "Oh, I thought maybe she should know."  It

06:11:21  10    was a very short conversation because it was on a

06:11:23  11    Friday evening.  She was on her way out.

06:11:30  12         Her last comments to me were, "Do you

06:11:33  13    know this is serious?"  I said, "Yeah, that's why

06:11:40  14    I'm here and I think there needs to be an

06:11:43  15    investigation."  "Okay."

06:11:45  16         That was from what I can remember the

06:11:49  17    gist of our conversation.

06:11:50  18    Q.   What about the second face-to-face

06:11:53  19    conversation that you remember having with

06:11:55  20    Ms. Moore?

06:11:55  21    A.   I believe at that meeting -- that was a

06:11:58  22    meeting, if I'm not mistaken, with Sue Moore and a

06:12:05  23    Larry Port, maybe.  He was a lawyer from

06:12:08  24    MassMutual.

PERLIK and COYLE REPORTING

324

06:12:11  1              I believe that was the second encounter

06:12:14  2      with Ms. Moore.

06:12:14  3          Q.   What do you recall being said during the

06:12:20  4      meeting with Mr. Port and Ms. Moore?

06:12:22  5          A.   They had -- or I should say she had

06:12:26  6      prepared questions that she went down the list.

06:12:34  7      She held her own deposition and I answered all the

06:12:37  8      questions.

06:12:37  9          Q.   What do you recall being said by both

06:12:40 10      parties to that conversation or that meeting?

06:12:42 11          A.   About what transpired?

06:12:43 12                   MR. REILLY:  Both parties?

06:12:45 13                   MS. ROBERTSON:  All three parties to

06:12:49 14      the conversation.

06:12:49 15          Q.   (BY MS. ROBERTSON)  In other words what

06:12:51 16      I'm asking, Mr. Williams, is to give to the best

06:12:53 17      of your recollection an account of what was said

06:12:55 18      from beginning to end of the meeting by all

06:12:57 19      parties present at the meeting?

06:12:58 20          A.   My purpose for going down there, I

06:13:13 21      believe how the class went, what did I talk about,

06:13:16 22      the correspondence with Tiffany, any

06:13:20 23      correspondence with any other students.

06:13:29 24                   I think she raised the issue of why did

| | | |
|---|---|---|
| 06:25:27 | 1 | Q.   Do you recall what day of the week |
| 06:25:29 | 2 | April 26th, 2002 was? |
| 06:25:31 | 3 | A.   Can I recall what day?  I wish I could, |
| 06:25:41 | 4 | counselor, but I can't. |
| 06:25:44 | 5 | MS. ROBERTSON:  I'll be right back. |
| 06:26:48 | 6 | (A recess was taken.) |
| 06:26:48 | 7 | MS. ROBERTSON:  Could you mark that |
| 06:26:49 | 8 | as an exhibit? |
| | 9 | (Defendant's Deposition Exhibit |
| 06:27:33 | 10 | No. 22 offered and marked.) |
| 06:27:34 | 11 | Q.   (BY MS. ROBERTSON)  Looking at |
| 06:27:35 | 12 | Exhibit 22, Mr. Williams, can you tell me what |
| 06:27:39 | 13 | date April 26th -- what day of the week April 26th |
| 06:27:43 | 14 | was according to Exhibit 22? (Indicating.) |
| 06:27:46 | 15 | A.   It was a Friday. |
| 06:27:46 | 16 | Q.   Do you recall what day you went out on |
| 06:27:49 | 17 | disability from work from Babson? |
| 06:27:55 | 18 | A.   Exact date?  No.  Exact date?  No. |
| 06:27:59 | 19 | Q.   Do you recall if it was close in time to |
| 06:28:05 | 20 | your meeting with Mr. Port and Ms. Moore? |
| 06:28:08 | 21 | A.   It could have been.  It could have been |
| 06:28:26 | 22 | close. |
| 06:28:32 | 23 | MS. ROBERTSON:  I have a couple of |
| 06:28:34 | 24 | questions on the complaint.  Do you want me to |

| | | |
|---|---|---|
| 06:28:36 | 1 | mark it as an exhibit or do you not care? |
| 06:28:38 | 2 | MR. REILLY:  It is probably better, |
| 06:28:39 | 3 | just for the benefit of the record. |
| 06:28:41 | 4 | MS. ROBERTSON:  Sure. |
| 06:28:42 | 5 | MR. REILLY:  If you don't mind. |
| 06:28:43 | 6 | MS. ROBERTSON:  No; not at all. |
| | 7 | (Defendant's Deposition Exhibit No. 23 offered and marked.) |
| 06:29:07 | 8 | |
| 06:29:20 | 9 | Q.  (BY MS. ROBERTSON)  I'm just going to |
| 06:29:21 | 10 | ask you to read paragraphs thirty-two and |
| 06:29:25 | 11 | thirty-three of your complaint which we've marked |
| 06:29:27 | 12 | as Exhibit 23.  (Indicating.) |
| 06:29:31 | 13 | A.  (Witness examining document.) |
| 06:29:40 | 14 | Thirty-two and thirty-three? |
| 06:29:41 | 15 | Q.  Yes. |
| 06:29:42 | 16 | A.  Read it to myself? |
| 06:29:45 | 17 | Q.  Read it to yourself. |
| 06:29:46 | 18 | A.  (Witness examining document.)  Okay. |
| 06:29:49 | 19 | Q.  Does reading paragraphs thirty-two and |
| 06:29:52 | 20 | thirty-three of your complaint refresh your |
| 06:29:55 | 21 | recollection about the date on which you left work |
| 06:29:58 | 22 | on disability? |
| 06:29:58 | 23 | A.  Yes. |
| 06:30:05 | 24 | Q.  What date was that? |

06:30:06  1       A.    The morning of April 29th, 2002.

06:30:11  2       Q.    If we refer to Exhibit 22, what day of

06:30:15  3    the week was April 29th, 2002?

06:30:17  4       A.    Monday.

06:30:22  5       Q.    That was the Monday immediately after

06:30:24  6    the date on Exhibit 21, is that correct?

06:30:28  7       A.    Yes.

06:30:28  8       Q.    Were you ever asked by a pastor of a

06:30:32  9    church to leave the church because of misconduct?

06:30:34 10       A.    No.

06:30:56 11              MR. REILLY:   We just tried that

06:30:58 12    case, counsel.   That's the Judge Schubert verdict,

06:31:02 13    the pastor situation.   I think that's what you're

06:31:04 14    referring to.

06:31:07 15              MS. ROBERTSON:   I just asked the

06:31:09 16    question and I got an answer.

06:31:19 17       Q.    (BY MS. ROBERTSON)   Did you ever tell

06:31:21 18    your treating psychiatrist or your treating

06:31:23 19    psychologist in April of 2002 about the complaint

06:31:26 20    of inappropriate conduct that had been made

06:31:29 21    against you by Tiffany James?

06:31:32 22       A.    I could have made mention somewhere in

06:31:36 23    there.

06:31:36 24       Q.    Do you remember whether or not you did?

06:36:42  1        A.    I met Mr. McDonough a couple of times.

06:36:45  2        Q.    Do you have any knowledge whether Babson

06:36:55  3    had any employee with the title of Director of

06:36:59  4    Corporate Communications in 2002 after you left

06:37:05  5    the workplace on disability?

06:37:06  6        A.    I'm not sure.

06:37:07  7        Q.    To your knowledge, did Babson have any

06:37:12  8    employee with the title Director of Corporate

06:37:15  9    Communications in 2003?

06:37:16 10        A.    I believe they did.  I believe they did,

06:37:32 11    maybe even 2002.

06:37:33 12        Q.    Who do you say or who do you believe

06:37:36 13    held that title in 2002?

06:37:38 14        A.    I don't remember the gentleman's name.

06:37:42 15    I remember an e-mail from Kevin McClintock with an

06:37:51 16    announcement.

06:37:52 17        Q.    And you remember it being in 2002?

06:37:55 18        A.    I do.

06:37:55 19        Q.    How did you happen to see an e-mail

06:37:59 20    about an employee at Babson?

06:38:00 21        A.    I think at the time, I had not been

06:38:03 22    taken off the system.

06:38:04 23        Q.    How long did you remain on the

06:38:08 24    MassMutual e-mail system after your disability in

07:02:39  1  terminate black employees based on performance?

07:02:42  2      A.    Probably myself, that there was three

07:02:46  3  blacks from Babson.

07:02:47  4            I'm probably referring to myself there.

07:02:48  5  It is more referring to MassMutual.

07:02:50  6      Q.    More referring to MassMutual, is that

07:02:53  7  your testimony?

07:02:53  8      A.    That's correct.

07:02:54  9      Q.    You're not aware of anyone else at

07:02:59 10  Babson that you say was subjected to this policy

07:03:11 11  of content-based treatment of African-American

07:03:15 12  employees through the pretextural use of

07:03:19 13  employment reviews and procedures.

07:03:22 14      A.    It could be but I'm not aware of it.

07:03:25 15      Q.    I'm just going to move down to paragraph

07:03:33 16  forty-five.  I don't want to spend a lot of time

07:03:35 17  on this.

07:03:37 18            I think we started out here, but do you

07:03:39 19  have any basis for saying that MassMutual and

07:03:42 20  Babson had you placed under surveillance at your

07:03:45 21  place of worship?

07:03:45 22      A.    I believe I testified earlier, counsel,

07:03:47 23  that my basis for that were with the conversation

07:03:51 24  with the man who actually -- who I caught taking

**PERLIK and COYLE REPORTING**

12/27/03

*Second letter sent*

**Liberty Mutual Insurance Company**
**Disability Claims**
**Post Office Box 5031**
**Wallingford, CT 06492**

Attn: Disability Manager



DEFENDANT'S
EXHIBIT
1-Williams
10/28/04

To Whom It May Concern:

I recently was terminated from my disability benefits. I was receiving long term benefits that were deemed necessary by various health professionals.

It should be noted that your company twice had me under investigation with private investigators that told me why they were out. On one occasion, an investigated violated my religious rights by enter my church with a recorder. A place of Holy ground. He later stated that he didn't want to do it.

Your company conducted two independent medical examinations on me. To my knowledge, both doctors agreed with my physician. This information was not shared with me.

I feel my benefits should have been extended another <u>three months</u> as I was still under and currently under my doctor's care.

I am requesting that my file be reviewed to assist in my efforts. I have spoken with the reimbursement department and they are aware of what is taking place.

Enclosed please find a list of the medication I am currently on. I continue to meet with my doctor concerning my dizziness. If you need additional information, please let me know.

HOME OFFICE APPEALS
FEB 2 6 2004

Sincerely,

Isaac Williams Jr.

RECEIVED
FEB 2 4 2004
GROUP DISABILITY PRODUCTS

AAMi Christian Tranchemontgue

IW000562

3/29/04

RE: 744269

Dear Ms Scott:

I hope you received my call letting you know that my treating physician is leaving. Enclosed you'll find a letter to that effect.

As you may know, this whole event has been traumatic. Not only to my family and my church, but also I. Liberty Mutual sent a skinhead with a back pack into an all Afro-American church and taped the service. Many of the members are still upset about this issue and have voiced a possible action. I was followed twice by unmarked cars and saw three doctors assigned by Liberty Mutual.

I know this is not a result of your handling, but this action has caused me to continue to have anxiety about many different cars and people. I am currently trying to work on heavy medication to make it through the day.

I have enclosed a medical release only. I believe I have given Liberty Mutual everything except blood.

Again, I apologize for my frustration. I am not asking for current benefits, just that what was owed to me.

Sincerely
Isaac Williams Jr.





IW000563

**Bickford, Edward**

| | |
|---|---|
| **From:** | McClintock, Kevin |
| **Sent:** | Monday, October 02, 2000 8:46 AM |
| **To:** | DLBStaff-Cambridge; DLBStaff-Springfield |
| **Subject:** | Isaac Williams Announcement |

Almost a year has past since the "reorganization" of Babson.  While much has been accomplished during this time, we are now at a point where a more focused proactive effort should be made towards developing and communicating our message both internally and externally.

As a result, I have asked Isaac Williams to take on the new position of Director of Corporate Communications.  Isaac's previous experience in the Investment Department of MassMutual working on a number of special projects for the Chief Investment Officer will serve him well in this new role.  One of his initial tasks will be to develop the "new" Babson message.  Building a strong reputation in the marketplace requires all of us to clearly communicate the same story internally, to existing clients, potential clients, and the media.  Isaac will be responsible for all advertising, website design and media relations.  Isaac will be the point person for all press and media contact, therefore, all outside inquiries from these sources should be referred to Isaac who will then coordinate appropriate and timely responses.

Please join me in welcoming Isaac to this new position.  He will be reporting to Ed Bickford, Director of Client Service, and will work closely with the entire Sales and Marketing organization since their input is critical to Isaac's new role.

KM


DEFENDANT'S EXHIBIT
S Williams
10/28/04
PENGAD 800-631-6989

MM000307

1

**From:** Williams, Isaac
**Sent:** Wednesday, March 27, 2002 11:09 AM
**To:** 'denisemeadows@virginia.edu'
**Subject:** FW: Request

FYI

-----Original Message-----
From: Williams, Isaac
Sent: Wednesday, March 27, 2002 11:09 AM
To: 'taj3r@cms.mail.virginia.edu'
Subject: RE: Request

Tiffany, let me first apologize for what has transpired. I have spoken with Denise and also apologized to her. It was not my intention to make you feel uncomfortable. As I explained to Denise some students' have stayed in contact with me after my visit. I will honor your wish. I wish you great success as you continue your education and career. Good luck finding a summer job. Again, am sorry for any inconvenience this may have caused you.

-----Original Message-----
From: taj3r@cms.mail.virginia.edu [mailto:taj3r@cms.mail.virginia.edu]
Sent: Wednesday, March 27, 2002 9:44 AM
To: Williams, Isaac
Subject: Request

Mr. Williams,
I am requesting that ALL communications from you to me cease from this point forward. It is my opinion and that of my COMM 200 Instructor, Ms. Denise Meadows, that your communication with me has been of an inappropriate nature and therefore, I have become increasingly uncomfortable with these correspondences. If you fail to honor this request and continue to contact me, I will pursue the necessary channels to ensure my right to privacy. If you have any questions concerning this request, contact Ms.Meadows to discuss your concerns at 434.924.7937.

Tiffany



DEFENDANT'S EXHIBIT
PENGAD 800-631-6989
18 Williams
10/28/04

1

MM000095

**To:**                Williams, Isaac
**Subject:**           response to allegations

I spoke with Deb Wojik on 3/28 regarding the e-mail I recieved.  Was told not good to get personally, keep it business.
She'll take care of it.  Recieved a call from Deb on 4/3 indicating again not to contact no student and this could result in a
letter of reprimand. To date no one has ask me what happen

*Isaac Williams Jr.*
*Director of Corporate Communications*

from Draft Folder

Rcvd 4-17 from John Robitaille
Info Security

DLB computer search

DEFENDANT'S
EXHIBIT
*Jn Williams*
10/28/04
PENGAD 800-631-6989

1

MM000099

# April 2002

DEFENDANT'S
EXHIBIT
22 Williams
10/28/04
PENGAD 800-631-6989

|  | April 2002 |  |  |  |  |  |
|--------|---------|----------|-----------|----------|--------|---------|
| Monday | Tuesday | Wednesday | Thursday | Friday | Sat/Sun |  |
| April 1 | 2 | 3 | 4 | 5 | 6 |  |
| 8 | 9 | 10 | 11 | 12 | 7 |  |
| 15 | 16 | 17 | 18 | 19 | 13 |  |
| 22 | 23 | 24 | 25 | 26 | 14 |  |
| 29 | 30 | 1 |  |  | 20 |  |
|  |  |  |  |  | 21 |  |
|  |  |  |  |  | 27 |  |
|  |  |  |  |  | 28 |  |

April 2002

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | | | | |

May 2002

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

Dibble, Francis

10/28/2004 8:55 AM