# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 03 CV 11470 MAP

ISAAC WILLIAMS, JR.

VS.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, et al.

DEPOSITION OF: EDWARD BICKFORD, taken before Rebekah J. Johnson, Registered Merit Reporter, Notary Public, pursuant to Rule 30 of the Federal Rules of Civil Procedure, at the offices of Philbin & Associates, Inc., 959 Main Street, Springfield, Massachusetts 01103, on November 4, 2004, commencing at 10:00 a.m.

APPEARANCES:
(Please see page 2)

COPY

Rebekah J. Johnson
Registered Merit Reporter

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts since 1947

Q. Is that correct? What specifically was your -- let me rephrase that. I think you also told me you were the director of client services and marketing of that company.

A. Correct.

Q. Was that true during that five-year period that you've just mentioned?

A. Yes.

Q. During that last five years with State Street -- and I'll refer to it as State Street rather than repeat this so we have a longer transcript -- during the last five years you were with that State Street entity, how many African-American employees did you supervise?

A. I don't recall exactly. I would say one.

Q. Do you know the name of, do you recall the name of that person?

A. Albert Rocheteau.

Q. Can you help us with the spelling?

A. Albert R-o-c-h-t-e-a-u.

Q. And for how long did you supervise Mr. Rocheteau during that five-year period at

23

A. Very -- yes.

Q. Competent in his employment?

A. Yes.

Q. Someone who could work independently, independently without close supervision?

A. Yes.

Q. And you were pleased with his work performance?

A. Yes.

Q. During your time with Concert Capital Management your position was director of marketing and now there is a merger. Did your position change in any way at that point in time?

A. Yes.

Q. How did it change?

A. My position, there was a director of marketing at Babson at the time, so I became a salesperson with the reorganization.

Q. Who was the director of marketing that you just referred to?

A. An individual named Ron Gwozda, G-w-o-z-d-z.

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts since 1947

Q. With this merger, did your duties change in any way from what they had been at Concert?

A. Yes.

Q. How did they change?

A. Instead of managing a group which was, at Concert was a new group and I was the only person, I then became, had a specific territory that I was responsible for selling, so I was not managing.

Q. Now, eventually you met Isaac Williams, the plaintiff in this case; is that correct?

A. Yes.

Q. Do you recall approximately when that was?

A. I don't recall the specific time.

Q. It was not when you first moved your offices to Cambridge, was it?

A. I don't believe so.

Q. Well, let's take the time from the merger until the time that Mr. Williams first become involved with David Babson, that period

of time. Did you during that period of time supervise any African-American employees?

MS. ROBERTSON: I'm going to object to the form of the question. You can answer, Mr. Bickford.

THE WITNESS: Read the question for me.

Q. (BY MR. REILLY) I will rephrase. Did you from the time of the merger which caused you to move to Cambridge until you first met Mr. Williams, did you supervise any African-American employees during that period of time?

A. I believe so. The timing there I'm not quite certain of.

Q. Who do you recall having supervised in that approximate time period?

A. African-American?

Q. Yes.

A. Albert Rocheteau.

Q. So Mr. Rocheteau left State Street and moved to Concert first?

A. He left State Street Research, went to MFS, Mass Financial Services, and then I hired

him at David L. Babson & Company.

Q. What was his position when you hired him? What was the position that he held at that point?

A. I'm not sure of the exact title, but it would be marketing communications. Writing was his primary function.

Q. When you say that you hired him, can you explain that a little bit, telling us exactly what your role was in Mr. Rocheteau's hiring process with the Babson entity?

A. There was an individual that I had hired from State Street Research called Jackie Maurer, and Jackie was heading up our product management area, and I had suggested to her that she needed additional help with respect to writing information at the company, and suggested to her that she contact Albert and that we should talk to him and hire him.

Q. And what was the reason that you directed her to Mr. Rocheteau?

A. Because I had worked with Albert in the past and he was excellent and she had

27

worked with him as well.

Q. What is your understanding of where Ms. Maurer had worked with Mr. Rocheteau previously?

A. At State Street Research.

Q. And I take it from your previous answers that this contact ultimately led to Mr. Rocheteau being hired --

A. Yes.

Q. -- at the Babson entity, correct?

A. Sorry. Yes.

MS. ROBERTSON: Thank you.

MR. REILLY: There is a natural tendency to want to get this process over and all the lawyers understand that, and it happens just about every deposition, so please bear with us.

MS. ROBERTSON: We will just keep reminding you.

THE WITNESS: Please do.

MR. REILLY: We will get to the end.

Q. (BY MR. REILLY) Is Mr. Rocheteau

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103

PHILBIN & ASSOCIATES, INC.

(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588

Serving the legal community of Massachusetts since 1947

new position of director of corporate communications. And my question is, how is it, to your understanding, that this position came into existence?

A. It was felt at the time that we needed somebody to focus on working with the media and general corporate communications.

Q. What do you mean by general corporate communications?

A. I would say internal communications amongst employees as well as talking about the Babson organization to the external world.

Q. Did you play any particular role in the decision to create this director of corporate communications position?

A. Yes.

Q. What role did you play?

A. I suggested that this position be created.

Q. And I take it that upper management agreed?

A. Yes.

Q. How soon after it was decided that the

210

Q. I take it you have had a chance to look at this?

A. Yes.

Q. Do you recognize this?

A. Yes.

Q. And what is this document?

A. It's an announcement of a new hire, Albert Rocheteau.

Q. Is this the same Mr. Rocheteau that we discussed earlier today?

A. Yes.

Q. I was unclear as to when he actually began in this position. This seems to suggest that it was not prior to Mr. Williams but it was in May of 2002.

A. Correct.

Q. And is this the African-American gentleman who you had worked with at State Street?

A. Correct.

Q. Now, when was Mr. Rocheteau interviewed for this job as director of institutional marketing promotion?

959 MAIN STREET
4TH FLOOR
SPRINGFIELD, MA 01103
PHILBIN & ASSOCIATES, INC.
(413) 733-4078
Pittsfield: (413) 499-2231
FAX: (413) 734-4588
Serving the legal community of Massachusetts since 1947

Q. Did he have any additional responsibilities?

A. No.

Q. What responsibilities that are listed here were not responsibilities of the corporate communications director position that Mr. Williams had?

A. One of the primary responsibilities for this function was to write communication letters to our clients and investors for the portfolio managers.

Q. So that's one difference. What other differences are there?

A. That is his major responsibility.

Q. What other differences are there?

A. Go back to your question, please.

Q. Yes. What other differences are there, if any, between the duties and responsibilities of this position and the duties and responsibilities of the position that Mr. Williams held?

A. I would say the writing and then overseeing the Web site, those roles are his

primary.

Q. When you indicate overseeing the Web site, does that appear in this notice? Can you point to me the line of the notification that talks about that? It says "maintain and enhance our Web site."

A. Middle sentence, "In addition, Albert will have over all responsibility for the Babson Web site."

Q. Thank you, working closely with Susan Donald. Now, Susan Donald was also involved when Mr. Williams was involved with that?

A. Correct.

Q. Now, those are two ways in which you indicate this position differs from the corporate communications director position. Are there any others?

A. I will retract the Web site. There was duplication in terms of what Mr. Williams was overseeing and Mr. Rocheteau.

Q. So we are back to the writing?

A. Correct.

Q. Anything else other than the writing?

A. Not that I can think of.

Q. Now, did anyone suggest to you that it would be a good idea to eliminate Mr. Williams's position for the purpose of attempting to avoid a racial discrimination claim?

A. No.

MS. ROBERTSON: I object to the form of the question, then you can answer the question.

Q. (BY MR. REILLY) Did anyone ever discuss with you whether it would be a good strategic move to eliminate Mr. Williams's position as director of corporate communications?

MS. ROBERTSON: Could you read that back, would be a good strategic move?

MR. REILLY: Strategic move.

MS. ROBERTSON: I object to the form of the question.

THE WITNESS: No.

Q. (BY MR. REILLY) Did anyone discuss with you whether it would be in the company's

best interests to eliminate the position that Mr. Williams held as a method of avoiding any claim of racial discrimination by Mr. Williams?

A. No.

Q. Did anyone ever discuss with you whether it would be beneficial to the company to eliminate the position that Mr. Williams held and then create another position with similar duties at some time in the future?

A. No.

Q. Did any of those things happen?

MS. ROBERTSON: I object to the form of the question.

THE WITNESS: This position, as I mentioned, was primarily responsible for writing, and Mr. Williams that was not part of his responsibilities.

Q. (BY MR. REILLY) Were there responsibilities that Mr. Williams had that were not the responsibilities of Mr. Rocheteau?

A. Yes.

Q. Let me rephrase. What were they, if you understand the question, what were they?

A. Dealing with the media. I'd have to go back and look through all the job descriptions, and this is not his responsibility, but I will go back to the fact that this is writing and it was not Mr. Williams's responsibility.

Q. Writing was the big difference?

A. Correct.

Q. Looking back at Exhibit 3 where you listed all of his responsibilities, which of those were not within the purview of Mr. Rocheteau's position?

A. The majority of these are not within Mr. Rocheteau's job description.

Q. Can you enumerate what you mean when you refer to the majority? Identify which ones you mean.

A. Public relations, no. Theses are all the no, not similar. Developing relationships with the press, no. Advertising, no. Web site, yes. Speaking engagements for portfolio managers, no. Conference sponsorships, no. Mutual fund reports, perhaps. Brochures, yes.

Coordinate and distribute press clippings, no. Organize off-site board meetings, no. E-commerce, no. Proactive media management, no. Coaching PM on media instruction, no. Media point person, no. Managing DLB message, no.

Do you want me to continue?

Q. Let me ask you this. In the answer that you have given so far, you said advertising was not part of it. I'm looking at the announcement in Exhibit 20, the third line down, commentary and advertising copy, that would seem to indicate that advertising was included in this position, correct?

A. According to this memo, correct.

Q. Now, this memo that we see her, this is a notification. Does Mr. Rocheteau report to you?

A. No.

Q. Who does he report to?

A. Jackie Maurer.

Q. Do you know whether any chart or listing of his responsibilities in addition to

or other than this public notice has been created?

A. Not that I'm aware of.

Q. So what we're looking at here in the notice, we don't know whether this is merely a summary of his position and its responsibilities or an exhaustive list of his responsibilities; is that right?

A. It's a fair and accurate representation of his responsibilities.

Q. But not an exhaustive list of them, is it?

MS. ROBERTSON: I object to the form of the question.

THE WITNESS: Can you rephrase it?

Q. (BY MR. REILLY) But not necessarily a complete listing of his duties and responsibilities, is it?

MS. ROBERTSON: I object to the form of the question. You can answer.

THE WITNESS: I would say at the time it's a complete review of his responsibilities as I look at it.

Q. (BY MR. REILLY) And as far as, then as far as e-commerce, is that what you said Mr. Williams did in this position? The Web site is e-commence, isn't it? Electronic commerce, e-mails.

A. Okay, if that falls into the Web site category, then yes.

Q. Now, Mr. Rocheteau was located in the Cambridge building; is that correct?

A. Correct.

Q. Has Mr. Rocheteau been excluded from meetings with department heads?

MS. ROBERTSON: I object to the form of the question.

THE WITNESS: Not that I'm aware of, but he doesn't report to me.

Q. (BY MR. REILLY) I see. So you have no direct knowledge of what his daily activities would be?

A. Not direct knowledge, correct.

Q. Well, to your understanding, has he ever been excluded from -- well, let me rephrase that.

**Williams, Isaac**

**From:** Maurer, Jacqueline **Sent:** Fri 5/10/2002 9:06 AM
**To:** Mlist: DLBStaff - All (with Field Offices)
**Cc:**
**Subject:** New Hire
**Attachments:**

I am very pleased to announce that we have hired Albert Rocheteau as Director of Institutional Marketing Promotion. Albert joined Babson on Wednesday, May 8th. He will be we responsible for marketing and client service writing, such as client/product/fund commentaries and advertising copy. He will also be responsible for the creation and development of marketing materials, working together with Steve O'Brien/sales, Jim Dwinell, Kim Buffam and myself to ensure that we always have the highest quality materials available for our sales and servicing efforts. In addition, Albert will have overall responsibility for the Babson web site, working closely with Susan Donald to maintain and enhance our web site. Albert is a veteran of the institutional asset management business with over ten years' prior experience at Putnam, State Street Research, and most recently, with MFS Institutional advisors, where he was Manager of Marketing Communications. He is a graduate of Boston College. Albert is a much needed addition to our marketing efforts and I'm certain he will be a tremendous asset to Babson. Albert is located on the 10th floor in the office next to Jeff Berry, so please drop by and welcome him to Babson.

Jackie

Jacqueline J. Maurer
Managing Director
Product Management
David L. Babson & Company, Inc
617-761-3728
617-679-5094 (fax)
jmaurer@dlbabson.com

This e-mail transmission may contain information that is proprietary, privileged and/or confidential and is intended exclusively for the person(s) to whom it is addressed. Any use, copying, retention or disclosure by any person other than the intended recipient or the intended recipient's designees is strictly prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and delete all copies.

---

This e-mail transmission may contain information that is proprietary, privileged and/or confidential and is intended exclusively for the person(s) to whom it is addressed. Any use, copying, retention or disclosure by any person other than the intended recipient or the intended recipient's designees is strictly prohibited. If you have received this message in error, please notify the sender immediately by return e-mail and delete all copies.

==========================================================================

DEPOSITION
EXHIBIT
20 Bickford
11/4/04 RJJ