**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ISAAC WILLIAMS, JR.,** : | |
|     **Plaintiff** : | |
| **v.** : | **C.A. No. 03 CV 11470 RCL** |
| : | |
| **MASSACHUSETTS MUTUAL LIFE** : | |
| **INSURANCE COMPANY (a/k/a** : | |
| **MASSMUTUAL FINANCIAL GROUP)** : | |
| **and DAVID L. BABSON & COMPANY, INC.** : | |
| **(a/k/a DAVID L. BABSON AND COMPANY),** : | |
|     **Defendants** : | |

**PLAINTIFF'S MEMORANDUM OF LAW SUPPORTING OBJECTION TO**
**DEFENDANT BABSON'S MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This action is brought by the Plaintiff, Isaac Williams, Jr., seeking redress for unlawful discrimination in employment based on his race, in violation of the Title VII of the Civil Rights Act, 42 U.S.C. §2000e, *et seq.*, 42 U.S.C. §1981, *et seq.*, and the Massachusetts Fair Employment Practices Act, M.G.L. ch. 151B §1, *et seq.* ("FEPA"). In addition, the Plaintiff has asserted a claim for Infliction of Mental Distress. (Compl. ¶60) Specifically, the Plaintiff is an African-American who alleges, *inter alia*, that he was hired by Defendant MassMutual Life Insurance Company ("MassMutual") as a vice president, during which time he was performing his job duties as expected. After a corporate re-organization in 2000, the Plaintiff became an employee of Defendant David L. Babson & Company, Inc. ("Babson") and was assigned to report to a Caucasian supervisor who made racist remarks directed toward the Plaintiff, assessed his performance below average, and set unrealistic goals. After receiving the worst performance evaluation of his career in January, 2002, the Plaintiff reported his supervisor's mistreatment to the human resources department and, shortly thereafter was informed that his position was being eliminated.

Defendant admits only that the Plaintiff is African-American and was hired by MassMutual in 1998, but denies all other allegations relating to the Plaintiff's claim of discrimination.

## II. DESCRIPTION OF MOTION

Defendant Babson brings this motion against the Plaintiff seeking summary judgment in its favor on the grounds that the Plaintiff's federal and state claims are time-barred for failure to file an administrative charge timely; the Plaintiff cannot make out a *prima facie* case of discrimination; and the Plaintiff cannot show his infliction of mental distress claim is related to the actions of Defendant.[1]

## III. FACTS[2]

The Plaintiff is an African American who was hired as Second Vice President by MassMutual on or about February 16, 1998.  (Def.'s Facts ¶¶1-2; Pl.'s Facts ¶1)  On or about January 14, 2000, the Plaintiff was given a performance appraisal which evaluated his performance for the preceding year (1999).  (Pl.'s Facts ¶2)  Of the twelve evaluation criteria reviewed, the Plaintiff was rated as "Exceeded Requirements," which was defined as "Consistently performed beyond requirements of the job," while being rated in the remaining category as "Met Requirements," which was defined as "Consistently performed beyond requirements of the job."  (Pl.'s Facts ¶3-4)  In connection with his 1999 performance appraisal, the Plaintiff received a bonus of forty thousand dollars ($40,000.00).  (Pl.'s Facts ¶5)

At some point in 2000, Babson merged with the Investment Management Department of MassMutual and, at that time, the Plaintiff became an employee of Babson.  (Def.'s Facts ¶4;

---

[1] Defendant MassMutual has also moved for summary judgment in a separate contemporaneous filing on the grounds that it was not the Plaintiff's employer at the relevant time.
[2] As required for continuity, the Plaintiff will make reference to Defendant's Statement of Material Facts Not in Dispute and the Plaintiff's Statement of Facts for Which There Exists a Genuine Issue to be Tried.

Pl.'s Facts ¶6)  During the first six (6) months that the Plaintiff was employed by Babson, he reported to Kevin McClintock, who informed the Plaintiff that he was doing a great job; he was well liked; and had a bright future with Babson. (Pl.'s Facts ¶¶7-8)  On or about October, 2000, the Plaintiff was appointed to the position of Director of Corporate Communications and was informed he would be reporting to Edward Bickford. (Def.'s Facts ¶5; Pl.'s Facts ¶9)  At that time, the Plaintiff's was job responsibilities were to include:

> public relations
> developing relationship with the press
> advertising
> website
> speaking engagements for portfolio managers
> conference sponsorships
> mutual fund reports
> brochures
> organize offsites/board meetings
> e-commerce
> proactive media management
> coaching portfolio manager on media interaction
> media point person
> manage David L. Babson message
> clarify and raise the visibility of the new Babson brand
> clearly communicate its attributes to key audiences
> challenge to employee morale resulting form the integration of two established firms
> position David L. Babson as a premier investment manager for the next century
> brand positioning
> building a strong, consistent outward reputation requires internal consistency
> employees are ambassadors to the customers, community, the job market and other audiences
> communications is at the foundation of an organization's long-term success
> standardized communications to the firm's internal and external audiences and ensure consistency of message for the firm and its products.

(Pl.'s Facts ¶10)  The Plaintiff was provided with no training or other guidance from Bickford in order to accomplish the duties that were assigned to him and was not provided with any written guidelines of what was expected of him. (Pl.'s Facts ¶11)

Shortly after the Plaintiff began his new position, he completed a project and was told by

3

Bickford, "That's a good boy," and during the course of the Plaintiff's reporting relationship with Bickford, Bickford referred to the Plaintiff as "boy" between 25 and 50 times. (Pl.'s Facts ¶¶12-13) Bickford did not deny that, in communicating with the Plaintiff, he referred to the Plaintiff as "boy," indicating only that he did "not recall" calling the Plaintiff "boy." (Pl.'s Facts ¶14) The Plaintiff reported Bickford's references to him as "boy" to several Babson/MassMutual employees. (Pl.'s Facts ¶¶15-17) The Plaintiff also reported Bickford's reference to him as a "good boy" to Susan Moore in Human Resources on or about March, 2002, and informed Ms. Moore that he did not like it. (Pl.'s Facts ¶17, Ex, 22) Ms. Moore was aware that the use of the term "boy" to an African American could be viewed as a racial slur. (Pl.'s Facts ¶18)

On or about February 1, 2001, Bickford gave a performance review to the Plaintiff memorialized in a form entitled Corporate Communications Officer Feedback Form ("Feedback Form"), a form created by Bickford and different than the standard format used to evaluate employees. (Pl.'s Facts ¶¶19-20) The Feedback Form used on February 1, 2001, set forth five (5) categories for evaluation:

> Product and Market Knowledge: shows a thorough understanding of DLB products and the various markets in which they are being sold.
> Communications Skills: displays strong verbal and written communications skills; has a sense of what the various audiences need to hear and the frequency of contact; creative.
> Media Familiarity: understands what media forums are effective and has developed close contacts with these groups; proactive approach.
> Project Management: well organized and exhibits a keen sense of how projects are completed in a timely fashion; able to set priorities for day-to-day tasks.
> Teamwork: promotes a team-oriented environment by helping others; works well with all areas of company especially sales, client service and investment professionals.

(Pl.'s Facts ¶21) The scoring on the Feedback Form was as follows:

> 1-2 Substantial Improvement Needed
> 3-4 Below Average
> 5-6 Meets Expectations

4

       7-8 Exceeds Expectations
       9-10 Clearly Outstanding

(Pl.'s Facts ¶23)  By the end of 2000, the Plaintiff had worked under Bickford's supervision for approximately 10-12 weeks.  (Pl.'s Facts ¶24)  Bickford does not recall if the criteria were communicated to the Plaintiff prior to the creation of the Form or whether, in evaluating the Plaintiff's performance for 2000, he consulted with anyone who may have supervised the Plaintiff prior to completing the Form.  (Pl.'s Facts ¶¶25-26)  Bickford's evaluation of the Plaintiff's performance resulted in ratings as follows:

       a. Product and market knowledge:   4
       b. Communication Skills:   6
       c. Media Familiarity:   4
       d. Project Management:   4-5
       e. Teamwork:   9

(Pl.'s Facts ¶27)  On or about February 1, 2001, the Plaintiff met with Bickford to review and discuss the completed Feedback Form, and upon receiving the results, the Plaintiff challenged Bickford on the scoring in light of the fact that he had only reported to him for a short period of time in 2000, and had only met with Bickford three (3) times since he had started reporting to him. (Pl.'s Facts ¶¶28-29)  When the Plaintiff asked Bickford how he had reached the numbers in the Feedback Form, Bickford did not give the Plaintiff a straight answer.  (Pl.'s Facts ¶30) Notwithstanding the scoring given by Bickford on the Plaintiff's 2000 performance appraisal, the Plaintiff received a salary increase of 4.3% and a bonus of forty-five thousand dollars ($45,000.00). (Pl.'s Facts ¶31)

    Despite the Plaintiff's disagreement with Bickford's evaluation of his performance, the Plaintiff took action to address those areas in which Bickford asserted the Plaintiff needed improvement.  (Pl.'s Facts ¶32)  Thereafter, Bickford did not give the Plaintiff any training to assist the Plaintiff in improving his performance in 2001.  (Pl.'s Facts ¶34)

5

As the time for annual evaluations approached the following year, and prior to the review itself, Bickford gave the Plaintiff a blank Feedback Form in which to evaluate his own performance for 2001 and the Plaintiff filled out the Form and provided it to Bickford. (Pl.'s Facts ¶35) The evaluation criteria and scoring scale on the 2002 Feedback Form remained unchanged from the 2001 Feedback Form. (Pl.'s Facts ¶36) The Plaintiff gave himself the following scores:

      a. Product and Market knowledge: 5
      b. Communication Skills: 9
      c. Media Familiarity: 7
      d. Project Management: 6
      c. Teamwork: 10

(Pl.'s Facts ¶38) At around that same time, Bickford completed a Feedback Form to evaluate the Plaintiff's performance for 2001, and sent a copy to the Plaintiff for review prior to a meeting to discuss the evaluation. (Pl.'s Facts ¶¶39-40) Bickford gave the Plaintiff the following scores:

      a. Product and Market knowledge: 1
      b. Communication Skills: 2
      c. Media Familiarity: 4
      d. Project Management: 4
      c. Teamwork: 4

(Pl.'s Facts ¶41) After receiving a copy of Bickford's proposed evaluation, the Plaintiff was upset at the scores and he contacted Bickford and informed him that such an evaluation was wrong and was not reflective of the person (i.e., the Plaintiff) who was doing the job. (Pl.'s Facts ¶43) In response to the Plaintiff's reaction, Bickford modified the scores he had given to the Plaintiff and the "Final" Feedback Form completed by Bickford rated the Plaintiff as follows:

      a. Product and Market knowledge: 2
      b. Communication Skills: 3
      c. Media Familiarity: 6
      d. Project Management: 4
      c. Teamwork: 6

(Pl.'s Facts ¶44)  On or about January 18, 2002, the Plaintiff and Bickford met to review the Feedback Forms and discuss the Plaintiff's performance for 2001.  (Pl.'s Facts ¶45)  At that meeting there arose a disagreement between the Plaintiff and Bickford as to the content of Bickford's evaluation of the Plaintiff since the Plaintiff had become upset with Bickford's evaluation scores because the scores were a complete surprise and inconsistent with Bickford informing the Plaintiff throughout 2001 that he was doing a good job.  (Pl.'s Facts ¶¶46-47)  After the Plaintiff challenged Bickford on his scoring, Bickford responded by stating "It is what it is," but provided no other explanation or substantiation (Pl.'s Facts ¶48) Initially, the Plaintiff was designated to not receive a bonus (which are paid on the basis of merit) for 2001 and was informed of this by Bickford.  (Pl.'s Facts ¶¶49-50)  After receiving his 2001, performance review, the Plaintiff contacted the Human Resources department to express that he felt the evaluation was unfair.  (Pl.'s Facts ¶51)  Ultimately, the Plaintiff did receive a bonus of $15,000.00 for performance in 2001.  (Pl.'s Facts ¶52)

Thereafter, at some point in or around early February, 2002, it was decided that the Plaintiff's position would be eliminated from Babson.  (Pl.'s Facts ¶53)  Although Bickford testified that he was not in any way involved in the decision to eliminate the Plaintiff's position and was not aware of the reasons for the elimination, he also testified as follows:

> A. We felt that Mr. Williams was not performing to the level that we wanted him to perform and that coincided with the reason for eliminating the position altogether.
>
> Q. Was it because Mr. Williams wasn't performing?
>
> A. Yes.

(Pl.'s Facts ¶54)  The first documented indication that the Plaintiff's position would be

eliminated is contained in the February 11, 2002, e-mail correspondences between Nancy Roberts and Susan Moore in which Ms. Roberts indicated that she was "surprised" to hear about the Plaintiff's performance review. (Pl.'s Facts ¶¶55-56) The following day, February 12, 2002, e-mails between and among Sue Alfano, Ms. Moore, and Ms. Roberts, indicated that the Plaintiff's position would be eliminated; he would report to Stu Reese; he would be given special projects to work on for the next 6-9 months and would be allowed to seek employment internally and outside the company. (Pl.'s Facts ¶57) Importantly, Mr. Reese (Babson CEO) does not recall if he was involved in the decision to eliminate the Plaintiff's position and did not recall why the Plaintiff was assigned to report to him. (Pl.'s Facts ¶¶58-59) The February 12, 2002, e-mails also indicated that the Plaintiff could potentially be considered for an Assistant Vice President position, which would be considered a demotion from his existing position. (Pl.'s Facts ¶60) In the February 12, 2002, e-mails, in response to Ms. Moore's curiosity or confusion as to why the Plaintiff was being given a 6-9 month notice period, Ms. Roberts indicted "we'll talk live – more to this story." (Pl.'s Facts ¶61) When asked to clarify what she meant or why she needed to speak with Ms. Moore "live" Ms. Roberts could not recall. (Pl.'s Facts ¶62) Finally, on or about March 13, 2002, the Plaintiff was notified by Mr. Reese that his position was being eliminated from the company. (Pl.'s Facts ¶63)

On or about April 26, 2002, the Plaintiff met with Larry Port and Susan Moore to discuss allegations that the Plaintiff had had inappropriate contact with a female student from the University of Virginia while on a recruiting trip. (Pl.'s Facts ¶64) In that meeting, the Plaintiff explained that his contact with the student was not as it had been portrayed, that he apologized, and had not in any way intended to offend anyone. (Pl.'s Facts ¶65) On April 29, 2002, in response to the great deal of stress the Plaintiff was suffering in connection with his work

8

environment, and feeling that the cumulative effect of the racial slurs, poor performance appraisal, and investigation into alleged misconduct was designed to force him from the company, he presented himself to his doctor and was placed on medical leave immediately. (Pl.'s Facts ¶¶66-67; Ex. 22)

On or about October 24, 2002, several months after the Plaintiff was placed on medical leave, Ms. Roberts forwarded a memorandum to Bob O'Connell (CEO of MassMutual) that read in part as follows:

> The interaction and consultation with HR throughout the process remains important for us to retain ultimate oversight responsibility. From a corporate perspective, the overall assessment of risk and potential impact to MassMutual (E.g., negative publicity, impact to MM image, internal morale) are key factors, particularly when dealing with cases that are sensitive and can quickly become high profile in the external world. (Examples of these are the Institutional action this year, and recent cases that have caused concern about disparate impact on African Americans).

(Pl.'s Facts ¶68)  When asked to specify which cases concerning African Americans she was referring to in her October 24, 2002, memorandum Ms. Roberts was unable to recall.  (Pl.'s Facts ¶69)  It was the practice of MassMutual companies that if an employee initiated legal action against the company their employee file would be sent to the legal department for "cleansing," and that position eliminationwas a method for riddign the company of employees who fell out of favor.  (Pl.'s Facts ¶¶71-72)

## IV.  <u>ISSUES</u>

1. Whether the Plaintiff's federal and state discrimination claims are time-barred because the Plaintiff failed to timely file an administrative charge in connection with these claims.

2. Whether the Plaintiff can establish a *prima facie* case of race discrimination based on the fact that his position was eliminated and whether Defendants' stated reason for eliminating the Plaintiff's position could be viewed as pretextual.

9

3. Whether the Plaintiff can prove a hostile work environment that altered the conditions of his employment or otherwise caused him to leave the workplace.

4. Whether the Plaintiff can show the Defendants are liable to the Plaintiff for infliction of emotional distress.

## V. POINTS AND AUTHORITIES

### A. Standard of Review in Considering a Motion for Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is *entitled to a judgment as a matter of law*." *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 3 (1st Cir. 1996)(emphasis added); *Kelly v. United States*, 924 F.2d 355, 357 (1st Cir. 1991); Fed. R. Civ. P. 56. In reviewing a motion for summary judgment, a court is obliged to view the facts in a light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 534 (1st Cir. 1996). "At the summary judgment stage, a Court should ask itself whether the plaintiff could prevail if a jury or judge believed plaintiff's version of the facts and disbelieved the Defendants' version." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929 (1st Cir. 1983). It is not the reviewing judge's function to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247, 249 (1986). Accordingly, summary judgment will not lie if the dispute about a material fact is "genuine," that is, the evidence is such that a reasonable jury could return a verdict for the non-moving party when construing all evidence in the record and inferences in favor of that party. *Id.* at 248.

B.  **Argument**

### 1.  THE COURT SHOULD DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THE PLAINTIFF'S FEDERAL AND STATE DISCRIMINATION CLAIMS ARE NOT TIME-BARRED FOR FAILURE TO TIMELY FILE AN ADMINISTRATIVE CHARGE

Defendant asserts that the Plaintiff's federal and state claims must fail as having been filed out of time at the administrative level. (Def.'s Mem. Supp. Summ. J. at 3-5)  Each is discussed in turn below.

*a. Federal Claims*

In its Memorandum, Defendant correctly points out that a plaintiff in Massachusetts who wishes to bring a claim of discrimination must file a charge with the Equal Opportunity Employment Commission (the "EEOC") within 300 days after the alleged unlawful employment practice occurred. (Def.'s Mem. Supp. Summ. J. at 3-4); see 42 U.S.C. §2000e-5(e)(1)(2000). In the present case, the Plaintiff filed his Charge of Discrimination with the EEOC on December 10, 2002. (Def.'s Mem. Supp. Summ. J. at 4).  Having established the filing date, the questions to consider are whether (1) some discrete act of discrimination occurred within the preceding 300 days, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002), or (2) whether there was some discriminatory action that occurred within the preceding 300 days that could be used as an anchor to previous ongoing acts of discriminatory conduct that would constitute a hostile work environment. *Id* at 115; *Andujar v. Nortel Networks, Inc.*, 400 F.Supp.2d 306, 329-30 (D.Mass. 2005).  In either case, the 300-day statutory cut-off would have been February 13, 2002.  The Plaintiff avers that there was both a discrete act that qualifies a discriminatory and at least one other act within the statutory period that served to anchor prior acts for purposes of establishing a hostile work environment.

11

### Discrete Act

Defendant's argument that the Plaintiff cannot demonstrate that at least one "harassing act occurred on or after February 13, 2002," (Def.'s Facts ¶23; Pl.'s Facts ¶63), fails to acknowledge that the Plaintiff was informed on March 13, 2002, that his position was being eliminated from the company. This discrete act, in and of itself, qualifies as a discriminatory act for establishing the filing deadlines. A discrete discriminatory act occurs on the day that it happens. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 110. The Plaintiff, being notified that his position was being eliminated was effectively terminated at that time, even if no final date of work had been determined or communicated to him. This action (termination) is different in kind than the ongoing verbal abuse and harassment that the Plaintiff suffered at the hands of his supervisor who frequently referred to the Plaintiff as "boy." Therefore, in the context of whether there was a single discrete discriminatory act within the 300-day administrative filing period, for purposes of establishing the timeliness of the Plaintiff's EEOC filing, such filing was indeed completed within the prescribed time.

### Continuing Violation

In asserting that the Plaintiff's claims were not timely filed at the administrative level, Defendant argues that there was no discriminatory act that occurred within the 300-day filing period such that a hostile work environment claim could be maintained. (Def.'s Mem. Supp. Summ. J. at 4) As the Supreme Court has noted:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

*Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. In the present case the Plaintiff asserts that the

12

ongoing harassment commenced against him almost immediately after he began reporting to Bickford in late 2000; initially in the form of verbal abuse, continuing in the form of two consecutive poor performance appraisals and, ultimately culminating in notice of termination and an investigation into allegations that he had inappropriate conduct with a student after a recruiting trip. (Compl. ¶30; Pl.'s Facts ¶¶64-65) "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117 (internal quotation marks omitted). Such a claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

Under the "continuing violation" theory of discrimination, some acts "involve an interlinked succession of related events or a fully-integrated course of conduct." *Mack*, 871 F.2d at 183. Hence, the key to determining whether there were events (or an event) that occurred within the prescribed time period to establish a continuing violation is evaluating whether either (1) the notice of job elimination or (2) the "investigation" into the Plaintiff's alleged inappropriate contact with a student could, separately or collectively, be considered part of an ongoing series of discriminatory acts which would then draw in the repeated references to the Plaintiff as "boy" and the two poor performance appraisals. The Plaintiff asserts that either of these acts could be considered as one in a continuing series of discriminatory actions, both of which occurred within the 300 days prior to the EEOC filing. Indeed, the Plaintiff should be allowed to present this evidence to a jury so that they may be free to conclude whether, in light of the circumstances present in this case, the notice of termination and the April, 2002, investigation are to be considered as part of a course of conduct of discrimination against the Plaintiff.

In light of the foregoing, the Plaintiff has indeed complied with the applicable 300-day filing period as to his hostile work environment claim. Although the jury may be free to conclude that the notice of job elimination and April, 2002, investigation were not part of a course of conduct undertaken by Defendant to discriminate against the Plaintiff, the facts which will allow them to reach such a conclusion should not be withheld at this stage. It certainly cannot be said, *as a matter of law*, that the notice of termination (although itself a potentially discrete discriminatory action) and the April, 2002, investigation could not qualify as part of a continuing violation.

Reviewing the facts in the case at bar, the April 26, "meeting" in which the Plaintiff was questioned in the presence of a company lawyer about alleged improper contact with a student could reasonably be viewed as the last in a series of actions undertaken by the Plaintiff's supervisor and the company to goad the Plaintiff out the door. Such a conclusion is not unreasonable when one considers that the Plaintiff had complained to human resources about his poor 2001 performance review and Bickford' repeated reference to him as "boy" and then, only days later, informed that his position was being eliminated. Thereafter, on or about April 2002, the Plaintiff was the subject of an investigation into alleged improper conduct. The culmination of these actions compelled the Plaintiff to seek medical treatment for job-related stress. Indeed, it cannot be said as a matter of law that the April, 2002, investigation was not sufficiently related to other actions taken by Defendant such that summary judgment is warranted.

Defendant has opted to limit its analysis on this point to a hostile work environment/constructive discharge claim and concludes that there was no action by Defendant that could qualify as discriminatory on or after February 13, 2002. (Def.'s Mem. Supp. Summ. J. at 4) Indeed, the Plaintiff contends that the actions of his supervisor, using a racially derogatory

term and evaluating his performance at extraordinarily low levels, amounted to a hostile work environment. A jury could reasonably conclude that, after many months of verbal abuse and two consecutive performance appraisals that purported to demonstrate that the Plaintiff was not capable of performing the job to which he was appointed, the notice of termination and/or the April, 2002, investigation qualified as further hostile acts in an ongoing series of acts.

   *b. State Claims*

Defendant further asserts that the Plaintiff's state law claim—violation of the Massachusetts Fair Employment Practices Act, M.G.L. ch. 151B §1, *et seq.*—is time barred because the Plaintiff failed to file an administrative charge within six months of the alleged discriminatory act. (Def.'s Mem Supp. Summ. J. at 5-6) In the present case, the Plaintiff filed his charge of discrimination only with the EEOC and not with the state agency, the Massachusetts Commission Against Discrimination (the "MCAD"). This is a critical fact since it is the law in this jurisdiction that,

> [i]n order to take advantage of the 300 day period, [a plaintiff is] not obligated to file with the MCAD before filing with the EEOC because, by virtue of the worksharing agreement [between the MCAD and EEOC], the charge filed with the EEOC initiate[s] proceedings at the MCAD.

*Seery v. Biogen, Inc.*, 203 F.Supp.2d 35, 44 (D.Mass. 2002). Moreover, the worksharing agreement simultaneously institutes and terminates proceedings at the MCAD on a plaintiff's behalf. *Id*. The worksharing agreement applicable to the present action grants a plaintiff the benefit of the 300-day filing period even if he never filed with the MCAD. *Id*. at 45. By virtue of the worksharing agreement, the state filing is accomplished on his behalf.[3] *Id*.

Therefore, Defendant's argument that the Plaintiff's state claims are barred because the Plaintiff had not filed a charge of discrimination within six months after the discriminatory acts,

---

[3] A copy of the worksharing agreement between the EEOC and MCAD is attached hereto as Exhibit A.

cannot be sustained. The Plaintiff's filing within 300 days at the EEOC was sufficient to preserve his state claims in accordance with the worksharing agreement between the MCAD and the EEOC.

### 2. THE COURT SHOULD DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THE PLAINTIFF CAN ESTABLISH A *PRIMA FACIE* CASE OF RACE DISCRIMINATION

Absent direct evidence of purposeful race discrimination, the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973), applies and requires that a plaintiff establish a *prima facie* case by presenting evidence sufficient to "create an inference that an employment decision was based on illegal discriminatory criterion." *Andujar*, 400 F.Supp.2d at 328 (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). Once the plaintiff has satisfied the requirements of establishing a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate non-discriminatory reason for its actions. *Id*. (quoting *Rodriquez-Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 58 (1st Cir. 2005)). The final stage shifts the burden back to the plaintiff to show that the employer's proffered reason is a pretext for discrimination. *Id*. (internal quotation marks omitted).

As a threshold matter, it is necessary to note that the Plaintiff has not limited his discrimination claims as narrowly as Defendant has tailored its arguments in support of the present motion. The facts present in the case at bar and the claims asserted by the Plaintiff in his Complaint indicate simply that the actions of Defendant constitute violations of federal and state discrimination laws. (Compl. ¶¶48-59) A jury, based on the evidence in the record could reasonably conclude that the Plaintiff was subjected to a hostile work environment, was constructively discharged, and/or was otherwise terminated for reporting mistreatment by his

supervisor. Although all three of the foregoing theories of discrimination can be gleaned from the facts present herein, each requires a slightly different legal analysis.

  *a. Elimination of the Plaintiff's Position*

As this Court acknowledged, "[b]ecause circumstances giving rise to complaints of employment discrimination vary widely, the elements of a *prima facie* case are elastic enough to be formulated to best fit the circumstances alleged." *McDonnell v. Certified Engineering & Testing Co.*, 899 F.Supp. 739, 746 (D.Mass. 1995). In an effort to dispatch this case summarily, Defendant avers that the test for establishing a prima facie case of discrimination in this matter requires the application of the paradigm set forth in *Lewis v. City of Boston*, 321 F.3d 207, 214 (1st Cir 2003). (Def.'s Mem. Supp. Summ. J. at 7) In *Lewis*, the plaintiff, who was and African American and the Music Director for Boston Public Schools, had his position eliminated attendant to a system-wide reduction in force that was intended to create funding to prepare students for the MCAS tests. *Id.* at 212. The plaintiff alleged that the City's elimination of his position and failure to offer him another available position was retaliation for making public statements criticizing the City's commitment to funding music programs. *Id.* at 211-13. The Lewis court concluded that, because the plaintiff had been terminated as part of a system-wide reduction in force, in order to establish a prima facie case of discrimination, he was required to show that (1) he was a member of a protected class; (2) he was performing his job in a satisfactory manner; (3) he was terminated; and (4) the employer City did not treat race neutrally in deciding to terminate him or retained personnel outside his protected class in the same position.[4] *Id.* at 214.

  The Plaintiff in the present matter agrees that the foregoing test represents the *general*

---

[4] The *Lewis* court drew this test from *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993). *Lewis*, 321 F.3d at 214.

test to be applied in a reduction in force context. However, the fourth prong of the *Lewis* test is not well suited to the facts of the case at bar. Although the present case arguably involves a reduction in force, the *Lewis* test does not help determine whether the Plaintiff can establish a *prima facie* case since Defendant did not continue to employ others in that same position or category. (Def.'s Mem. Supp. Summ. J. at 9) The proper standard to be applied in cases such as the present matter was established in *McDonnell v. Certified Engineering & Testing Co., supra*.

In adopting the test enunciated by the Tenth Circuit case of *Jones v. Unisys Corp.*, 54 F.3d 624 (10th Cir. 1995), the *McDonnell* court concluded that in order to make out a *prima facie* case in which the relevant group of those eliminated is very small—or, as in the case of the plaintiff in *McDonnell*, only herself—a plaintiff may satisfy the fourth prong of the prima facie test by presenting evidence that the job elimination was not undertaken in a racially neutral manner *or otherwise presenting evidence from which a factfinder might reasonably conclude that the employer intended to discriminate on the basis of race in reaching its decision to eliminate the position.*[5] *McDonnell*, 899 F.Supp. at 747-48. This modified fourth prong rounds out the proper test for determining whether the Plaintiff in the present action can establish a

---

[5] The *McDonnell* court (Woodlock, J.) noted,

> the unavoidable restrictiveness created when the reduction in force prima facie formulation is applied to reductions involving small numbers of people. In these circumstances, some courts have questioned plaintiffs' offerings regarding the fourth element—that the employer did not conduct the layoffs gender neutrally or that men were retained in the same position. As the First Circuit wrote,
>
>> We . . . question whether a company can be said not to treat age neutrally as a matter of law merely because two of the three people it discharges pursuant to a reduction in force belong to a protected class. A sample of three is a small number from which to draw deductions of this sort. *LeBlanc*, 6 F.3d at 844.
>
> Such a holding may effectively foreclose the claim of a plaintiff because of the small statistical pool in which he or she experiences an adverse employment action, and is consequently unable to make a sufficient statistical proffer to fit within the formulation the courts have devised. In order to address the comparative evaluation concerns of the fourth . . . category, without making a statistical showing an evidentiary necessity, a different formulation is appropriate.

*McDonnell*, 899 F.Supp. at 747 n.9.

18

*prima facie* case of discrimination, not the overly restrictive *Lewis* test as presented by Defendant.

### **Plaintiff's *Prima Facie* Case**

Having established the foundation for evaluating whether the Plaintiff can establish a *prima facie* case, the query now moves to whether there are sufficient facts present in the record to satisfy the test. The first part of the test is clearly satisfied. There is no dispute that the Plaintiff is an African American and, therefore, in the class of persons intended to be protected under federal and state anti-discrimination laws. Next, the question of whether the Plaintiff was performing his job duties in a satisfactory manner is left unaddressed by Defendant. (Def.'s Mem. Supp. Summ. J. at 7) Furthermore, a fair reading of Defendant's Memorandum indicates that Defendant asserts only that the Plaintiff "cannot establish the third and fourth elements of a *prima facie* case." (Def.'s Mem. Supp. Summ. J. at 7) Notwithstanding Defendant's failure to evaluate the second prong of the test, there is indeed ample evidence to demonstrate that, despite Bickford's opinion, the Plaintiff was, in fact, meeting his employer's legitimate expectations.

First, the Plaintiff was informed verbally from the time he was hired until he received his 2001 performance review (in January, 2002) that he was doing a great job. (Pl.'s Facts ¶¶8, 47) Certainly, it would be difficult for Defendant to argue that an employee who received a nearly perfect performance appraisal in 1999, accompanied by a sizeable ($40,000.00) bonus and who, despite being given an average to below average performance appraisal for 2000, was given another sizeable bonus ($45,000.00) and a raise, somehow became wholly incapable of performing any of his essential job functions satisfactorily within a year's time. At a minimum, there exists a question of fact whether the Plaintiff was performing his job duties to his employer's *legitimate* expectation, thereby precluding summary judgment. Moreover, since

Defendant has opted to forego any argument as to why the first and second prongs of the test are not satisfied, this Court should take such elements as conceded (and therefore established).

The third element of the *prima facie* test is also easily satisfied. Defendant dares to argue that the Plaintiff was not terminated until December 13, 2002. (Def.'s Mem. Supp. Summ. J. at 8) Curiously, Defendant opines that had the Plaintiff not been placed on medical leave in April, 2002, he "could very well have remained employed within the MassMutual family of companies" and asserts that any claim that the Plaintiff's "employment would have been terminated based on the *anticipated* elimination of his position is purely speculative." (Def.'s Mem. Supp. Summ. J. at 8)(emphasis added). To be sure, it is Defendant who is engaging in speculation when it presents such conclusions. The record is clear (and undisputed) that the Plaintiff was informed on or about March 13, 2002, that his position as Director of Corporate Communications was being "eliminated." As a result, it was on March 13, 2002, that the discriminatory act occurred. *See Delaware State College v. Ricks*, 449 U.S. 250 (1980)(alleged discriminatory act occurred at time denial of tenure was communicated to plaintiff); *Ching v. Mitre Corp.*, 921 F.2d 11 (1st Cir. 1990)(a cause of action accrues when the plaintiff learns of the alleged discriminatory act). As the Supreme Court has noted, "the proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful." *Ricks*, 499 U.S. at 258 (internal quotation marks and citations omitted)(emphasis in original). Hence, it is clear that the "termination" occurred not in December when the Plaintiff was administratively separated from the company, but in March, 2002, when he was told his days were numbered. Therefore, there exists sufficient evidence in the record to support the third element of a *prima facie* case.