UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ISAAC WILLIAMS, JR.,<br>    Plaintiff<br>v.<br><br>MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY (a/k/a<br>MASSMUTUAL FINANCIAL GROUP)<br>and DAVID L. BABSON & COMPANY, INC.<br>(a/k/a DAVID L. BABSON AND COMPANY),<br>    Defendants | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    C.A. No. 03 CV 11470 RCL |

**PLAINTIFF'S STATEMENT OF FACTS FOR WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED – BABSON'S MOTION FOR SUMMARY JUDGMENT**

In accordance with Massachusetts District Court Local Rule 56.1, the Plaintiff in the above captioned matter hereby submits the following enumerated Statement of Facts for which there exists a genuine issue to be tried.[1]

1. Prior to assuming the position of Director of Corporate Communications with David L. Babson & Company, Inc. ("Babson"), the Plaintiff worked for Babson's parent company, Defendant MassMutual Life Insurance Company ("MassMutual"), as Second Vice President in the MassMutual Investment Group, a position he commenced in or about January, 1998. (Pl.'s Dep. at 53; Jan. 9, 1998, Ltr.)[2]

2. On or around January 14, 2000, the Plaintiff was given a formal Performance Review by MassMutual which contained twelve (12) areas of evaluation: (1) Client/Partner Orientation; (2) Cross Functional Communication; (3) Effective Delegation; (4) Big Picture Thinking; (5)

---

[1] Although the Plaintiff has listed various facts herein that are duplicative of some of the facts contained in Defendant's Statement of Material Facts Not in Dispute, said facts are presented in order that the context of those facts which the Plaintiff asserts give rise to triable issues can be considered properly.

[2] The relevant portions of the Plaintiff's deposition transcript are attached hereto as Exhibit 1; the January 9, 1998, letter from MassMutual to the Plaintiff offering him the position of Second Vice President is attached hereto as Exhibit 2.

Analytical; (6) Developing/Coach Others (Include Peers); (7) Concern for Improvement; (8) Decision Making/Business Judgment; (9) Flexibility; (10) Professional confidence; (11) Integrity; and (12) Goal Attainment. (1999 Performance Review)[3]

3. The 1999 Performance Review allowed for three (3) possible scores as follows:

   a. <u>Exceeded Requirements</u> - Consistently performed beyond requirements of the job;
   b. <u>Met Requirements</u> – Consistently performed requirements of the job; and
   c. <u>Did Not Completely Meet Requirements</u> – Did not completely fulfill some requirements of the job.

   (1999 Performance Review)

4. On eleven (11) of the twelve (12) areas for evaluation denominated in the 1999 Performance Review, the Plaintiff received a score of "Exceeded Requirements" and on the remaining area received a score of "Met Requirements." (1999 Performance Review)

5. In connection with the Plaintiff's 1999 Performance Review, the Plaintiff received a bonus of forty thousand dollars ($40,000.00). (Salary/Bonus Summary Sheet)[4]

6. At some point in 2000, Babson merged with the Investment Management Department of MassMutual and the Plaintiff became an employee of Babson. (Pl.'s Dep. at 74-76)

7. For approximately the first six (6) months of the Plaintiff's employment with Babson, he reported to Kevin McClintock. (Pl.'s Dep. at 76-81)

8. During that time, Mr. McClintock informed the Plaintiff that the Plaintiff was doing a great job; the people in Cambridge really liked him; and that he had a bright future with the company. (Pl.'s Dep. at 81-82)

9. On or about October 2, 2000, the Plaintiff was appointed to the position of Director of Corporate Communications for Babson and was informed he would be reporting to Edward

---

[3] A copy of the Plaintiff's 1999 Performance Review is attached hereto as Exhibit 3.
[4] A copy of a handwritten salary/bonus summary sheet for the Plaintiff is attached hereto as Exhibit 4.

2

Bickford (Director of Client Services). (Pl.'s Dep. at 84-85; Oct. 2, 2000, e-mail)[5]

10. When the Plaintiff was hired into the position of Director of Corporate Communications for Babson, his job responsibilities were to include:

   a. public relations
   b. developing relationship with the press
   c. advertising
   d. website
   e. speaking engagements for portfolio managers
   f. conference sponsorships
   g. mutual fund reports
   h. brochures
   i. organize offsites/board meetings
   j. e-commerce
   k. proactive media management
   l. coaching portfolio manager on media interaction
   m. media point person
   n. manage David L. Babson message
   o. clarify and raise the visibility of the new Babson brand
   p. clearly communicate its attributes to key audiences
   q. challenge to employee morale resulting from the integration of two established firms
   r. position David L. Babson as a premier investment manager for the next century
   s. brand positioning
   t. building a strong, consistent outward reputation requires internal consistency
   u. employees are ambassadors to the customers, community, the job market and other audiences
   v. communications is at the foundation of an organization's long-term success
   w. standardized communications to the firm's internal and external audiences and ensure consistency of message for the firm and its products.

(Bickford Dep. at 52-54)[6]

11. The Plaintiff was provided with no training or other guidance from Bickford in order to accomplish the duties that were assigned to him and was not provided with any written guidelines of what was expected of him. (Bickford Dep. at 57-58)

12. Shortly after the Plaintiff began his new position, he completed a project and was told by

---

[5] A copy of an October 2, 2000, e-mail to the Babson staff announcing the Plaintiff's appointment as Director of Corporate Communications is attached hereto as Exhibit 5.
[6] A copy of the relevant portions of Edward Bickford's deposition transcript is attached hereto as Exhibit 6.

Bickford, "That's a good boy." (Pl.'s Dep. at 91-92)

13. During the course of the Plaintiff's reporting relationship with Bickford, Bickford referred to the Plaintiff as "boy" between 25 and 50 times. (Pl.'s Dep. at 91)

14. Bickford did not deny that, in communicating with the Plaintiff, he referred to the Plaintiff as "boy." (Bickford Dep. at 100-101)

15. The Plaintiff reported Bickford's references to him as "boy" to Michael Foley on a number of occasions between 2000 and 2002. (Pl.'s Dep. at 100-103)

16. The Plaintiff reported Bickford's references to him as "boy" to Steve O'Brien. (Pl.'s Dep. at 100-101; 139)

17. The Plaintiff reported Bickford's reference to him as a "good boy" to Susan Moore on or about March, 2002, and informed Ms. Moore that he did not like it. (March 11, 2002 Handwritten Note)[7]

18. Ms. Moore was aware that the use of the term "boy" to an African American could be viewed as a racial slur. (Moore Dep. at 38)[8]

19. On or about February 1, 2001, Bickford gave a Performance Review to the Plaintiff memorialized in a form entitled Corporate Communications Officer Feedback Form ("Feedback Form"). (Pl.'s Dep. at 183)

20. The Feedback Form used for the February 1, 2001, performance appraisal was created by Bickford and was not in the standard format employed by MassMutual. (Bickford Dep. at 67; Pl.'s Dep. at 183; Roberts Dep. at 26-27)[9]

21. The Feedback Form used on February 1, 2001, evaluated work performed in 2000, and set forth five (5) categories for evaluation:

---

[7] A copy of a handwritten note created by Ms. Moore is attached hereto as Exhibit 7.
[8] A copy of the relevant portions of Susan Moore's deposition transcript is attached hereto as Exhibit 8.

4

    a. Product and Market Knowledge: shows a thorough understanding of DLB products and the various markets in which they are being sold.
    b. Communications Skills: displays strong verbal and written communications skills; has a sense of what the various audiences need to hear and the frequency of contact; creative.
    c. Media Familiarity: understands what media forums are effective and has developed close contacts with these groups; proactive approach.
    d. Project Management: well organized and exhibits a keen sense of how projects are completed in a timely fashion; able to set priorities for day-to-day tasks.
    e. Teamwork: promotes a team-oriented environment by helping others; works well with all areas of company especially sales, client service and investment professionals.

(Feedback Form, 02/01/01)[10]

22. The criteria listed on the Feedback From was created specifically by Bickford for the various positions that reported to him and differed for each position. (Bickford Dep. at 64)

23. The Feedback Form provided a scoring scale as follows:

    1-2       Substantial improvement needed
    3-4       Below average
    5-6       Meets expectations
    7-8       Exceeds expectations
    9-10      Clearly outstanding

(Feedback Form, 02/01/01)

24. By the end of 2000, the Plaintiff had worked under Bickford's supervision for approximately 10-12 weeks. (Pl.'s Dep. at 84-85; Oct. 2, 2000, e-mail)

25. Bickford does not recall if the criteria listed on the Feedback Form was communicated to the Plaintiff prior to the creation of the Form. (Bickford Dep. at 68)

26. Bickford does not recall whether he solicited any input from McClintock or anyone who may have supervised the Plaintiff prior to joining Babson before completing the February 1, 2000, Feedback Form. (Bickford Dep. at 69; 73)

27. As to each of the criteria for evaluation, Bickford rated the Plaintiff as follows:

    a. Product and Market Knowledge:    4

---

[9] A copy of the relevant portions of Nancy Roberts' deposition transcript is attached hereto as Exhibit 9.
[10] A copy of the February 1, 2001, Feedback Form is attached hereto as Exhibit 10.

5

    b. Communication Skills:   6
    c. Media Familiarity:    4
    d. Project Management:   4-5
    e. Teamwork:     9

(Feedback Form, 02/01/01)

28. On or about February 1, 2000, the Plaintiff met with Bickford to review and discuss the completed Feedback Form. (Pl.'s Dep. at 183)

29. After reviewing the results listed on the February 1, 2001, Feedback Form with Bickford, the Plaintiff challenged Bickford on the results in light of the fact that he had only reported to him for a short period of time in 2000, and had only met with Bickford three (3) times since he had started reporting to Bickford. (Pl.'s Dep. at 183-185)

30. When the Plaintiff asked Bickford how he had reached the numbers in the Feedback Form, Bickford did not give the Plaintiff a straight answer. (Pl.'s Dep. at 185)

31. In February, 2001, the Plaintiff received a salary increase of 4.3% and a bonus of forty-five thousand dollars ($45,000.00). (Feb. 2001, Compensation Stmt.)[11]

32. After the February, 2001, Performance Review, the Plaintiff endeavored to address the areas in which Bickford asserted the Plaintiff needed improvement. (Pl.'s Dep. at 185-188)

33. Bickford does not recall whether, during 2001, he had any further discussions with the Plaintiff regarding the Plaintiff's job performance. (Bickford Dep. at 95)

34. Bickford did not give the Plaintiff any training to assist the Plaintiff in improving his performance in 2001. (Bickford Dep. at 94)

35. At some time before January 18, 2002, the Plaintiff was given a blank Feedback Form by Bickford in which to evaluate his own performance for 2001 and the Plaintiff filled out that Form and provided it to Bickford. (Pl.'s Dep. at 189-190; 200; Bickford Dep. at 127; 141;

---

[11] A copy of the Plaintiff's February, 2001, Compensation Statement is attached hereto as Exhibit 11.

6

Pl.'s 01/18/02 Feedback Form)[12]

36. The evaluation criteria and scoring scale on the 2002 Feedback Form remained unchanged from the 2001 Feedback Form. (Bickford Dep. at 127)

37. The Feedback Form that was completed by the Plaintiff was sent to Bickford prior to January 18, 2002. (Pl.'s Dep. at 200-201)

38. The Plaintiff gave himself the following scores:

    a. Product and Market Knowledge:   5
    b. Communication Skills:           9
    c. Media Familiarity:              7
    d. Project Management:             6
    c. Teamwork:                       10

   (Pl.'s 01/18/02 Feedback Form)

39. At or around that same time, Bickford completed a Feedback Form to evaluate the Plaintiff's performance for 2001. (Bickford Dep. at 126)

40. An initial draft of the Feedback Form completed by Bickford at that time was sent to the Plaintiff for review prior to a meeting to discuss the evaluation. (Pl.'s Dep. at 200-201)

41. Bickford gave the Plaintiff the following scores:

    a. Product and Market Knowledge:   1
    b. Communication Skills:           2
    c. Media Familiarity:              4
    d. Project Management:             4
    c. Teamwork:                       4

   (Pl.'s Dep. at 201)

42. Bickford agreed that there was a draft created prior to the "Final" draft of the Feedback Form completed by him and, although conceding he may have changed some of the numbers, does not recall specifically if he did so. (Bickford Dep. at 126-27; 143-44)

43. After receiving a copy of Bickford's evaluation, the Plaintiff was upset at the scores given by

---

[12] A copy of the January 18, 2002, Feedback Form completed by the Plaintiff is attached hereto as Exhibit 12.

Bickford and he then contacted Bickford and informed him that such an evaluation was wrong and was not reflective of the person (i.e., the Plaintiff) who was doing the job. (Pl.'s Dep. at 201)

44. Bickford then modified the scores he had given to the Plaintiff and the "Final" Feedback Form completed by Bickford rated the Plaintiff as follows:

    a. Product and Market Knowledge:    2
    b. Communication Skills:            3
    c. Media Familiarity:               6
    d. Project Management:              4
    c. Teamwork:                        6

(Bickford 01/18/02 Feedback Form)[13]

45. On or about January 18, 2002, the Plaintiff and Bickford met to review the completed Feedback Forms and discuss the Plaintiff's performance for 2001. (Pl.'s Dep. at 189; Bickford Dep. at 143)

46. At the January 18, 2002, meeting to discuss the Plaintiff's performance there arose a disagreement between the Plaintiff and Bickford as to the content of Bickford's evaluation of the Plaintiff. (Pl.'s Dep. at 200; Bickford Dep. at 144)

47. The Plaintiff had become upset with Bickford's evaluation scores because he had been informed by Bickford throughout 2001 that he was doing a good job and the low scores were a complete surprise to him. (Pl.'s Dep. at 202-03)

48. After the Plaintiff challenged Bickford on the scores Bickford had given him, Bickford responded by stating "It is what it is," but provided no other explanation or substantiation (Pl.'s Dep. at 202-03)

49. Initially, the Plaintiff was designated to not receive a bonus for 2001 and was informed of

---

[13] The January 18, 2002 "Final" Feedback Form completed by Bickford is attached hereto as Exhibit 13.

8

this by Bickford. (Moore Dep. at 17; Pl.'s Dep. at 166)

50. Bonuses are paid on the basis of performance. (Moore Dep. at 17)

51. In response to the January 18, 2002, performance review that Bickford had given to the Plaintiff, the Plaintiff contacted the Human Resources department to express that he felt the evaluation was unfair. (Moore Dep. at 20)

52. Ultimately, the Plaintiff did receive a bonus of $15,000.00. (February 11, 2002, e-mail; February, 2002, Compensation Stmt.)[14]

53. At some point in or around early February, 2002, it was decided that the Plaintiff's position would be eliminated from Babson. (Reese Dep. at 63; Bickford Dep. at 185)[15]

54. Although Bickford testified that he was not in any way involved in the decision to eliminate the Plaintiff's position and was not aware of the reasons for the elimination, he also testified as follows:

A. We felt that Mr. Williams was not performing to the level that we wanted him to perform and that coincided with the reason for eliminating the position altogether.

Q. Was it because Mr. Williams wasn't performing?

A. Yes.

(Bickford Dep. at 188-89)

55. The first documented indication that the Plaintiff's position would be eliminated is contained in the February 11, 2002, e-mail correspondences between Nancy Roberts and Susan Moore. (February 11, 2002, e-mail)

56. Also in that e-mail correspondence, Ms. Roberts indicated that she was "surprised" to hear about the Plaintiff's Performance Review. (February 11, 2002, e-mail)

---

[14] A copy of February 11, 2002, e-mail correspondences between Susan Moore and Nancy Roberts is attached hereto as Exhibit 14; a copy of the February, 2002, Compensation Statement is attached hereto as Exhibit 15.
[15] A copy of the relevant portions of Stu Reese's deposition transcript is attached hereto as Exhibit 16.

57. In February 12, 2002, e-mail correspondences between and among Sue Alfano, Ms. Moore, and Ms. Roberts, it was communicated that the Plaintiff's position would be eliminated; he would report to Stu Reese; he would be given special projects to work on for the next 6-9 months and would be allowed to seek employment internally and outside the company. (Feb. 12, 2002, e-mails)[16]

58. Mr. Reese does not recall if he was involved in the decision to eliminate the Plaintiff's position but that any such decision would have required his approval. (Reese Dep. at 63)

59. Mr. Reese did not recall why the Plaintiff was assigned to report to him. (Reese Dep. at 60)

60. It was noted that Jim Miller had agreed to give consideration to working with the Plaintiff if he would be willing to accept an Assistant Vice President position, which would be considered a demotion from his existing position. (Feb. 12, 2002, e-mails; Roberts Dep. at 21)

61. In the February 12, 2002, e-mails, in response to Ms. Moore's curiosity or confusion as to why the Plaintiff was being given a 6-9 month notice period, Ms. Roberts indicted "we'll talk live – more to this story." (Feb. 12, 2002, e-mails)

62. When asked to clarify what she meant or why she needed to speak with Ms. Moore "live" Ms. Roberts could not recall. (Roberts Dep. at 30-32)

63. On or about March 13, 2002, the Plaintiff was notified by Mr. Reese that his position was being eliminated from the company. (Pl.'s Dep. at 179; Reese Dep. at 61, 67)[17]

64. On or about April 26, 2002, the Plaintiff met with Larry Port and Susan Moore to discuss allegations that the Plaintiff had had inappropriate contact with a female student from the

---

[16] A copy of the February 12, 2002, e-mails is attached hereto as Exhibit 17.
[17] There is no indication in the record as to a date on which the Plaintiff's employment with Babson was scheduled to end.

University of Virginia while on a recruiting trip. (Meeting Minutes, 04/26/02)[18]

65. In that meeting, the Plaintiff explained that his contact with the student was not as it had been portrayed, that he apologized, and had not in any way intended to offend anyone. (Mtg. Minutes, 04/26/02)

66. On April 29, 2002, the Plaintiff presented himself to his doctor and reported the stress in his work environment that was caused by his work conditions. (Med. Rec. Bay State, 04/29/02)[19]

67. As a result of the stress and anxiety the Plaintiff was suffering at work, he was placed on medical leave immediately by his doctor. (Apr. 29, 2002, Ltr.)[20]

68. On or about October 24, 2002, Ms. Roberts forwarded a memorandum to Bob O'Connell (CEO of MassMutual) that revealed possible knowledge of race discrimination.[21]

69. Ms. Roberts, when asked to specify which cases she was referring to in her October 24, 2002, memorandum that caused concern about disparate treatment of African Americans, was unable to recall. (Roberts Dep. at 51-53)

70. Based on Bickford's reference to the Plaintiff as "boy," the consecutive poor performance appraisals, the lack of any investigation into reports of mistreatment, the notification that his job had been eliminated, and the investigation into claims of inappropriate conduct, the Plaintiff felt that he was being forced out my position. (Pl.'s Aff.)[22]

71. It was that policy of MassMutual companies to eliminate the positions of employees who fell out of favor. (McAteer Aff. ¶7)[23]

---

[18] A copy of the meeting minutes from the April 26, 2002, meeting are attached hereto as Exhibit 18.
[19] In accordance with the Protective Order Assented to in this case, the referenced document is being forwarded to the Court in a sealed Envelope and referenced as Plaintiff's Exhibit 19.
[20] A copy of a letter from the Plaintiff's doctor placing him out of work on medical leave is attached hereto as Exhibit 20.
[21] In accordance with the Protective Order Assented to in this case, the referenced document is being forwarded to the Court in a sealed Envelope and referenced as Plaintiff's Exhibit 21.
[22] A copy of the Plaintiff's Affidavit is attached hereto as Exhibit 22.
[23] A copy of the Affidavit of Michael McAteer is attached hereto as Exhibit 23.

72. It was also the practice of the MassMutual companies to send an employee's file to the company's legal department for "cleansing." (McAteer Aff. ¶6; Moore Dep (II) at 36-42)[24]

          ISAAC WILLIAMS, JR.
          By his attorney,

          /s/ John B. Reilly, Esq.
          John B. Reilly, Esq.
          BBO #545576
          John Reilly & Associates
          Summit West - Suite 330
          300 Centerville Road
          Warwick, Rhode Island 02886
          (401) 739-1800
          Fax: (401) 738-0258

---

[24] A copy of the relevant portions of Susan Moore's deposition transcript from the April 19, 2005, deposition are attached hereto as Exhibit 24.