# EXHIBIT 2

```
                    1
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS

          Civil Action No. 03 CV 11470 MAP


ISAAC WILLIAMS, JR.

VS.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, et
al.


DEPOSITION OF:  SUSAN MOORE, taken before
Rebekah J. Johnson, Registered Merit Reporter,
Notary Public, pursuant to Rule 30(b)(6) of the
Federal Rules of Civil Procedure, at the
offices of Philbin & Associates, Inc., 959 Main
Street, Springfield, Massachusetts 01103, on
April 19, 2005, commencing at 1:00 p.m.






APPEARANCES:
(Please see page 2)





            Rebekah J. Johnson
            Registered Merit Reporter
```

```
                    2
APPEARANCES:

JOHN REILLY & ASSOCIATES, Summit West, Suite
330, 300 Centerville Road, Warwick, Rhode
Island 02886, representing the Plaintiff.
BY:  PATRICK S. BRISTOL, ESQUIRE

BULKLEY, RICHARDSON AND GELINAS, LLP, 1500 Main
Street, Springfield, Massachusetts 01115,
representing the Defendants.
BY:  KATHERINE A. ROBERTSON, ESQUIRE

LAW DEPARTMENT, Massachusetts Mutual Life
Insurance Company, 1295 State Street,
Springfield, Massachusetts 01109, representing
the Defendants.
BY:  SEAN SEELY, ESQUIRE
```

```
                    3
                  I N D E X

WITNESS:      EXAMINATION           PAGE

SUSAN MOORE   Direct by Mr. Bristol    5


EXHIBITS      DESCRIPTION           PAGE

Deposition 1   Notice                 5
Deposition 2   Notification meeting   39
Deposition 3   Document               42
Deposition 4   E-mail                 44
```

```
                    4
              S T I P U L A T I O N S

        It is agreed by and between the

parties that all objections, except objections

as to the form of the question, are reserved to

be raised at the time of trial for the first

time.


        It is further agreed by and between

the parties that all motions to strike

unresponsive answers are also reserved to be

raised at the time of trial for the first time.


        It is further agreed that the deponent

will read and sign the deposition and that the

sealing of said deposition will be waived.


        It is further agreed by and between

the parties that notification to all parties of

the receipt of the original deposition

transcript is also hereby waived.


                    *****
```

### Page 33

1 about Mr. McDonough duties and responsibilities
2 are beyond the scope of the April 6 order
3 issued by the Court, and Ms. Moore is not
4 prepared to testify about Mr. McDonough's
5 duties and responsibilities.
6     Q.  (BY MR. BRISTOL) Are you all set?
7     A.  Yes.
8     Q.  Does David L. Babson maintain
9 employment files for its employees?
10     A.  Yes, we do.
11     Q.  And is an employee entitled to a copy
12 of that file?
13     A.  Yes, they are.
14     Q.  And can you tell me the process
15 whereby an employee would gain access to that
16 file?
17     A.  Generally if an employee wants a copy
18 of their employment file, they would submit a
19 request and then a copy of the file would be
20 made for the employee.
21     Q.  Can you tell me what is contained in a
22 person's employment file?
23     A.  There would in the --

### Page 34

1     MS. ROBERTSON: I'm going to
2 object. The question is beyond the scope of
3 the Court's April 6 order. You can answer.
4     THE WITNESS: In the general
5 employment file there would be their
6 application and any new hire processing
7 paperwork that needed to be done.
8     Q.  (BY MR. BRISTOL) Anything else?
9     A.  In the employment file there -- if an
10 individual were posting for a position, there
11 would be that kind of documentation in it, but
12 I'm speaking only of the actual employment
13 file.
14     Q.  Are there other types of files
15 maintained by Babson regarding employees?
16     A.  There may be an employee relations
17 file.
18     Q.  Can you tell me what that would
19 involve?
20     A.  That would contain notes on meetings
21 when an individual came to meet with human
22 resources. It may contain any other kind of
23 disciplinary documentation.

### Page 35

1     Q.  And that was called an employee
2 relations file?
3     A.  Correct.
4     Q.  And is an employee also entitled to a
5 copy of that file?
6     A.  Yes, they are.
7     Q.  And is the process for obtaining that
8 the same as the employee file?
9     A.  Yes, it is.
10     Q.  Do you know if Isaac Williams made a
11 request for a copy of his employment file?
12     A.  Yes, he did.
13     Q.  And was that provided to him?
14     A.  Yes, it was.
15     Q.  And do you know who provided that to
16 him?
17     A.  I provided all of the files to Isaac,
18 I gathered all of the files that he asked for
19 and made copies for him.
20     Q.  Do you recall what files he requested?
21     A.  He requested any and all of his files.
22 I believe that was the request that came
23 through.

### Page 36

1     Q.  Can you tell me what you did when you
2 received that request?
3     A.  What I did was I gathered all of the
4 files. I reviewed them with in-house counsel.
5 I made copies of all of the information and
6 provided it to Isaac, with the exception of one
7 document which I left with the files, and I
8 provided the files to outside counsel.
9     MS. ROBERTSON: And to Isaac.
10     THE WITNESS: I sent Isaac his
11 copies. I did provide the files to Isaac.
12     Q.  (BY MR. BRISTOL) You said you met
13 with in-house counsel. Can you tell me who you
14 met with?
15     A.  I met with an attorney in MassMutual's
16 law department.
17     Q.  Can you provide me his or her name?
18     A.  Robert Rancke.
19     Q.  And do you recall how long after you
20 received Mr. Williams' request for his file
21 that meeting took place? How long after you
22 received it, I'm sorry.
23     A.  I don't remember the exact time, but

37

1  it would have typically been within a few days.
2   Q. Can you tell me the purpose of your
3  meeting with Mr. Rancke?
4   A. Typically when we receive, when I
5  receive a request for employment files I will
6  meet with in-house counsel to ensure that we're
7  in compliance with Mass and Connecticut law
8  with respect to personnel records, to ensure
9  there isn't any confidential information that's
10 contained in the file related to other
11 employees or customers or any other
12 confidential information in there.
13  Q. And is this a face-to-face meeting
14 that's conducted?
15  A. Typically, yes.
16  Q. And do you provide in-house counsel
17 with an actual copy of the file or do you just
18 bring one file to them and you both go through
19 it?
20  A. I bring the original files to them.
21  Q. And you said that the purpose of the
22 meeting is to ensure compliance with Mass and
23 Connecticut state laws.

38

1  A. Uh-huh.
2   Q. And then to ensure that confidential
3  information is not released.
4   A. Correct.
5   Q. Can you tell me what type of things
6  may be in a file that would not be in
7  compliance with Mass and Connecticut laws?
8    MS. ROBERTSON: I object to the
9  form of the question.
10     THE WITNESS: Again, the type of
11 things that could be in there that we would
12 want reviewed would be information that didn't
13 pertain to the individual at hand, confidential
14 information about our customers, other
15 confidential business information. And there
16 could be medical information in there that
17 should be redirected to the disability area at
18 MassMutual.
19  Q. (BY MR. BRISTOL) And you just said
20 that one of the things that could be in there
21 is information that didn't pertain to the
22 individual at hand.
23  A. Correct.

39

1   Q. Could you tell me what you meant by
2  that?
3   A. There could be mention of another
4  employee or another individual that we would
5  want to look for.
6   Q. And you had a meeting with Mr. Rancke
7  regarding Mr. Williams' employment file.
8   A. Correct.
9   Q. And you mentioned that I think it was
10 one document was removed?
11  A. Correct.
12  Q. Can you tell me what that document
13 was?
14  A. This is a copy of the document that
15 was not submitted to Isaac but was kept with
16 the file.
17     MR. BRISTOL: I'm just going to
18 have that marked as Plaintiff's Exhibit 2, I
19 believe.
20     (Deposition Exhibit No. 2
21      offered and marked.)
22  Q. (BY MR. BRISTOL) Are you familiar
23 with Plaintiff's Exhibit 2?

40

1   A. Yes, I am.
2   Q. And can you tell me why that was
3  removed from Mr. Williams' file?
4     MS. ROBERTSON: I'm going to
5  object on grounds of attorney-client privilege.
6  To the extent any answer to that question would
7  rely on communication between Mr. Rancke and
8  Ms. Moore, that would be an attorney-client
9  communication. She testified she went to Mr.
10 Rancke on legal advice on compliance with state
11 law. So she can testify to what she did, but
12 I'm going to object to the extent that any
13 response to that question would require her to
14 disclose any attorney-client communication, and
15 I'm going to instruct her not to answer.
16  Q. (BY MR. BRISTOL) So as a result of
17 your conversation with Mr. Rancke, not going
18 into the contents of that conversation, can you
19 tell me what you did with that document?
20  A. I kept this document with the files
21 that I sent to outside counsel, and I did not
22 mail it to Isaac.
23  Q. So at that point you mailed a copy of

## 41

1  Isaac's personnel file minus Plaintiff's
2  Exhibit 2 to Isaac?
3     A.   Correct.
4     Q.   And you also mailed a copy with
5  Plaintiff's Exhibit 2 to outside counsel?
6     A.   I delivered it.
7     Q.   You delivered what, I'm sorry?
8     A.   The files and this document.
9          MS. ROBERTSON:  I want to consult
10 with my client.
11         (Witness and counsel confer.)
12         MS. ROBERTSON:  I just want to
13 clarify one thing.
14         THE WITNESS:  I apologize.  The
15 files and this document were held aside, the
16 original files and this document were held
17 aside and not delivered to outside counsel
18 until a later date.
19    Q.   (BY MR. BRISTOL) Do you remember
20 approximately when that was?
21    A.   I don't have the date right now.  It
22 would have been when I received other
23 documentation requesting further information or

## 42

1  being given further information, and at that
2  time I would have submitted it to outside
3  counsel.
4     Q.   But shortly after your meeting with
5  Mr. Rancke you sent a copy minus Plaintiff's
6  Exhibit 2 to Isaac?
7     A.   Correct.
8     Q.   And then you held the others aside?
9     A.   Correct.
10    Q.   And then at a later date that was sent
11 to outside counsel?
12    A.   Correct.
13    Q.   And you are just not sure what that
14 date was?
15    A.   That's right.
16    Q.   Did you inform Mr. Williams that
17 anything had been removed from his file?
18    A.   No, I did not.
19         MR. BRISTOL:  I'm going to show
20 you what's going to be marked as Plaintiff's
21 Exhibit 3.
22         (Deposition Exhibit No. 3
23         offered and marked.)

## 43

1     Q.   (BY MR. BRISTOL) Have you reviewed
2  Plaintiff's Exhibit 3?
3     A.   Yes.
4     Q.   Have you ever seen that document
5  before?
6     A.   Yes.
7     Q.   Can you tell me what that document is?
8     A.   This actually looks like two
9  documents.  It looks like one page -- it looks
10 like a copier, it looks like one page and then
11 there may have been another document underneath
12 it that got copied onto one.
13    Q.   Do you remember seeing either the top
14 page or the page which looks like it was copied
15 underneath it in Mr. Williams' personnel file?
16    A.   It would have been in the file,
17 correct.
18    Q.   And do you know what the second page
19 of that is?
20    A.   In the file that we were having copied
21 there would have been, and you can kind of look
22 at this, this would have been the original, one
23 of the original sheets, there would have been

## 44

1  another sheet in the file, and what you could
2  see happening is the copy machine would have
3  grabbed two of them and made a copy of this
4  second document, which would have been in the
5  file also.
6          MR. BRISTOL:  I'm going to take
7  this one and just mark it as Plaintiff's
8  Exhibit 4.
9          MS. ROBERTSON:  Just for the
10 record, Plaintiff's Exhibit 4 was produced in
11 this litigation to plaintiff's counsel.
12         (Deposition Exhibit No. 4
13         offered and marked.)
14    Q.   (BY MR. BRISTOL) Can I just take a
15 quick look at that exhibit.
16         Showing you again what's been marked as
17 Plaintiff's Exhibit 3, can you identify the
18 document which appears to be on top of and
19 covering Plaintiff's Exhibit 4?
20         MS. ROBERTSON:  I object to the
21 form of the question.
22         THE WITNESS:  It's a copy of a
23 document that was in the file.

45

1   Q.  (BY MR. BRISTOL) And can you read
2   that document?  There appears to be handwritten
3   notes in the upper left-hand corner and then a
4   large written message across the center of the
5   document.
6   A.  Uh-huh.
7   Q.  Can you tell me what those say?
8   A.  The first line says Kevin --
9       MS. ROBERTSON:  I'm going to
10  object to the form of the question.  She can
11  answer to the extent she can.
12      THE WITNESS:  The first line says,
13  "Kevin -- Isaac."  I cannot read what the
14  second line is, nor the third line, and it
15  appears there's handwriting that says, "Call
16  Sue."
17  Q.  (BY MR. BRISTOL) Do you know if that
18  is your handwriting?
19  A.  That is not my handwriting.
20  Q.  Do you recognize whose handwriting it
21  is?
22      MS. ROBERTSON:  I'm going to
23  object to the form of the question.  I'm going

46

1   to again say this is beyond the scope of the
2   April 6, 2005 order.  You can answer if you
3   can.
4       THE WITNESS:  It looks like it's
5   Stu Reese's handwriting.
6   Q.  (BY MR. BRISTOL) And it's your belief
7   that Plaintiff's Exhibit 3 was produced in this
8   fashion as a result of a copying error?
9   A.  Most definitely.
10  Q.  There was no attempt to cover up the
11  contents of what's now been marked Plaintiff's
12  Exhibit 4?
13  A.  Not at all.  Not at all, because that
14  document is still in the file that's with it.
15  Q.  I'm sorry?
16  A.  This document that's cut off here is
17  in the file irrespectively.
18  Q.  So it's your testimony that Isaac
19  received a copy of Plaintiff's Exhibit 4?
20  A.  There was some kind of copy error.  I
21  can tell you that both of these documents are
22  in the file that I have.  Whether Isaac got
23  both of these I can't honestly say.

47

1   Q.  Okay, that's fair enough.
2       Is a handwritten message the type of
3   what appears to be exhibited in Plaintiff's
4   Exhibit 3 the type of thing what is normally
5   contained in someone's personnel file?
6       MS. ROBERTSON:  I object to the
7   form of the question.
8       THE WITNESS:  Generally notes are
9   in all kind, sometimes I have typewritten notes
10  and hand notes, so.
11  Q.  (BY MR. BRISTOL) So it would not be
12  uncommon for something like that to be
13  contained in the file?
14      MS. ROBERTSON:  I object to the
15  form of the question.
16      THE WITNESS:  I don't believe it
17  would be uncommon.
18  Q.  (BY MR. BRISTOL) Since 1997 when an
19  employee makes a request for his employment
20  file, can you tell me the procedure that is
21  followed in those cases?
22  A.  Since 1997?
23  Q.  Yes.

48

1   A.  Typically when we receive a response
2   from an employee to have their, a copy of their
3   file, we gather the files, we make the copies.
4   Generally we would review them with outside
5   counsel if there were employee relations
6   issues; otherwise, we would make sure that the
7   individual requesting the file has it well
8   within the time frame that's allowable.
9   Q.  You said that you would review with
10  outside counsel if there were employee
11  relations issues.
12  A.  Uh-huh.
13  Q.  Can you tell me what you mean by that?
14  A.  Generally if there was an issue with
15  respect to an employee, I would review it with
16  counsel.
17  Q.  Can you tell me what type of an issue
18  would cause you to review it with counsel?
19  A.  It could be a disciplinary issue.  It
20  could be a complaint that's been made.  It
21  could be a disability issue.  Any type of
22  employee relations issue.
23  Q.  Would that include a lawsuit filed by

### 49

1  the employee?
2  A. It could.
3  Q. If there had been a lawsuit filed by
4  the employee, would you always review it with
5  outside counsel?
6  A. That has been something that I have
7  done.
8  Q. Do you know if that is a formalized
9  procedure within Babson and MassMutual?
10 A. It is not a policy.
11 Q. Can you tell me when you started doing
12 that?
13 A. I had --
14     MS. ROBERTSON: Since 1997.
15     THE WITNESS: Since 1997.
16     MS. ROBERTSON: I mean that's the
17 scope of the order, so if she's been doing it
18 since 1997 she can testify she's been doing it
19 at least that long.
20 Q. (BY MR. BRISTOL) So you have been
21 doing it from 1997 to today?
22 A. Correct.
23 Q. Now, you said you reviewed it with

### 50

1  outside counsel. Is that a different procedure
2  than when you review it with MassMutual
3  counsel?
4  A. It's not a different procedure.
5  Q. So would outside counsel include
6  people like Mr. Rancke?
7  A. No, I'm sorry, inside counsel would be
8  Bob Rancke. When I refer to outside counsel
9  that would be Katy or Bulkley, Richardson and
10 Gelinas.
11 Q. So can you tell me when you would
12 review a file only with inside counsel from
13 1997 to today?
14 A. If I received a request to make copies
15 of an employee's file and there was an employee
16 relations file, I would review it with inside
17 counsel.
18 Q. And that would be done only if there
19 was an employee relations file?
20 A. Correct.
21 Q. And can you tell me why it would only
22 be done if there was an employee relations
23 file?

### 51

1  A. Again, generally I want to ensure that
2  we are being compliant with Mass and
3  Connecticut law regarding personnel records. I
4  want to ensure that there isn't any other
5  confidential information contained in the file
6  that should not be divulged. I want to ensure
7  there isn't any customer information, any firm
8  business confidential information or any
9  medical information that needs to go to the
10 disability unit at MassMutual.
11 Q. And would there ever be occasion to
12 simply redact a document rather than remove it
13 in its entirety if it contains some information
14 which was confidential or some information
15 which was not?
16 A. In the files that I have reviewed
17 that's not happened.
18 Q. And have you ever been instructed to
19 remove documents for fear that they might cause
20 embarrassment to either MassMutual or Babson?
21 A. Never.
22 Q. Have you ever been instructed to
23 remove documents because they may harm either

### 52

1  MassMutual or Babson in litigation?
2  A. Never.
3  Q. And the meetings with inside counsel
4  that you've had those are always held with
5  Attorney Rancke?
6  A. From 1997 through probably just a few
7  months ago, he was the employment lawyer for
8  these types of situations.
9  Q. And from 1997 to today, has there ever
10 been an occasion where Mr. Rancke reviewed a
11 file outside of your presence?
12 A. No.
13 Q. So it's your testimony that he --
14 A. Not any file that I've brought to him
15 for review. If I bring him files for review,
16 they're reviewed during that meeting.
17 Q. Okay. Have you ever had occasion to
18 simply provide a file to Mr. Rancke without
19 having a meeting about the contents of the
20 file?
21 A. I don't believe so.
22 Q. Do you know approximately how many
23 files you have reviewed with Mr. Rancke?

53

1  A.  I don't remember how many. You mean
2  related to Isaac Williams or --
3  Q.  In general from 1997 to today.
4  A.  I don't remember.
5  Q.  Do you know how many you review a year
6  with him approximately?
7  A.  I don't have an exact number.
8  Q.  Can you give me an approximation?
9  A.  It would vary year to year depending
10 on cases.
11 Q.  Would it be less than 50?
12 A.  Yeah.
13 Q.  Less than 25?
14 A.  Yes.
15 Q.  Less than 10?
16 A.  I would say maybe a handful in a given
17 year, but again some years are different than
18 others.
19 Q.  Do you know approximately what
20 percentage of files have something removed from
21 them?
22 A.  I'm trying to -- I believe this is
23 probably the only time that I've been asked to

54

1  hold something out of submitting it.
2  Q.  So from 1997 to today you believe
3  there's only been one occasion?
4  A.  Or it's been on a very rare occasion.
5  Q.  Can you think of any other times when
6  you've been asked to do that?
7  A.  No, I can't.
8      MR. BRISTOL: I'm just going to
9  take a short break, okay.
10     (A recess was taken.)
11 Q.  (BY MR. BRISTOL) Do you recall the
12 names of anyone else who had requested their
13 files?
14     MS. ROBERTSON: I'm sorry, Ms.
15 Moore wanted to supplement one of the answers
16 she gave you.
17     THE WITNESS: There have been
18 times after meeting with Mr. Rancke I have
19 taken information out of a file of a medical
20 nature and sent it to the medical department at
21 MassMutual, the disability unit, and I don't
22 know if I was clear about that. I just wanted
23 to make sure I clarified that.

55

1  Q.  (BY MR. BRISTOL) And can you tell me
2  your understanding of why information of a
3  medical nature would be removed?
4  A.  It does not belong in an employment
5  file. There is a disability area of MassMutual
6  that houses all of the medical and disability-
7  related information on employees.
8  Q.  Getting back to the question I just
9  asked, can you recall the names of anyone else
10 who have requested their files from 1997 to
11 today?
12 A.  Not at this particular moment.
13 Q.  And can you tell me did you meet with
14 Attorney Rancke prior to your deposition today?
15 A.  Did I meet with him today, no.
16 Q.  Or did you meet with him to prepare
17 for your deposition?
18 A.  No.
19 Q.  And can you tell me your understanding
20 of why Mr. Williams' file was the only one from
21 which something was removed?
22     MS. ROBERTSON: I object to the
23 form of the question. That has not been the

56

1  witness' testimony.
2  Q.  (BY MR. BRISTOL) You can answer.
3  A.  Can you repeat it again, I'm sorry.
4      MR. BRISTOL: Sure, can you just
5  read that back.
6      (Reporter read back as requested.)
7      MS. ROBERTSON: I'm going to
8  object to the extent that that question
9  requires Ms. Moore to disclose any confidential
10 attorney-client communication with Mr. Rancke.
11 If she has an understanding about why a
12 document would have been held out of Mr.
13 Williams' file separate and apart from
14 communications with counsel, she can answer.
15 Q.  (BY MR. BRISTOL) Do you have any
16 understanding of why separate and apart from
17 communications with Mr. Rancke?
18 A.  This document and what's contained in
19 it didn't happen according to what's written
20 here. These were notes concerning a meeting
21 that was going to take place with Stu Reese,
22 and the formal meeting never took place.
23 Q.  So was it because the meeting never