# EXHIBIT 3

**1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 03CV11470MAP

ISAAC WILLIAMS, JUNIOR,
    Plaintiff

vs

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,
(a/k/a MASSMUTUAL FINANCIAL GROUP) and
DAVID L. BABSON & COMPANY, INC.,
(a/k/a DAVID L. BABSON & COMPANY)
    Defendants

DEPOSITION OF: JEANETTE JEZ, taken
before M. Virginia Lanou, Notary
Public-Stenographer, pursuant to the
Massachusetts Rules of Civil Procedure,
at the offices of PHILBIN & ASSOCIATES,
959 Main Street, Springfield, Massachusetts,
on March 21, 2005 at 11:00 a.m.

APPEARANCES:   See second page

M. Virginia Lanou
Court Reporter

---

**2**

APPEARANCES:

JOHN REILLY & ASSOCIATES, Summit West - Suite
    330, 300 Centerville Road, Warwick, Rhode
    Island, 02886, representing the Plaintiff
BY: PATRICK S. BRISTOL, ESQUIRE

BULKLEY, RICHARDSON and GELINAS, 1500 Main
    Street, Suite 2700, Springfield, Massachusetts,
    01115, representing the Defendants
BY: KATHERINE A. ROBERTSON, ESQUIRE

---

**3**

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEANETTE JEZ | 5 | 42 | 45 | |

---

**4**

STIPULATIONS

It is agreed by and between the parties that

all objections, except objections as to the form of

the questions, are reserved, to be raised at the

time of trial for the first time.

It is further agreed by and between the

parties that all motions to strike unresponsive

answers are also reserved, to be raised at the time

of trial for the first time.

It is also agreed that the deponent will read

and sign the deposition.

It is further agreed by and between the

parties that notification to all parties of the

receipt of the original deposition transcript is

also hereby waived.

---

5

1    JEANETTE JEZ, Deponent, having been first
2  duly sworn, deposes and says as follows:
3    DIRECT EXAMINATION BY MR. BRISTOL
4    Q.  Miss Jez, just by way of introduction my
5  name is Patrick Bristol and I am an attorney
6  representing Isaac Williams in a case that he has
7  brought against MassMutual and the David L. Babson
8  Company.
9    Have you ever been deposed before?
10    A.  Yes.  As an employee of MassMutual.
11    Q.  Just to let you know some of the ground
12  rules for what we're going to do here today, when I
13  ask you a question, I need a verbal response.  So
14  that way the court reporter can take down what you
15  say and I say and we can have a clean record of what
16  takes place here today.
17    Additionally if there's a question that I ask
18  that you don't understand, let me know that.  There
19  are ways that we can correct that problem.  It can
20  be read back by the court reporter.  We can work
21  around that; okay?
22    A.  Yes.
23    Q.  If you need to take a break for any reason,

6

1  let me know and I will be happy to accomodate you in
2  that regard.
3    A.  Yes.
4    Q.  Could you provide your name and address for
5  the record, please?
6    A.  Jeanette Patricia Jez, 71 Fairway Drive,
7  Chicopee, Massachusetts, 01020.
8    Q.  Could you tell me a little bit about your
9  educational history?
10    A.  Graduated from high school; have graduated
11  from college, bachelors degree in business with a
12  minor in human resource management.
13    Q.  Where did you attend college?
14    A.  American International College.
15    Q.  What time period did you graduate from
16  college?
17    A.  19 -- spring of 1994.
18    Q.  Can you provide me with your employment
19  history?
20    A.  All the way back?
21    Q.  Maybe we could start from post college.
22    A.  From 1994 I was already employed at
23  MassMutual.

7

1    Q.  Why don't you start from the beginning of
2  your employment at MassMutual.
3    A.  In January 1989 I began employment with
4  MassMutual as an employee relations and staffing
5  specialist I believe was the title.  Most of my
6  responsibilities were employee relations, part of a
7  new department that was formed.  And then over the
8  next few years was rewarded with promotions and
9  ended up heading up the employee relations unit at
10  MassMutual.
11    Q.  Do you recall the time period when you
12  became the head of that unit?
13    A.  Oh, geez, I should have brought my resume.
14  Early nineties.  Let me see, 1990 was during a lot
15  of when Desert Storm, FMLA, ADA were all new
16  policies because I worked on them, defining and
17  training.  So early nineties.  I'm sorry, I don't
18  have the exact date.
19    Q.  Just so you're aware, I understand these
20  dates are sort of distant.  So we're not trying to
21  pin you down with exact dates on anything.  To the
22  best of your recollection is fine.
23    You continued with MassMutual?

8

1    A.  Right.  Until 1995 there was a
2  re-organization into service centers where there I
3  headed a multi-functional team that was responsible
4  for servicing different business units within the
5  organization.  I remember 1995 because it was prior
6  to the CML merger with MassMutual that occurred in
7  March of 1996.
8    Q.  Could you tell me what CML stands for?
9    A.  Connecticut Mutual Life Insurance.
10    Q.  In 1995 you took that new position?
11    A.  Well, we were just assigned to it.  It
12  wasn't, you know, it wasn't a job post.  Everybody
13  was assigned to positions.
14    Q.  Where were you located at that point; where
15  was your office?
16    A.  The home office which I think is 1295
17  State.
18    Q.  In Springfield?
19    A.  Yes.
20    Q.  After 1995 did you continue in that
21  position?
22    A.  I did until just after the merger.  This
23  gets a little fuzzy.  I believe it was the fall of

9

1    '96 there was an opportunity to move over to a
2    service center supporting investment management
3    which I was considering. But at the same time I was
4    approached by the head of corporate communications
5    to take the community relations job for Springfield
6    which had opened up.
7        Q.    Who was the head of corporate
8    communications?
9        A.    Eustis Walcott.
10       Q.    So did you take that position?
11       A.    Yes, I did.
12       Q.    Can you describe that position?
13       A.    I was responsible for representing
14    MassMutual in the community on boards and
15    committees. I was responsible for the charitable
16    giving program for MassMutual in terms of money
17    given out to organizations.
18        I had a small staff who was also responsible
19    for the writing and publishing of the annual report.
20    I was responsible for working with senior
21    management, and say there was a fundraising campaign
22    for Camp Atwater through the Urban League of
23    Springfield, working and coordinating that on behalf

10

1    of the CEO and whatever came my way. It was a
2    menagerie of community related events and things
3    that, you know, were to represent the company
4    favorably within the community.
5        Q.    How long did you continue in that position?
6        A.    That was short. It was probably nine, ten
7    months. And what happened, I was approached by the
8    Chief Information Officer at MassMutual about a
9    newly created position in the Information Technology
10    organization heading up human resource management.
11    Of course, human resources had been my profession
12    and I was coming to realize that I did miss it and
13    accepted it, much to the chagrin of Mr. Walcott.
14       Q.    Mr. Walcott was your supervisor in the
15    community relations position?
16       A.    Correct.
17       Q.    While you were in the community relations
18    position do you know who the CEO of MassMutual was
19    at that time?
20       A.    Tom Wheeler.
21       Q.    Tom?
22       A.    Tom Wheeler.
23       Q.    So did you accept the new job after the

11

1    community relations position?
2        A.    Yes.
3        Q.    What was your position at that point, can
4    you describe the position?
5        A.    I was responsible for -- I inherited people
6    who had been displaced in other areas of MassMutual
7    to form an HR organization responsible for staffing,
8    the training pool, training and development,
9    compensation and affirmative action. I was the
10    affirmative action officer for the organization.
11       Q.    What time did you take that post?
12       A.    That was the fall of I believe '99, early
13    fall of '99.
14       Q.    Do you know who the head of affirmative
15    action was prior to you taking that post?
16       A.    I don't know that they had a designated
17    affirmative action officer. Each business head has
18    had or has an affirmative action performance
19    objective measure on their performance review and
20    then it cascaded down to all the managers within
21    each organization. But because of my HR role within
22    IT and driving recruiting strategies and staffing
23    plans, my boss kind of conferred on me the

12

1    affirmative action officer.
2        Q.    Okay. But to your knowledge prior to then
3    there was no one with that specific title?
4        A.    Other than the head of human resources, you
5    know, for the company. I would not necessarily know
6    unless I serviced that organization. You know,
7    MassMutual is a pretty huge place. Each business
8    area is structured differently. They might operate
9    differently, so I couldn't tell.
10       Q.    Do you know if Mr. Walcott is still with
11    MassMutual?
12       A.    I don't think so. I heard that he had
13    retired but whether or not he consults, which he had
14    a lot of great knowledge, so he could be doing that.
15    But I believe he formally retired.
16       Q.    So it's your understanding that he retired
17    from MassMutual?
18       A.    Yes.
19       Q.    Do you know when approximately?
20       A.    It was after I left MassMutual but I don't
21    know because I wasn't formally connected.
22       Q.    So in 1999 we discussed the position that
23    you held.

13

1    A.  Uh-huh.
2    Q.  How long did you hold that position?
3    A.  Until February 2001.
4    Q.  What happened at that point?
5    A.  My department and job was eliminated.
6    Q.  You say your department was eliminated.
7    The entire department was eliminated?
8    A.  Yes.  It was dissolved.  We were the only
9    HR organization within the same business area and we
10    would collaborate with HR on some things.
11    Q.  So what was the name of the department that
12    was eliminated?
13    A.  Information Systems Human Resource
14    Management I believe it was.  It was a mouthful.
15    Q.  Were there other members of the department
16    other than you?
17    A.  Yes.
18    Q.  Could you tell me who they were?
19    A.  If I can remember, Diane Holman, Jack -- I
20    don't remember his last name.  We had an intern
21    Janine Walsh.  I should have written these down.
22        I had a training manager, I don't remember
23    his name, who headed the training pool.

14

1        Diane Holman, Jack, Lou Banasiewicz was the
2    training manager heading up the training pool
3    training.
4    Q.  If you remember more, you can let me know.
5        Can you tell me what your department was
6    responsible for specifically in relation to human
7    relations at that point?
8    A.  How are you defining human relations?
9    Q.  You said that the department was
10    responsible for HR?
11    A.  Uh-huh.  Oh, so broadly speaking.  We had a
12    number of responsibilities.  First and foremost was
13    recruiting and staffing in advance of the year 2000
14    because key resources had been placed on the year
15    2000 project.  We had a need to backfill those
16    positions plus WEB development in ERP were new
17    technologies, so we needed to find people who had
18    those specialized skills and staff positions
19    appropriately as well as I was networking with
20    executive search firms to find key leadership to
21    help support the strategic initiative of the
22    organization.
23        The next thing was training and development

15

1    because we knew through year 2000 efforts there
2    would be a lot of system integration as well as the
3    retirement of obsolete systems and that would mean
4    that we would have staff with obsolete skill sets
5    because their primary jobs for many years was the
6    maintenance of those systems.  So plans to re-tool
7    these people for other kinds of jobs and roles
8    within the organization.  That was a pretty huge
9    initiative.
10        The other piece of training were training
11    pools.  So we kind of concurrently had people we
12    were retooling while bringing in new resources to
13    develop and train them.  We had to actually certify
14    them following the training pool training.  These
15    were college grads who had come in, in this
16    wonderful opportunity to be paid and train for free
17    to become a programmer.
18    Q.  That sounds like quite a bit at that time.
19    A.  Yes.  Then we had the normal recruiting for
20    regular kinds of positions and advertising and then
21    compensation, annual performance review, planning,
22    creating or identifying a way in which to track
23    training and development for certifications.  Many

16

1    information technology positions, say Microsoft
2    certification, that sort of thing, we needed to
3    track that so that now we would get a snapshot of
4    where our technological resources were and then what
5    we needed to do to continue to support the
6    businesses long-term in resource development.
7        There was a lot going on.  It was a great
8    experience, absolutely great.
9    Q.  Good.  Now as the head of, I believe you
10    said the head of affirmative action?
11    A.  I was designated the affirmative action
12    officer.  You don't have to be impressed with that.
13    It's kind of a generic title.  I think that's used
14    in many organizations.
15    Q.  What were your responsibilities as an
16    affirmative action officer?
17    A.  Well, it was to communicate certainly to my
18    staff as well as the senior management team in which
19    I supported and worked with the importance of
20    inclusiveness, diversity.  I know that just from
21    working in corporate and at least the kinds of
22    things that I did with my clients when I was in
23    corporate was work toward changing the complexion of

17

1    the population to be more reflective of the
2    population in the Springfield area and Hartford once
3    we went through the merger. We had a lot of
4    success.
5        One of the things in information technology,
6    we had a lot of summer temps come in every year
7    during college breaks. So these people were not
8    necessarily majoring in information technology. So
9    we took a look at their program and established a
10   new program with our school business partner,
11   Springfield Science and Technology High School
12   across the street and they have an IT program there.
13       The kids, juniors and seniors, would apply
14   for positions within our organization. We had a
15   whole brochure done up and everything. We thought
16   it was a great opportunity to have people who were
17   truly interested in information technology careers
18   and also felt that we would be pulling from the
19   community in which we resided. It was an enormous
20   success.
21       What just naturally happened is that the
22   complexion of the people who were part of the
23   academy was reflective of the community.

18

1        And so we had affirmative action reports
2    that we had to complete. Well, I would complete it
3    and give it to my boss. We had tremendous success
4    and not only with the affirmative action goals but
5    the kids were just incredible. I mean just more
6    than what we anticipated. I believe it continues
7    today, maybe not under that ISO academy name, but
8    it's something that certainly made sense because
9    then you have a trained pool of candidates from
10   which to hire from after them being a part of this
11   program for a few years. It was great.
12       Q.  Do you remember the year in which your
13   position, your department was eliminated?
14       A.  Well, I left in February 2001. I was given
15   thirty or sixty days. The person who was my
16   assistant, she went to work in corporate human
17   resources if I remember, and then the one who
18   handled comp, I believe she went to another business
19   area. Then one person left the company, Jack, who I
20   can't remember his last name right now, his position
21   was eliminated. And then Lou who handled, headed up
22   training pool, he was retiring. I believe that's
23   it.

19

1        Then I had a couple of interns who were IT
2    professionals. One was absorbed within the
3    organization. The other one went back to school.
4        Q.  So in February of 2001 you left MassMutual?
5        A.  Yes.
6        Q.  What have you been doing since then?
7        A.  Well, I took some time off and I had
8    naturally commenced a search and had, you know, some
9    opportunities which I decided not to take. So then
10   I went to head up the Safety Council at Western New
11   England in June 2001. So I left MassMutual
12   February 2000 -- I'm sorry -- correction. Because I
13   went to the Safety Council at Western New England
14   June of 2001. Then I left there May 2004.
15       And then I went to Springfield Area Council
16   for Excellence in May 2004 and I'm there.
17       Q.  That's where you are still employed?
18       A.  Yes.
19       Q.  During your employment with MassMutual did
20   you come to know Isaac Williams?
21       A.  Actually I met Isaac before he joined
22   MassMutual because Valerie, his wife, worked for me.
23   Well, I met Valerie first before she worked for me

20

1    actually. She worked over in payroll, payroll and
2    benefits I believe.
3        Q.  So you knew Isaac before he began his
4    employment?
5        A.  Yes. Socially I had met him a couple of
6    times. Might have been a Christmas party or
7    something like that, yes.
8        Q.  That interaction occurred through his wife?
9        A.  Yes, yes.
10       Q.  Did you ever have occasion to work with
11   Isaac during your time at MassMutual?
12       A.  No, not that I recollect, no.
13       Q.  Did you have occasion to form an opinion of
14   Isaac's character during the time that you knew him?
15       A.  Oh, yeah. Yeah.
16       Q.  Can you tell me what that opinion is?
17       A.  Just very likeable. You know, his wife and
18   he were just very likeable people, fun.
19       Q.  It sounds like you had a working
20   relationship with his wife Valerie?
21       A.  Yes.
22       Q.  Can you describe that relationship?
23       A.  Yes. I was familiar with Valerie and

**21**

1  intermittently had contact with the payroll benefit
2  department. She was always very professional.
3      As the employee relations team that I
4  headed up grew, we had a need for the addition of a
5  person. So we posted and we had several candidates.
6  I can't tell you who the candidate applicants were,
7  but Val was one.
8      I just thought based on my interaction with
9  her that, and interview, that she would make a great
10  addition. So she was ultimately extended the offer
11  to come join our team, which she did. So that
12  involved, you know, training her. So while I didn't
13  take it on entirely myself because I had experienced
14  members of my team who would share knowledge, she
15  joined the team.
16      Q.  Do you remember when she joined the team?
17      A.  Early nineties. That's the best I can give
18  you.
19      Q.  That's fine. Do you know how long you
20  worked with her?
21      A.  I'm going to say close to a couple of years
22  maybe.
23      Q.  During the course of your working with her

**22**

1  did you come to form an opinion of her character?
2      A.  Oh, yes.
3      Q.  Can you tell me what that opinion is?
4      A.  Very favorable; high integrity,
5  straightforward, diplomatic, very favorable. Never
6  -- I mean you could agree to disagree, but
7  courteous. Just really enjoyed working with her.
8      Q.  Did there come a time when your working
9  relationship ended?
10      A.  Yes. That's when prior to the merger we
11  were re-organized into service centers and I
12  actually don't remember -- Val didn't end up within
13  my service center. She ended up, I believe, in
14  another service center but I can't tell you
15  necessarily who she worked for then.
16      Q.  Okay. So eventually there came a time when
17  you no longer worked together?
18      A.  Right, right.
19      Q.  Did you remain in contact with Valerie
20  after that?
21      A.  Well, hello and stuff like that. It's a
22  pretty busy place. You don't have a whole lot of
23  time unless you can grab lunch but, you know, it's

**23**

1  just a lot of us have lunch at the desk or grab
2  fifteen minutes in the cafeteria. But always, you
3  know, how are you doing, you know.
4      Q.  Fair enough. During your employment with
5  MassMutual, and this would be any time during the
6  lengthy time, were you ever involved in the
7  investigation of claims of racial discrimination?
8          MS. ROBERTSON: I'm going to object to
9  the form of the question. You can go ahead and
10  answer.
11          THE WITNESS: Yes.
12      Q.  (By Mr. Bristol) Do you know the time
13  period in which you were involved in those
14  investigations?
15      A.  Early nineties I'm going to say again.
16      Q.  In what capacity were you involved in those
17  investigations?
18      A.  Well, I don't know that investigation is
19  the right word. We were employee relations. There
20  was an EEO office and while people may come to
21  employee relations to register a complaint or
22  whatever, for whatever reason, the procedure was to
23  flip it over to the EEO office.

**24**

1      However, one that I'm recalling, a
2  complainant came directly to me and it was a pretty
3  serious matter.
4      Q.  Can you describe the nature of the
5  complaint?
6          MS. ROBERTSON: I'm going to object to
7  the form of the question. Go ahead. You can
8  answer.
9          THE WITNESS: There was a young lady
10  who was part of a training and development area who
11  I knew, didn't work directly with but just knew her.
12  And she came to me one day wanting to meet and
13  express some concerns about some racial comments by
14  her department head.
15      Q.  (By Mr. Bristol) Do you remember the name
16  of the department head?
17      A.  Jeff McEwen.
18      Q.  What time period was this?
19      A.  I think it was early nineties.
20      Q.  Was an investigation conducted of those
21  allegations?
22      A.  Oh, yes, definitely.
23      Q.  Can you describe the course of the

25

1  investigation?
2         MS. ROBERTSON: I object to the form of
3  the question.
4         THE WITNESS: Not really. I could
5  speak to my role but then it was flipped over to the
6  EEO office for handling.
7     Q. (By Mr. Bristol) If you could just describe
8  your role?
9     A. Well, I had met with this individual twice
10  within like one day, two days. Because of my
11  concern on what I was hearing and because of this
12  coming from a department head supposedly, I didn't
13  want to conclude anything because I, you know, this
14  was someone, you know, expressing concern. Then I
15  passed it up the pipeline to my department head who
16  was Carol Johnson at the time.
17         I have to believe that either she or I --
18  I'm sure I talked with -- I think Jerry Mayfield was
19  heading EEO at the time because he was somehow
20  involved in that matter.
21         Then it went over to EEO but somehow I was
22  brought back into it because Jerry somehow was
23  involved in the matter. Certainly I was involved

26

1  with our attorneys inside in discussing the matter.
2         There was a lot of concern and ultimately,
3  you know, I wrote up documentation, any case for
4  purposes of remembering what was said and what was
5  advised, no matter what matter we were working on.
6         In the end there were some documents drawn
7  up and what was unusual, I had to meet alone with an
8  attorney from the law division to meet with Jeff
9  McEwen to pretty much say this was inappropriate.
10  If you ever do it again, you know, you're gone. But
11  the message was primarily delivered by Jeff
12  Chambers. I think he used to be with them.
13     Q. So was any formal action taken against the
14  person who allegedly had made the racial comments?
15         MS. ROBERTSON: Object to the form of
16  the question. You can answer.
17         THE WITNESS: I believe, I don't know
18  for a fact, I believe I remember there may have been
19  a meeting with him, with the head of human resources
20  separately because he was in her management chain.
21  But I was not part of that meeting. So if anything
22  else came out of that, I wouldn't know.
23     Q. (By Mr. Bristol) Okay. Did you have

27

1  occasion to be involved in any other investigations
2  of racial conduct?
3         MS. ROBERTSON: I object to the form of
4  the question. You can answer.
5         THE WITNESS: Racial, yes. Well,
6  racial. Sexual harassment. I'm trying to think.
7  Specifically racial, I'm trying to think. No, not
8  that I am remembering right now in terms of racial
9  discrimination. I don't believe so.
10     Q. (By Mr. Bristol) Okay. Do you know if Mr.
11  McEwen is still with the company?
12     A. I'm assuming no because a couple of years
13  ago someone told me he was heading up a consulting
14  organization, but -- and when he left I don't know.
15     Q. So you have no firsthand knowledge of that?
16     A. No.
17     Q. During your involvement with HR did you
18  ever have occasion to see documents removed from a
19  file?
20         MS. ROBERTSON: I object to the form of
21  the question.
22         THE WITNESS: Have I seen documents
23  removed?

28

1     Q. (By Mr. Bristol) We can start there.
2     A. I haven't seen documents removed. I know
3  that in counselling managers, say if I wanted to see
4  a manager's work file to work with them, we would
5  certainly educate a manager on what should be the
6  content of an employee file. To say do I remember
7  specifically, I know that there had been one or two
8  occasions that I've said to someone, it is not
9  necessary to have this kind of thing in the file but
10  it was not anything discriminatory. It's just proper
11  order of an employee record.
12     Q. Did you ever hear of items being removed
13  from a file that may have been harmful to the
14  company?
15         MS. ROBERTSON: I object to the form of
16  the question.
17         THE WITNESS: Harmful to the company?
18  Well, not the removal. See, we had access to the
19  files and then EEO would have access to the files
20  and then the law division would have access to the
21  files to review. EEO wasn't, you know, that wasn't
22  regular. Actually let me back up. Let me correct
23  that.

29

1    EEO had access to the corporate records
2    but corporate couldn't have access to the EEO
3    records. That was the practice at the time. I
4    don't think it was anything that was in writing.
5    That's just what we did so there was a clear view on
6    things I think.
7    Law division would borrow files to
8    review but, you know, I wasn't monitoring either EEO
9    or law.
10    Q. (By Mr. Bristol) Okay. Were you familiar
11    with a practice whereby the law division would
12    remove documents from the file?
13    MS. ROBERTSON: I object to the form of
14    the question.
15    THE WITNESS: Say it again.
16    Q. (By Mr. Bristol) Were you familiar with
17    the practice whereby the law department would remove
18    documents from the file?
19    A. No.
20    MS. ROBERTSON: I would object to the
21    form of the question, but your answer may stand.
22    Q. (By Mr. Bristol) If a person were --
23    strike that.

30

1    If a person were involved in litigation
2    against MassMutual were you aware of any documents
3    being removed from their file at that point?
4    MS. ROBERTSON: I object to the form of
5    the question.
6    THE WITNESS: No, no.
7    Q. (By Mr. Bristol) Based on your earlier
8    answers I assume you were familiar with the process
9    of job elimination at MassMutual?
10    MS. ROBERTSON: Again I would object to
11    the form of the question, but you may answer,
12    Jeanette.
13    THE WITNESS: Yes.
14    Q. (By Mr. Bristol) Do you know what job
15    elimination was used to accomplish?
16    A. Can you restate that?
17    Q. Sure. Do you know why certain jobs were
18    eliminated at MassMutual?
19    MS. ROBERTSON: I'm going to object to
20    the form of the question. You can answer if you
21    can.
22    THE WITNESS: Re-organization,
23    obsolescence, duplication, wide variety, down

31

1    sizing.
2    Q. (By Mr. Bristol) Okay. Were you ever
3    familiar with job elimination being used as a
4    pretext to get rid of certain employees?
5    MS. ROBERTSON: I'm going to object to
6    the form of the question.
7    THE WITNESS: No. Not -- you mean --
8    do you mean that we don't want you here so we're
9    going to eliminate your job?
10    Q. (By Mr. Bristol) Exactly.
11    MS. ROBERTSON: I object to the form of
12    the question.
13    THE WITNESS: Do I have to answer that?
14    Q. (By Mr. Bristol) Yes, please.
15    MS. ROBERTSON: Again, I object to the
16    form of the question.
17    THE WITNESS: It's difficult for me to
18    answer from a personal standpoint because that's
19    just my perspective that we had -- you know, I can
20    only speak to my own perspective. What other
21    circumstances may exist, I don't know.
22    It was hard because we had so many
23    successes in IT HR. I think sometimes it's a matter

32

1    of perspective, you know. The company was going
2    through a lot of change at the time as well and I
3    think that a lot of people were -- there was a
4    package for people who qualified, an early out
5    package. Unfortunately, I wasn't old enough for
6    that.
7    I just think that a lot of people were
8    trying to realign to the new leadership. I think we
9    all go forward with the best of intentions, giving
10    our all and I certainly felt that I did that for the
11    company and would have liked to have seen a little
12    reaching out I guess. But I'm fine with that. It's
13    probably for the best.
14    Q. (By Mr. Bristol) When you say new
15    leadership, are you referencing any person or any
16    particular time?
17    A. Well, by the new leadership Bob O'Connell
18    was coming in. Tom Wheeler and John Pajak were
19    leaving. They had, I think it was an early
20    retirement. I don't know what they called it.
21    Sometimes there were different names of the early
22    retirement packages. So a lot of executive
23    management and senior leadership elected that

33

1 because it was a great deal as well as other people
2 within the company.
3    Q.  After the arrival of Mr. O'Connell I
4 believe it was, did the corporate environment begin
5 to change at MassMutual?
6        MS. ROBERTSON:  I object to the form of
7 the question.
8        THE WITNESS:  Yes.
9    Q.  (By Mr. Bristol)  Can you explain how it
10 changed?
11        MS. ROBERTSON:  Again, I object to the
12 form of the question.  Again you may answer.
13        THE WITNESS:  You know, part of it is
14 the anxiety of new leadership, what's going to
15 happen. There were people who were already familiar
16 with the company that he led prior to coming to
17 MassMutual, so there was anxiety about that in terms
18 of value. Value is what he valued as a leader.
19        At the same time I think there was, you
20 know, curiosity.  Fresh view is sometimes welcomed.
21 There were rumors about different things said which
22 I think caused some angst.
23    Q.  (By Mr. Bristol)  Can you tell me any of

34

1 those rumors?
2        MS. ROBERTSON:  Again, I object to the
3 form of the question.
4        THE WITNESS:  I wasn't witness to any
5 of those comments.  Some were, I understood, were
6 age related but it was rumor and I would not have
7 any firsthand knowledge.
8    Q.  (By Mr. Bristol)  Did you hear any rumor
9 about the treatment of African Americans?
10        MS. ROBERTSON:  I object to the form of
11 the question.
12        THE WITNESS:  No, no, not -- of course
13 I wasn't there that long afterwards, but no.  That
14 wouldn't be one that I would interact with.
15    Q.  (By Mr. Bristol)  After Mr. O'Connell's
16 arrival did you witness any changes in the treatment
17 of African Americans at MassMutual?
18        MS. ROBERTSON:  I object to the form of
19 the question.
20        THE WITNESS:  I wasn't privy or didn't
21 -- you know, I did my thing.  Of course, after he
22 came there wasn't much time before my job was
23 eliminated.  So my focus was not on what he was

35

1 doing.
2    Q.  (By Mr. Bristol)  Prior to his arrival had
3 you witnessed any disparate treatment of African
4 Americans?
5        MS. ROBERTSON:  I object to the form of
6 the question.
7        THE WITNESS:  Well, what I had shared
8 with you, the story of McEwen.
9    Q.  (By Mr. Bristol)  So was that the one
10 occasion of disparate treatment that you remember?
11        MS. ROBERTSON:  I object to the form of
12 the question.  You may answer.
13        THE WITNESS:  African Americans, yes.
14 Unless I'm forgetting something but that, you know,
15 certainly that was kind of a major problem.
16    Q.  (By Mr. Bristol)  During your time at
17 MassMutual did you hear of any racial slurs directed
18 at Isaac Williams?
19        MS. ROBERTSON:  I object to the form of
20 the question.
21        THE WITNESS:  No, no.
22        MR. BRISTOL:  Off the record.
23        (A recess was taken.)

36

1        MR. BRISTOL:  On the record.
2    Q.  (By Mr. Bristol)  Just a few more questions
3 and then you will be done.
4        As you sit here today you are not familiar
5 with any file cleansing that happened at MassMutual?
6        MS. ROBERTSON:  I object to the form of
7 the question.
8        THE WITNESS:  Our role in employee
9 relations was to advise managers on the content of
10 employee files.  We would use words -- say if you
11 were a manager I would say, you know, if I were
12 working with you, an employee, and say for instance
13 there was a newspaper article, I don't know,
14 something that's not appropriate for the file, I
15 would advise you on cleansing the file.  We would
16 use that word as well as the attorneys in the law
17 division who I'm sure trained me.
18        But it wasn't where someone came with
19 the complaint and me looking at the file, you know,
20 after being aware of the complaint and me removing
21 stuff from the file.  No, I would not do that.
22    Q.  (By Mr. Bristol)  Were you aware of that
23 ever occurring at MassMutual?

37

1     MS. ROBERTSON: I object to the form of
2  the question.
3     THE WITNESS: No, not unless somebody
4  told me or saw them do it. That's a big company but
5  no, I wasn't aware of that.
6     Q.  (By Mr. Bristol) So no one ever told you
7  that either?
8     A.  No. We would just educate on the cleansing
9  of the file but, you know, our approach was when we
10  were coaching managers who were learning, that was
11  just something we constantly preached just to make
12  sure that people understood what the content of an
13  employee record should be. The fact that they sold
14  the most Girl Scout cookies or might have gotten
15  arrested for drunken driving or something like that,
16  we use those as examples. You know, try to -- but
17  to my knowledge, you know, at least myself and my
18  team, knew how to coach people and educate them.
19     In fact, when I headed up employee
20  relations I did a training session for all of
21  employment services which included the recruiters on
22  the content of corporate CHR files because
23  recruiters wouldn't necessarily have had that

38

1  knowledge and they were accessing the files or job
2  posting candidates because things such as warnings
3  and probations may be contained in there which the
4  applicant might not have destroyed. They would
5  verify education and stuff like that.
6     Q.  But you were not familiar with any
7  documents being removed specifically because they
8  might be harmful to MassMutual?
9     MS. ROBERTSON: I object to the form of
10  the question. You may answer.
11     THE WITNESS: Not to my knowledge. At
12  some point it left, it leaves employee relations
13  hands if it goes to our outside council you know.
14  The internal are the liaison with the outside
15  council, so they would -- in many cases it would
16  just flip over to them. It was beyond our
17  expertise, our role, our job.
18     Q.  (By Mr. Bristol) After being, I believe
19  you said flipped over to outside council, were the
20  files ever returned to you?
21     MS. ROBERTSON: I object to the form of
22  the question.
23     THE WITNESS: Well, it was really our

39

1  inside council who we would let borrow the file.
2  They most often worked with outside council
3  directly. The occasion for, which would usually be
4  my role to be involved in a deposition, would come
5  up occasionally, but how much interaction on
6  specific cases between MassMutual and the outside, I
7  don't know.
8     Q.  (By Mr. Bristol) You used the term borrow.
9  You said that legal council would borrow the HR
10  files.
11     A.  Yes.
12     Q.  Were those files then returned to you after
13  legal council was through with them?
14     A.  Uh-huh.
15     Q.  In having those files returned to you did
16  you ever have occasion to notice documents that were
17  missing from those files?
18     MS. ROBERTSON: Again, I object to the
19  form of the question.
20     THE WITNESS: You know, you don't audit
21  files. We did not audit contents. We did not have
22  a check-in system. Nothing motivated us at the time
23  to make sure that everything was there because of

40

1  the working relationship that we had. We were all
2  on the same team. At least that was the way I
3  thought about it.
4     Q.  (By Mr. Bristol) With the understanding
5  that there was no categorical list of documents that
6  went to the legal department and when it was
7  returned it was checked back in by going through
8  every document, did you ever have occasion to notice
9  any documents missing?
10     A.  No.
11     Q.  Do you have any concerns or fears about
12  providing testimony in this case?
13     MS. ROBERTSON: I object to the form of
14  the question.
15     THE WITNESS: Yes and no. It's a lot
16  of confidential matters from my past life on cases
17  which, you know, is not in the most positive light.
18  It is what I did there and supported the company on
19  to the best of my ability. It's a small community.
20  I don't know the details of this and how my
21  participation, which I guess it's not elective, is
22  it?, is perceived. It's a small community. You
23  network with a lot of people to do what you have to

41

1  do. It's just disconcerting to have to think about
2  how this might impact.
3            I just wish everybody well and, you
4  know, I just prefer to keep a low profile. But I'm
5  not so sure that -- I'm not sure how it would be
6  perceived but I don't have -- whatever happens, I
7  have a choice of the matter and I'm not sure what I
8  say or don't say. I'm not privy to what you guys
9  are all working on, your interest individually and
10  separately. It's not a comfortable position to be
11  in. I mean I can certainly share with you in what I
12  have done in my roles and how I practice it.
13     Q.  (By Mr. Bristol) Can you, as you sit here
14  today, remember any actions that you have taken that
15  would have a negative impact on MassMutual in any
16  way?
17            MS. ROBERTSON: I object to the form of
18  that question.
19            THE WITNESS: Any actions that I took
20  at MassMutual?
21     Q.  (By Mr. Bristol) Yes.
22     A.  No, Nothing that I could do.
23            MR. BRISTOL: Off the record.

42

1            (Discussion held off record.)
2            MR. BRISTOL: On the record.
3            I have no further questions today.
4            MS. ROBERTSON: I just have a few
5  questions for you.
6
7       CROSS EXAMINATION BY MR. ROBERTSON
8     Q.  I believe you testified that your position
9  at MassMutual was eliminated in February of 2000, is
10  that correct?
11     A.  Yes.
12     Q.  Do you recall when you were notified that
13  your position was going to be eliminated?
14     A.  It was thirty or sixty days prior. There
15  were two separate meetings and then I was asked to
16  write up my job elimination memo. So I mean it was
17  like a period of a week or something.
18     Q.  So either thirty or sixty days before the
19  February date of elimination --
20     A.  Actually it was on my birthday.
21     Q.  That's too bad. Let me finish my question
22  before you answer; otherwise Virginia can't make a
23  good record.

43

1            I think my question was, so it was either
2  thirty or sixty days before your February
3  termination date?
4     A.  Yes.
5     Q.  That you were notified that your job would
6  be eliminated?
7     A.  Yes.
8     Q.  You said it was on your birthday?
9     A.  Yeah. I think, you know I guess the
10  document which we would give someone, that was the
11  date of it. Between the meetings and stuff, that
12  was the date it landed on.
13     Q.  What is the date, not necessarily the year
14  but the date?
15     A.  December 13th.
16     Q.  So on December 13th you were notified that
17  your position would be eliminated in February of
18  2000?
19     A.  Yes.
20     Q.  What did you use that period of time
21  between December and February, did you use that for
22  any purpose at MassMutual?
23     A.  Yeah. I networked around to the leadership

44

1  was changing so some people were new and the
2  organizations were changing, so I networked around
3  for opportunities with different leadership people.
4     Q.  Do you know whether your work unit in the
5  information systems organization was replaced after
6  your position was eliminated?
7     A.  They transferred the positions, as I think
8  I explained. They eliminated the one recruiter
9  because they had enough recruiters in corporate and
10  they moved a secretary down to corporate HR because
11  they had an opening down there.
12            In terms of -- so what was good was that
13  some people were able to transfer into other
14  positions, which at least I felt pretty good about
15  them not being displaced.
16     Q.  Did you have any reason to believe that
17  your position was relisted after you left, that
18  there was a comparable position in ISO after you
19  left?
20            MR. BRISTOL: I object to the form of
21  the question.
22            THE WITNESS: Part of the
23  responsibilities were -- part were absorbed by

45

1  financial administration within IT. Then the other
2  responsibilities that were HR related went to
3  corporate. Of course, the recruiting and stuff had
4  dropped by then.
5          And the technical training unit, I'm
6  not quite sure what they did with that or those
7  people to be honest with you, Because IT had always
8  had the technical training unit.
9      Q.  (By Ms. Robertson) So when you say some
10 responsibilities went down to corporate, was that
11 corporate human resources?
12     A.  Yes.
13         MS. ROBERTSON:  I don't have any
14 further questions.
15         MR. BRISTOL:  Just a couple.
16
17     REDIRECT EXAMINATION BY MR. BRISTOL
18     Q.  Do you feel your job was eliminated for
19 personal reasons?
20         MS. ROBERTSON:  I'm going to object to
21 the form of the question.
22         THE WITNESS:  Yes. And I would like to
23 qualify it. Personal business, there's, as I

46

1  mentioned before, there was no leadership. I think
2  people were trying to get on board with that. There
3  were some new directions being taken. I worked for
4  Peter Daboul, the CIO, and I took my direction from
5  him. And in terms of what was best for the
6  information technology organization and sometimes
7  there's a conflict between what corporate wants or
8  needs and, you know, what you are charged with. So
9  you are damned if you do or you're damned if you
10 don't.
11         While you could make a business case,
12 yeah, I think there was. But from a personal
13 standpoint, that's fine. I've had a great career,
14 you know, I was treated very, very well. I had some
15 great role models. If you're able to have great
16 role models and people with high integrity, those
17 are motivators. Things change.
18         I'm not being very clear, am I?
19     Q.  (By Mr. Bristol) Fine. Did you have
20 occasion to meet with anyone from Miss Robertson's
21 firm before today?
22     A.  Who?
23     Q.  Miss Robertson?

47

1      A.  No.
2          MR. BRISTOL:  I have nothing further.
3          MS. ROBERTSON:  I have nothing further.
4          THE WITNESS:  I do have to say that I
5  know David Park who I -- gee, I don't even know how
6  I met David. He's just a good friend.
7      Q.  (By Mr. Bristol) Did you have telephone
8  contact with anyone from their firm before today?
9      A.  Katy called to, you know -- well, I had met
10 Katy previously through work with Bulkley,
11 Richardson and Gelinas during my employment. It was
12 a while. So it was confirming today and, you know,
13 just, you know, why I was participating. So that's
14 the extent of our conversation.
15         MR. BRISTOL:  Thank you.
16         MS. ROBERTSON:  I have no further
17 questions.
18         (Witness excused.)
19         (Deposition concluded.)
20
21
22
23

48

1  COMMONWEALTH OF MASSACHUSETTS
   Hampden, ss
2
       I, M. VIRGINIA LANOU, a Notary Public
3  within and for the Commonwealth of Massachusetts at
   large, do hereby certify that I took the deposition
4  of JEANETTE JEZ, pursuant to the Massachusetts Rules
   of Civil Procedure on March 21, 2005, at the offices
5  of PHILBIN & ASSOCIATES, 959 Main Street,
   Springfield, Massachusetts.
6
       I further certify that the above-named
7  deponent was by me first duly sworn to testify to
   the truth, the whole truth and nothing but the truth
8  concerning her knowledge in the matter of the case
   of ISAAC WILLIAMS, JUNIOR versus MASSACHUSETTS
9  MUTUAL LIFE INSURANCE COMPANY, and DAVID L. BABSON &
   COMPANY, INC., now pending in the United States
10 District Court for the District of Massachusetts.
11     I further certify that the foregoing
   testimony was taken by me stenographically and
12 reduced to typewritten form under my direction by
   means of COMPUTER ASSISTED TRANSCRIPTION; and, I
13 further certify that said deposition is a true
   record of the testimony given by said witness.
14
       I further certify that I am neither counsel
15 for, related to, nor employed by any of the parties
   to the action in which this deposition was taken;
16 and further, that I am not a relative or employee of
   any attorney or counsel employed by the parties
17 hereto, nor financially or otherwise interested in
   the outcome of the action.
18
       WITNESS my hand and seal this 24th day of
19 March, 2005.
20         _____
           M. Virginia Lanou
21         Notary Public-Stenographer
22 My commission expires:
   March 3, 2006.
23