UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ISAAC WILLIAMS, JR.,<br>        Plaintiff | )<br>)<br>) |
| v. | ) CIVIL ACTION NO. 03-11470-MAP |
| MASSACHUSETTS MUTUAL LIFE<br>INSURANCE COMPANY (a/k/a<br>MASSMUTUAL FINANCIAL<br>GROUP) and DAVID L.<br>BABSON & COMPANY, INC.<br>(a/k/a DAVID L. BABSON AND<br>COMPANY),<br>        Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM REGARDING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 67 and 70)

February 20, 2007

PONSOR, D.J.

## I. INTRODUCTION

Plaintiff Isaac Williams, Jr., an African American male, brought this action against Defendants Massachusetts Mutual Life Insurance Company ("MassMutual") and David L. Babson & Company, Inc. ("Babson"), alleging discrimination on the basis of race.  Plaintiff contends that he was subjected to a hostile work environment and a constructive discharge in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, et seq. (Counts I-II); discrimination in the terms and conditions of his employment in violation of 42 U.S.C. §§ 1981, et seq. (Count III); and violation of Mass. Gen.

Laws ch. 151B §§ 1, et seq. (Count IV).[1]

Defendants filed a joint motion for summary judgment
(Dkt. No. 70), and Defendant MassMutual filed a separate
motion for summary judgment on independent grounds (Dkt. No.
67).  On September 29, 2006, in a short memorandum, the
court allowed Defendants' joint motion (Dkt. No. 70), in
part, and allowed the separate motion of MassMutual (Dkt.
No. 67) in its entirety.  This memorandum will set forth the
court's reasoning in more detail.

## II. FACTS

In considering a motion for summary judgment, the court
must view the evidence in the light most favorable to the
nonmoving party.  Viewing the evidence in this manner, the
pertinent facts are as follows.

A.  MassMutual Hiring and Transfer to Babson.

In February 1998, Plaintiff was hired as a Second Vice
President in the MassMutual Investment Management Division.
In his 1999 Performance Evaluation, Plaintiff received
excellent scores in eleven of twelve categories and was
awarded a bonus of $40,000.

At some point in 2000, Babson merged with the Investment

---

[1] Plaintiff also asserted a claim for negligent and
intentional infliction of emotional distress (Count V) but has
agreed that this count should be dismissed.

Group at MassMutual, and Plaintiff became a Babson employee.
Initially, Plaintiff worked in Babson's Springfield office
and reported to Kevin McClintock, an employee in the
Cambridge office.  McClintock informed Plaintiff that he was
doing a great job, was well-liked, and had a bright future
with Babson.

B.  <u>Plaintiff's New Supervisor</u>.

 In October 2000, Plaintiff assumed a newly created
position, Director of Corporate Communications, for Babson,
reporting to another Cambridge employee, Edward Bickford,
Director of Client Services.  Plaintiff met with Bickford
face-to-face once or twice a month on average and
communicated with him by phone almost daily.

Plaintiff's new position included responsibility over a
range of external and internal communications.  Bickford
provided Plaintiff with no training or general guidance for
this new position.  Bickford could also not recall whether
he had ever given Plaintiff written guidelines setting forth
job expectations.  Under Bickford's supervision, Plaintiff
contends that he received different treatment from other
employees, including harsher and more persistent criticism.
Defendants note that Plaintiff failed to name any
individuals whom Bickford had treated differently from
Plaintiff, but the clear implication of Plaintiff's

-3-

deposition testimony is that he felt Bickford treated all other employees in the largely white workforce differently.

Throughout their work relationship, Bickford called Plaintiff "boy" between twenty-five and fifty times.  The first such incident occurred shortly after Plaintiff began to work for Bickford, when Plaintiff completed a project and Bickford said, "That's a good boy."  In his deposition, Bickford stated that he could not specifically recall whether he had ever called Williams or any other employee "boy," but he agreed that it was possible.

Plaintiff never confronted Bickford over his use of the term.  Plaintiff stated that when he raised more minor problems with Bickford, Bickford would become defensive, condescending, and angry.  Plaintiff was concerned that if he confronted Bickford over the use of this demeaning term, Bickford might find a way to fire him.

Plaintiff did, however, mention Bickford's comments to several co-workers, including, in March 2002, Susan Moore, Human Resources Consultant at MassMutual.  In her deposition, Moore stated that she was aware that the term "boy" could be seen as a racial slur in a certain context. She stated, however, that she did not understand the remark to have any racial overtones when used by Bickford towards Plaintiff.

C. <u>Negative Performance Reviews</u>.

Bickford first gave Plaintiff a formal evaluation in early 2001; at the time of this review, Plaintiff had only been working for Bickford for ten to twelve weeks. Bickford could not recall whether, in preparing this review, he had solicited input from anyone else who had supervised Plaintiff in 2000. He also could not recall whether he had communicated his evaluation criteria to Plaintiff ahead of time. Bickford evaluated Plaintiff in five performance areas, using a form he had designed, rather than the standard corporate form. Bickford gave Plaintiff two "below average" marks, two "meets expectations" marks, and one "outstanding" mark.

Plaintiff challenged the results of this evaluation in light of the fact that Plaintiff had only reported to Bickford for a short period of time in 2000, and had only met with Bickford three times since then. Plaintiff was surprised to learn that he had become a below average employee in only a month and a half, when for the majority of 2000 he had received positive verbal feedback from supervisors. In spite of the rather poor evaluation, Plaintiff received a salary increase and bonus of $45,000. After the negative evaluation, Bickford provided no guidance as to ways Plaintiff could improve.

Bickford next evaluated Plaintiff in January, 2002. This evaluation was far worse than the first. Bickford sent the evaluation form to Plaintiff for review prior to their meeting. All five of Plaintiff's scores were below average; in two areas, Bickford found that substantial improvement was needed. Plaintiff was upset with the scores and contacted Bickford to discuss his assessment. In response to Plaintiff's objections, Bickford modified the scores, so that Plaintiff ultimately received two "meets expectations" scores and three lower marks. When Plaintiff indicated his continued disagreement, Bickford merely responded, "It is what it is." (Williams Dep. 202:6-8.)

After this performance review, Plaintiff initially was not designated to receive a bonus for that year. Plaintiff contacted the Human Resources Department to inform them that he felt the evaluation was unfair. In an internal Human Resources e-mail, one employee noted to another that she was "surprised" to hear about Plaintiff's poor review. In the end, Plaintiff did receive a $15,000 bonus.

D.  Elimination of Plaintiff's Job Position.

One month after the second evaluation, in early February 2002, a decision was made to eliminate Plaintiff's position from the company. Defendants contend that this decision was made by McClintock, a managing director of Babson, and

-6-

Stuart Reese, Chief Executive Officer of Babson.  Reese
indicated that Babson needed to develop further before it
had a need for communications with the outside world, and
that as a result, the company had no place for an individual
with Plaintiff's primary job functions.  At deposition,
Babson's corporate representative, pursuant to Fed. R. Civ.
P. 30(b)(6), confirmed that the decision to eliminate
Plaintiff's job would have been taken by Reese and
McClintock, although she noted that she had no specific
knowledge of where the decision in fact originated.

     Plaintiff pointed out the weaknesses in Babson's account
of the provenance of the decision to eliminate his job.
First, Reese himself testified that he could not recall
whether he had been involved in the decision to eliminate
Plaintiff's job.  McClintock provided no testimony or
affidavit of any kind.  On the other hand, Bickford
testified that "[w]e felt Mr. Williams was not performing to
the level we wanted him to perform and that coincided with
the reason for eliminating the position altogether."
(Bickford Dep. 186:14-189:5.)  Somewhat inconsistently,
Bickford also testified that he was not involved in the
decision or aware of the reasons for the job elimination.
In light of this conflicting evidence, a reasonable jury
could conclude that Bickford –- the party who referred to

Plaintiff repeatedly as "boy," who had offered him no guidance, and who had given him inexplicable low evaluations -- played a significant role in the decision to eliminate Plaintiff's position. Moreover, a jury could find that the decision to eliminate the position was based significantly on Bickford's unfair assessment of Plaintiff's performance and not on a conclusion that his job duties were superfluous.

On or about March 13, 2002, Plaintiff was notified by Reese that his position was being eliminated. Although Babson's standard practice was to give an employee sixty-days notice when eliminating a position, the company decided to provide Plaintiff four to six months notice. During this time it was intended that he report to Reese and work on special projects while seeking other employment either within MassMutual or outside the company. Executives also discussed the possibility of persuading Plaintiff to take an Assistant Vice President position, a demotion from his existing position.

E.   The University of Virginia ("UVA") Incident.

Shortly before the notification of his job elimination, around February 26, 2002, Plaintiff visited UVA as a representative of Babson and MassMutual to interview potential applicants for employment and to be a guest

-8-

speaker in a class that MassMutual sponsored.  On March 27,
2002, Caroline Mandeville, a College Relations Manager for
MassMutual, received a phone call from James McBride, a
member of UVA's career services organization, who informed
Mandeville that the university had received a complaint from
a student regarding Plaintiff's inappropriate
communications.  McBride emphatically stated that Plaintiff
should never return to UVA and demanded a letter of apology.
McBride also provided Mandeville copies of e-mails from
Plaintiff to the student and a memorandum summarizing
telephone calls Plaintiff allegedly made to the student.
The summary shows that Plaintiff requested the student's
phone number, then asked to meet her, and finally asked her
to e-mail him a photo of herself.  After the student sent
Plaintiff an e-mail demanding that all future communications
cease, Plaintiff responded by apologizing for the
misunderstanding.

On April 26, 2002, Plaintiff met with two MassMutual
employees, Larry Port and Susan Moore, to discuss the UVA
allegations.  Plaintiff explained that his contact with the
student was not as it had been portrayed, then apologized
and noted that he had not intended to offend anyone.

While this incident may not present Plaintiff, in a
jury's eyes, in a particularly flattering light, Plaintiff

contends that a jury might also find that the episode was blown out of proportion to pressure him to resign.  While it is a stretch, in the Rule 56 context the court must presume that a jury might view the incident in this light.

F.  <u>Medical Disability</u>.

On April 29, 2002, Plaintiff saw his doctor and reported the stress he was experiencing at work.  As a result, the doctor placed Plaintiff on immediate medical leave.

Under Babson's short-term disability program, an employee who is unable to perform his or her job because of a physical or mental impairment is entitled to a percentage of his salary up to six months.  If the employee remains unable to perform his job after six months, he may be eligible for long-term disability benefits; when he is approved for such benefits, his status as a Babson employee ends.  In keeping with the terms of the policy, Plaintiff's employment was terminated on December 13, 2002, when he was approved for long-term disability benefits.

A jury could find that Plaintiff's job duties were not eliminated after this termination but were shifted to other employees.  A new Director of Corporate Communications was hired in January 2004, slightly over a year after Plaintiff's termination.

### III.  <u>MASSMUTUAL'S MOTION FOR SUMMARY JUDGMENT</u>

MassMutual has moved separately for summary judgment on Counts I through IV, arguing that because it was not Plaintiff's employer, it could not be liable to Plaintiff under any theory.

A review of the uncontested facts regarding the relationship between Babson and MassMutual in light of the controlling law confirms the force of MassMutual's argument.[2]

A. <u>Facts</u>.

MassMutual acquired Babson in 1995, at which time Babson became an indirect majority-owned subsidiary of MassMutual. Babson and MassMutual had separate and distinct businesses and presented themselves to regulators, clients and prospective clients as separate and distinct entities. Under the terms of a service agreement between Babson and

_____

[2] Plaintiff raises a general objection to most of the facts set forth by MassMutual, noting that they describe present practices and do not speak to the conditions at the time of his termination.  Plaintiff also contends that the affidavit of James Masur, which serves as the basis for most of the information about corporate structure, does not meet the requirements of Fed.R.Civ.P. 56(e), because it fails to state that the facts presented represent personal knowledge.  Instead, Masur notes that the "affidavit was prepared in conjunction with counsel to establish certain facts relevant to" the present motion.

While the facts should, of course, be viewed in the light most favorable to the nonmoving party, Plaintiff provides very little alternate information about the relevant corporate structures. Therefore, the court will use MassMutual's version of those facts as a useful background for the discussion that follows.

MassMutual, Babson managed MassMutual's investments.  Babson staffed and maintained its own finance department, and its bank accounts were at no time commingled with those of MassMutual.  MassMutual ran Babson's payroll, but no other overlap existed between their financial operations.

Both companies operated in separate locations with different employees. Babson was (and is) a solvent entity capable of meeting its financial obligations, including any judgment in this case.  Most of Babson's written human resources policies were consistent with human resources policies that applied to MassMutual employees.  MassMutual, however, had very limited participation in the human resource process at Babson or in the management of Babson's approximately six hundred employees.  Babson did not rely on MassMutual's recruiting staff to assist in filling open positions at Babson, and MassMutual did not participate in Babson's decisions about salary increases, bonus awards, assignments of duties and responsibilities, employee discipline, or employment terminations.  Babson's employees were free to interview for open positions at MassMutual if they wished, but there was no interchange of employees in the performance of the companies' normal operations.

Under a service agreement between Babson and MassMutual, effective January 1, 2000, Babson could, but was not

-12-

required to, ask for MassMutual's assistance with certain
personnel management services, including assistance with
employee relations and equal employment opportunity support.
At all relevant times, Nancy Roberts was employed in the
Human Resources Department at MassMutual, and at the time of
Plaintiff's termination held the title Vice President of
Corporate Human Resources.  Susan Moore was employed as a
Human Resources Consultant at MassMutual until she switched
to Babson in April 2002.  Susan Moore was identified as an
individual to whom Babson employees should address concerns
about alleged unfair, discriminatory, or harassing
treatment.  In February 2002, Moore and Roberts (then both
at MassMutual), exchanged e-mails discussing the
circumstances surrounding the elimination of Plaintiff's
position at Babson.

B.   Discussion.

     The First Circuit's decision in Romano v. U-Haul Int'l,
233 F.3d 655 (1st Cir. 2000), provides a helpful overview of
the forms of analysis applicable when an employment-related
claim is pressed against two related corporations.  The
court noted that it had previously recognized three methods
"for determining whether a single employer exists under
Title VII: the integrated-enterprise test, the corporate law
'sham' test, and the agency test."  Id. at 665.

-13-

Neither party in this case suggests that the "sham" test applies; MassMutual prefers the agency test, while Plaintiff contends that the integrated-enterprise test should govern. Application of either test is fatal to Plaintiff's claim.

Under the agency test, a parent company cannot be held liable for its subsidiary's alleged misdeeds unless there is "strong and robust evidence of parental control over the subsidiary, rendering the latter a mere shell." De Castro v. Sanifill, Inc., 198 F.3d 282, 284 (1st Cir. 1999) (quoting Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st Cir. 1980)). The mere use of common human resources employees by Plaintiff's employer Babson and its corporate parent MassMutual, particularly where these employees did not participate in any way in the decision-making process leading to Plaintiff's separation from the company, does not evidence anything remotely approaching the level of control needed to justify imposing liability on MassMutual. This modest overlap of personnel, the only significant evidence in the record of any level of coordinated corporate operations, is far from the strong and robust evidence required by the First Circuit under the agency test.

Plaintiff, as noted, fares no better under the integrated-enterprise test. Under this rubric, the court

-14-

must examine four factors: (1) interrelation of operations;
(2) common management; (3) centralized control of labor
relations, and (4) common ownership.  Romano, 233 F.3d at
664.  The Court of Appeals will apply these factors flexibly
looking at the parent's participation in the "total
employment process."  Id.  Here, Babson exercised complete
control over the employment process in relation to
Plaintiff; MassMutual had no role whatsoever.  The fact that
overlapping employees may have had a role in consulting with
Plaintiff to assist him in finding new employment, or may
have generally been available for inquiries or complaints
about job discrimination, cannot make MassMutual liable for
an allegedly discriminatory decision that, if made at all,
was made solely by Babson employees.  See Mas Marques v.
Digital Equip. Corp., 637 F.2d 24, 27 n.4 (1st Cir. 1980)
(parent corporation's willingness to investigate plaintiff's
complaint not sufficient to hold parent liable for alleged
discrimination by subsidiary).

     In sum, under any applicable test the facts of record
simply will not support any claim that MassMutual may be
held liable for injuries suffered by Plaintiff as a result
of Babson's alleged discrimination.

### IV.  BABSON'S MOTION FOR SUMMARY JUDGMENT

     Babson argues that both the federal and state statutory

-15-

claims were filed outside the applicable statutes of limitation.  Defendant is incorrect as to the federal claims, but correct as to Plaintiff's state law claim.

Pursuant to 48 U.S.C. § 2000e-5, a plaintiff in Massachusetts, a so-called deferral state, must file his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within three hundred days of the alleged unlawful employment practice.  Plaintiff filed his charge of discrimination with the EEOC on December 10, 2002; therefore, at least one discriminatory act must have been committed by Defendant on or after February 13, 2002.

As the factual recitation above indicates, it is undisputed that Plaintiff received notice of his job elimination in March of 2002 and was exposed to the investigation into his allegedly inappropriate contact with a student in April of 2002.  A reasonable jury could find that these acts within the limitations period were linked to the abuse (e.g., repeated use of the term "boy") and the poor performance appraisals that occurred earlier.  Given this, Plaintiff's claims under federal law for a hostile work environment and constructive discharge are timely.

The state law claim, however, carries a six-month statute of limitations.  Given the date of the administrative filing, Defendant Babson can be liable under

-16-

state law only for acts that occurred on or after June 10, 2002. Since it is undisputed that Plaintiff left the workplace permanently on April 29, 2002, his claim under state law is outside the limitations period.[3] <u>See</u> <u>Cummings v. Pearson Education, Inc.</u>, No. 03-12183-DPW, 2004 WL 2830702, at *4 (D. Mass. Dec. 6, 2004)(Ch. 151B 6-month statute of limitations requirement had to be met upon filing with EEOC). The court's analysis to this point leaves three substantive counts remaining against Defendant Babson: Count I (hostile work environment under Title VII); Count II (discriminatory discharge under Title VII), and Count III (employment discrimination based on race in violation of 42 U.S.C. § 1981).

Lengthy discussion with regard to these counts is unnecessary. As has been frequently noted, the first criterion of the well-known three-part analysis in an employment discrimination case -- demonstration of a <u>prima facie</u> case -- is not difficult to make out. A jury would

---

[3] Plaintiff's attempt to cite <u>Seery v. Biogen, Inc.</u>, 230 F. Supp. 2d 35 (D. Mass. 2002), in support of his claim that the state law cause of action was timely, is unpersuasive. That case involved two statutes carrying a 300-day statute of limitations, and the court held that the filing with the federal agency satisfied the administrative filing requirement for the state law claim. While a filing with a federal administrative agency can save a state law claim if the federal filing is made within the limitations period, the federal filing cannot <u>extend</u> the limitations period beyond the state law limit.

have no difficulty on these facts finding that Plaintiff was
a member of a protected class, that he performed his work
satisfactorily, that he was terminated, and that his
employer did not treat him race-neutrally in making the
termination decision. <u>Lewis v. City of Boston</u>, 321 F.3d
207, 204 (1st Cir. 2003).[4]


It is equally clear that Defendant here has offered a
legitimate, non-discriminatory reason for its employment
decision. Defendant contends that the decision to eliminate
Plaintiff's position was made in early 2002 by two
employees, Reese and McClintock, as to whom there is no
evidence of any racially discriminatory motive. Some
external evidence (<u>e.g.</u>, the contemporaneous termination by
Babson of its relationship with its outside public relations
firm) offers objective support for Defendant's position.

As to the third stage, it is well established that
Plaintiff must "present sufficient evidence to show both
that the employer's articulated reason . . . is a pretext

---

[4] In reaching this conclusion, the court must note that
Plaintiff's case may not be the strongest in the world.
Certainly, there is sufficient contrary evidence both on the
issue of whether Plaintiff was formally terminated and on
whether his treatment was race-neutral. However, the purpose
of the court's analysis at the Rule 56 stage is not to weigh
the evidence, but simply to determine whether there is
sufficient evidence, however slim, to take this case to the
jury.

and that the true reason is discriminatory." <u>Thomas v.
Eastern Kodak</u>, 183 F.3d 38, 56 (1st Cir. 1999)(internal
citations omitted).  The evidence recited above would
justify a jury in concluding that, in fact, Plaintiff
suffered a termination, not the elimination of his job,
following a course of conduct under his supervisor Bickford
that created a racially-hostile work environment.  As noted
above, the features of this environment were the absence of
any guidance or supervision of Plaintiff, the use of
racially demeaning language, the sudden and inexplicable
collapse of Plaintiff's previously outstanding work
evaluations, the overblown reaction to the UVA incident, and
the ambiguous evidence as to whether Plaintiff's position
was truly eliminated and, if so, by whom.  While this
evidence may be thin, and while powerful evidence may exist
to controvert it at trial, Plaintiff is entitled to his day
in court.[5]

    As noted in the court's Summary Order of September 29,
2006, Defendant Babson is entitled to summary judgment on

_____

    [5] The evidence supporting the denial of summary judgment
on the Title VII claims makes the same ruling the § 1981 claim.
As the First Circuit has noted, the language in § 1981
essentially tracks the Title VII language.  <u>Danco, Inc. v. Wal-
Mart Stores, Inc.</u>, 178 F.3d 8, 13 (1st Cir. 1999); <u>see</u> <u>also</u> <u>El-
Haken v. BJY, Inc.</u>, 415 F.3d 1068, 1073 (9th Cir. 2005)("It is
also correct that this standard applies to the  § 1981 claim
at issue in this case, because we evaluate § 1981 claims the
same as we do Title VII claims.").

one aspect of the claims asserted by Plaintiff in Counts I,
II and III, the claim for "constructive discharge."  In
order to avoid summary judgment on this aspect of his claim,
Plaintiff must be able to point to evidence of working
conditions so intolerable "that a reasonable person would
feel compelled to forsake his job rather than to submit to
looming indignities." Landrau-Romero v. Banco Popular de
Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000) quoting Simas
v. First Citizens' Fed. Credit Union, 170 F.3d 37, 46 (1st
Cir. 1999)).  Moreover, in order to make out a claim on this
theory, Plaintiff is entitled to resign within a reasonable
period after exposure to the intolerable working conditions.
Id.  Although the facts in this case may be sufficient to
make out a claim of a hostile environment, the threshold for
this showing is less than that required to demonstrate
constructive discharge.  See Hernandez-Torres v. Intercont'l
Trading, Inc., 158 F.3d 43, 48 (1st Cir. 1998).  Here, even
viewing the facts in the light most favorable to Plaintiff,
his working conditions simply failed to reach the threshold
required to support a claim for constructive discharge.
Moreover, the record lacks evidence of an adequate temporal
link between the alleged intolerable working conditions and
Plaintiff's departure.  For these reasons, while Plaintiff
may pursue a claim that he suffered a racially-motivated

-20-

termination (pretextually choreographed to look like a job elimination), and suffered from a racially-hostile work environment, he may not claim that he was constructively discharged.

### V. CONCLUSION

For the foregoing reasons, the court has DENIED the Motion for Summary Judgment offered by Defendant Babson on Counts I through III, with the exception of any claim for constructive discharge.  MassMutual's separate Motion for Summary Judgment has been ALLOWED.  The Motion for Summary Judgment on Count IV has been ALLOWED, based upon Plaintiff's failure to file a timely administrative charge. Count V has been dismissed by agreement.

The court understands that this case is now in mediation with Magistrate Judge Dein.  In the event that mediation is unsuccessful, the case will proceed to trial on May 14, 2007.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U.S. District Judge

-21-